UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:18-cr-131-Orl-41LRH

DEEPAK DESHPANDE

### UNITED STATES' SENTENCING MEMORANDUM

*"What guys have you is for a f\*\*\*[.]  You are a piece of meat that's good to f\*\*\* and throw."*

*"No one gets such a damning shot at life at 16.  Only a few lucky ones do.  But you will be an example of how to ruin it all[.]  Go end it and die.  Do whatever[.]"*

The defendant texted these messages and others like them to his 16-year-old victim in the midst of a nearly year-long scheme to extort and induce her to produce hundreds of images of child pornography for him.  During the scheme, he assumed three different identities ("Devin," "Nick," and "Roger").  He pitted them against each other to repeatedly lure the victim into meeting him in person so he could sexually assault her and film the assaults for his own gratification.  But even after the defendant was arrested, he wouldn't leave the victim alone.  The girl whom he had previously cast as "a piece of meat that's good to f\*\*\* and throw" had become a key witness in the case against him—so as the defendant's trial loomed, he attempted to recruit others to kidnap and kill her.

The defendant's offense level is 48 and his Guidelines range is life. In light of the grave and violent offenses committed by the defendant, and his history and characteristics, a life sentence in this case will achieve the purposes of sentencing because it will reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect children from further crimes of the defendant.

## **BACKGROUND**

The defendant is a dangerous sexual predator. To those who knew him as Deepak Deshpande, he was a husband, a father of two young children, and a senior software security engineer who earned a six-digit salary at a California tech company. (Doc. 58 (Pre-Sentence Report, or "PSR") ¶¶ 99, 109-111.) But through the years, the defendant assumed multiple identities in his secret, other life—the life in which he posed as an agent and photographer for Britemodels, a sham modeling agency. (*Id.* ¶¶ 52-54.)

Using his superior computer skills, the defendant created an elaborate façade for Britemodels to make it appear legitimate. He engineered a Britemodels website that set forth an extensive portfolio and description of the agency, including its supposed track record of launching the careers of thousands of modeling professionals. (*See* Exs. 1, 2[1]; PSR ¶¶ 16-19.) He also

---

[1] These copies of the "Belle" and "Become a Model" sections of the Britemodels website were printed during the course of the investigation. Because the text is cut off at the right

created Britemodels email accounts, and corresponded with girls who were seeking modeling opportunities. (PSR ¶ 53.)

Under the guise of this false exterior, the defendant hunted for his prey: young girls who dreamed of becoming models. The child victim (CV) was 16 years old when she voiced interest in becoming a model through a post on Whisper, a social media application. The defendant—posing as a Britemodels agent named "Devin"—reached out to her. (PSR ¶¶ 16-17.)

Even though CV told the defendant that she was only 16 years old, he dangled the prospect of modeling success as a carrot, and convinced her to send pornographic photographs of herself to him, claiming that he would help advance her career. (*Id.* ¶¶ 16, 20.) In the weeks that followed, the defendant induced CV to produce and send additional pornographic images of herself on a near-daily basis. In total, the defendant received several hundred such images from CV during that period. (*Id.* ¶ 20.)

Thereafter, the defendant posed as a different modeling agent named "Nick Cuban," who claimed to know "Devin." (*Id.* ¶ 21.) As "Nick," the defendant reached out to CV and capitalized on CV's frustration with "Devin's" lack of progress in securing a modeling job (a problem which he himself created). (*Id.* ¶¶ 21-22.) He then convinced CV to send additional

---

margin, the undersigned recently attempted to obtain full-text printouts, but the website is no longer available.

nude photos of herself to "Nick" instead, on the promise that "Nick" would help her in a way that "Devin" had failed to. (*Id.* ¶ 21.)

The defendant—who controlled both the "Devin" and "Nick" personas—then began to control CV through extortion. As "Nick," the defendant threatened to tell "Devin" that CV had been disloyal by sending nude photographs to another modeling agent. He used that threat to compel CV to tell "Devin" a bizarre web of lies about a (non-existent) boyfriend who was blackmailing her with a (non-existent) sex tape. The defendant then made CV believe that she had to help create that blackmail material by making a sex tape with him. (*Id.* ¶ 22.)

At some point, the defendant assumed a third identity and reached out to CV as "Roger." (*Id.* ¶ 23.) As "Roger," the defendant bullied CV into complying with "Nick's" perpetual demands that CV continue to produce and send hundreds (if not thousands) of pornographic images of herself. (*Id.* ¶ 27.) "Roger" also manipulated CV into believing that she had to continue making sex tapes with "Nick." Between September 2017 and April 2018, the defendant (as "Nick") traveled to Orlando at least four times to meet CV in person. During those visits, the defendant gave CV alcohol and drugs, and he sexually assaulted her over and over as he videotaped the assaults. At times, the defendant handcuffed and blindfolded CV, and penetrated her with sex

toys. He did not use condoms, and dismissed CV's concerns about contracting a sexually transmitted disease. (*Id.* ¶¶ 25-27, 30.) In addition, he had CV take emergency contraceptive pills.

CV tried to free herself from the defendant's tri-hold grip. But through trickery and extortion, the defendant had amassed a vast collection of pornographic photographs of CV, and he threatened to leak those photographs to her family, friends, and classmates. As shown in one surviving thread of text messages gleaned from screenshots that CV had saved on her phone, the defendant taunted and browbeat CV into submission. (*See* Ex. 3.[2])

The defendant repeatedly called her a "whore" and a "b****," and blamed her for the situation she was in. (Ex. 3 at 0641-0645, 0649, 0657, 0663, 0678, 0689, 0693.) When CV expressed her feelings of helplessness and being trapped, the defendant heaped insults on her, saying, "You are shit," and telling her, "This ends never. This will haunt you throughout your life." (*Id*. at 0646-0653.) CV replied that she was at an emotional breaking point,

---

[2] This exhibit has been redacted to protect CV's identity. The white bubbles on the left contain the defendant's texts. Even though the header says "Nick Cuban," the defendant was posing as "Roger" in these text messages; he had changed his username to "Nick Cuban" at the time to mock CV for comparing "Nick" to "Roger." The black rectangles next to the defendant's white bubbles are redacted profile pictures; the defendant used a photograph of CV's face as his profile picture for "Roger." The purple bubbles on the left contain CV's texts. The texts on pages 0654-0656 of Exhibit 3 are screenshots that "Roger" sent to CV. Those screenshots contain text messages between "Nick" (in white bubbles) and "Roger" (in blue bubbles). The name of CV's high school was redacted on pages 0664, 0667, and 0675. The names of several friends of CV are redacted on page 0666. CV's first name is redacted on page 0693.

and threatened to end her own life.  The defendant flippantly countered, "No one gets such a damning shot at life at 16.  Only a few lucky ones do.  But you will be an example of how to ruin it all[.]  Go end it and die.  Do whatever." (*Id.* at 0653.)

When CV remained silent for a time after, the defendant threatened to publish his entire stash of her pornographic images in order to keep her on his short leash.  (*Id*. at 0657.)  CV responded with a plaintive plea for mercy:

> You make me want to die…I can't handle the heat anymore.  I have a broken spirit.  I want to be left alone so badly and just have my old life back. . . .
>
> It's f***king hard to stay strong. Especially when you have to do things again and again and again.  It's mentally destroying me and I'm literally physically deteriorating me.
>
> I don't want to do this anymore.  I don't want to sleep with Nick once more.  I hate it.  I hate it all to the fullest extent.  Yet I've been smiling through the pain for the past 10 months. . . .
>
> All I want to do is be a teenager again.  You're taking that from me.  Along with my confidence, strength and pride.  You're killing me. . . .
>
> You and Nick will surely blame me for yet another fallout.  But this is just what happens when one can't handle the heat.  You don't like facing this.  Maybe because it's true.  But, I'm 16.  Not 20.  Not 36.  Not 45.  Not 50.  Not yet.  My actions only correlate to my age.

(*Id.* at 0657-0662.)

The defendant's retort was venomous and vengeful. He vowed to release CV's nude photographs to her high school classmates through Instagram and stated that her entire school would come to see her. "Some will hate it," he wrote, "but they will still watch your nudes and wait to f*** you when they get a chance." The defendant also threatened to involve CV's mother, stepfather, and siblings, so that she would "watch the whole life break down on you right in front of your eyes for what you've done to me." (*Id.* 0662-0667, 0675, 0680, 0689.)

In May 2018, the Federal Bureau of Investigation (FBI) received a tip concerning CV and arrested the defendant following an undercover investigation. (PSR ¶¶ 31-51.) The defendant was charged with receipt of child pornography, production of child pornography, and enticement of a minor (both attempted and actual). (*Id.* ¶¶ 2-5.) On October 29, 2018, the defendant eventually pled guilty to production of child pornography and enticement. (*Id.* ¶ 7.)

For months before the plea, however, the defendant attempted to recruit others to kidnap and kill CV. He befriended a fellow inmate ("Doe") whom he believed would soon be released, and set up Doe to serve as a middleman. The defendant gave Doe names and contact information for individuals who might be willing to carry out the abduction and murder, and provided

instructions on how to log into a Virtual Private Network (VPN) so that the defendant's plans and Doe's communications would remain clandestine. The defendant also furnished personal details concerning CV and her mother, including their full names and address, a hand-drawn map to their home, and observations about CV's schedule. The defendant also tried to make a significant sum of money available to fund his sinister operation.

Upon learning of the defendant's plot, the FBI began an undercover investigation. With Doe's assistance, the FBI gave the defendant contact information for a fictitious hitman willing to kidnap and kill the victim for him. The defendant recruited a different inmate to contact the fictitious hitman several times, in coded language, to further his murderous plan.

## ARGUMENT

### A. The Nature and Circumstances of the Offenses

The nature, circumstances, and extent of the defendant's criminal offenses are extremely serious and militate in favor of a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1).

CV was 16 years old when the defendant first sought her out. Even after learning of CV's age, however, the defendant persisted in ensnaring and sexually exploiting her. Indeed, he capitalized on her youth, naivety, and her dreams of becoming a model.

In the guise of a well-connected modeling agent, the defendant convinced CV to send pornographic images of herself to further her budding career.  But then quickly, one by one, the defendant fabricated various iterations of himself and surrounded CV with manipulators named "Devin," "Nick," and "Roger," until she felt trapped with nowhere to go.

And once the defendant had his full grip on CV, he was merciless.  The defendant extorted CV into believing she had no choice but to allow the defendant to come to Orlando, take her to a hotel, and sexually assault her, again and again—all while filming his exploits for his own sexual gratification.  In addition, between his visits to Orlando, the defendant made CV believe she had to keep creating and sending him a steady stream of pornographic images of herself.

Moreover, the defendant's abuse was not only physical, it was also emotional.  Over the course of ten months, he steadily broke CV down to the point where she contemplated taking her own life, as that was the only means of escape she could envision.

Finally, as the defendant was awaiting trial, he obstructed justice by attempting to recruit people to kidnap and murder CV.  He identified people who might be willing to assist with the murder.  He gave details about CV, including where she could be found, and when.  He represented that he had a

sizeable sum of cash to fund the plot. He provided a means to communicate in secret about the scheme. When he learned about a hitman willing to do the job (who, unbeknownst to the defendant, was actually an undercover FBI agent), he engaged with that individual several times, with the assistance of another inmate.

In the end, the defendant's plans fell apart, largely because the inmate he initially trusted with this plot wanted no part in the murder of a child. But what if that hadn't been the case? And what if the would-be hitman had not been fictitious?

The defendant jeopardized CV's welfare and life in committing his offenses and attempting to evade a just prosecution. A Guidelines sentence of life is necessary in this case to adequately reflect the seriousness of the defendant's offenses, particularly because "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009).

B.    The History and Characteristics of the Defendant

The defendant's history and characteristics, if significant at all, are aggravating factors that weigh in favor of a high-end guidelines sentence. 18 U.S.C. § 3553(a)(1).

The defendant is a 41-year-old man who was born into an intact family within the highest social caste of his culture. (PSR ¶¶ 96-97.) Although his economic circumstances in childhood may have been challenging, the defendant enjoyed the opportunity to obtain higher education—including a master's degree from Northwestern University. (*Id.* ¶¶ 97, 106.) He was gainfully employed throughout his adult life and earned sufficient income to afford a million-dollar home. (*Id.* ¶¶ 109-111.) At the time of his offenses, he was married and lived with his wife and two young daughters. (*Id.* ¶ 99.)

The defendant had great intellectual talent, enjoyed significant educational and career opportunities, and amassed abundant financial resources. He also had a loving family. But instead of faithfully stewarding all that he had been given, the defendant squandered it on power and sex—at the expense of an innocent 16-year-old girl. Nothing about the defendant's personal history and characteristics warrants a downward variance in this case.

    C.    <u>Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public</u>

A Guidelines sentence also meets the sentencing goals of adequate deterrence, respect for the law, protection of the public, and just punishment in this case.

Deterrence and protection of the public are particularly weighty factors in this case.  "The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others." *United States v. Irey,* 612 F.3d 1160, 1212 (11th Cir. 2010).

Moreover, the defendant has demonstrated that he is a danger to the public—particularly young, impressionable girls.  CV is the only victim identified thus far.[3]  How many others have there been?

The defendant's extensive criminal conduct involving violent sexual exploitation, his use of sophisticated manipulation to carry out his nefarious schemes, and his attempts to recruit others to kidnap and murder the victim in this case underscore the risk he poses to children in the future.  "Congress [has] explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders." *United States v. Allison,* 447 F.3d 402, 405-06 (5th Cir. 2006); *see also United States v. Pugh,* 515 F.3d 1179, 1201 (11th Cir. 2008) ("As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported.").  A Guidelines sentence will protect children from further crimes of the defendant.

---

[3] Due to significant barriers of encryption (which are unsurprising, given the defendant's expertise with computer security), the FBI has been unable to access the vast majority of the defendant's many electronic devices—including the multiple cell phones found on his person during a search incident to arrest.  The defendant has not cooperated with law enforcement requests for access to his devices.

## **REQUEST FOR NO-CONTACT ORDER**

The defendant has been a menace in CV's life ever since he first reached out to her online. Even after he was detained in this case, he still tried to harm her through others. The defendant's actions and CV's resulting fear warrant an indefinite no-contact order. The United States requests that the Court incorporate the following provision in its judgment:

> Neither the defendant nor anyone acting in concert with, or at the behest of, the defendant shall have contact with the victim or her family, friends, or employers (past, present, or prospective) by any means, including but not limited to, verbal, telephonic, or electronic means. It will be the defendant's duty and the duty of anyone acting at his behest and in concert with him to affirmatively absent himself from her presence and from contact with her, her family, friends, or employers (past, present, or prospective).

## **CONCLUSION**

In light of the serious nature of the defendant's offenses, his personal characteristics, the need to protect children from his further crimes, just punishment, deterrence, and the need to promote respect for the law, the United States respectfully requests the Court to sentence the defendant to a custodial sentence of life.

In addition, the United States requests that the Court include in its judgment the no-contact order set forth above to protect CV and her family, friends, and employers from any further contact from the defendant or his agents.

        Respectfully submitted,

        MARIA CHAPA LOPEZ
        United States Attorney

By:   */s/ Emily C. L. Chang*
       EMILY C. L. CHANG
       Assistant United States Attorney
       USA No. 166
       400 W. Washington Street, Suite 3100
       Orlando, Florida 32801
       Telephone: (407) 648-7500
       Facsimile: (407) 648-7643
       E-mail:   emily.chang@usdoj.gov

U.S. v. DEEPAK DESHPANDE	Case No. 6:18-cr-131-Orl-41LRH

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Sean M. Wagner, Esquire

*/s/ Emily C. L. Chang*
EMILY C. L. CHANG
Assistant United States Attorney
USA No. 166
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: emily.chang@usdoj.gov