1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

```
- - - - - - - - - - - - - -X
  UNITED STATES OF AMERICA,     :
                                :
                                :   Case No.:
          Plaintiff,            :   6:18-cr-131-Orl-41KRS
                                :
  vs.                           :
                                :   Orlando, Florida
  DEEPAK DESHPANDE,             :   April 10, 2019
                                :   1:05 p.m.
                                :
          Defendant.            :
                                :
- - - - - - - - - - - - - -X
```

TRANSCRIPT OF JUDGE'S RULING ON DEFENDANT'S MOTION TO
WITHDRAW GUILTY PLEAS AND SENTENCING
BEFORE THE HONORABLE CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE


APPEARANCES:

 Counsel for Plaintiff:        Emily C.L. Chang

 Counsel for Defendant:        Sean M. Wagner



Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
                  Federal Official Court Reporter
                  401 West Central Boulevard, Suite 4600
                  Orlando, Florida 32801
                  e-mail: trimblecourtreporter@gmail.com

2

1                      T A B L E   O F   C O N T E N T S

2
    PROCEEDINGS                                                    PAGE
3

4                              April 10, 2019

5    TESTIMONY

6    **RODNEY JAMES HYRE**, called by Government
         Direct Examination By Ms. Chang.................. 30
7        Cross-Examination By Mr. Wagner................. 70
         Redirect Examination By Ms. Chang............... 76
8    **BRYCE ESSARY**, called by Government
         Direct Examination By Ms. Chang................. 80
9        Voir Dire Examination By Mr. Wagner............. 106
         Cross-Examination By Mr. Wagner................. 107
10       Redirect Examination By Ms. Chang............... 109
     **DEEPAK DESPHANDE**, called by Defense
11       Direct Examination By Mr. Wagner................ 112
         Cross-Examination By Ms. Chang.................. 127
12       Redirect Examination By Mr. Wagner............. 140

13
     OTHER
14
     Judge's Ruling on Defendant's Motion to Withdraw
15   Guilty Pleas........................................3
     Sentencing Hearing.................................22
16

17                        E X H I B I T S

18       NO.                          MARKED/ADMITTED   PAGE

19   Government's Exhibits
         Nos. 1, 2, 3, 4, and 6       admitted........ 33
20       No. 5 (under seal)           admitted........ 32

21   Defendant's Exhibits
         Composite No. 1              admitted........ 127
22

23

24

25

3

1        P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  This is the case of the

3    United States of America v. Deepak Desphande, Case

4    No. 6:18-cr-131.

5            Will counsel please state their appearances for the

6    record?

7            MS. CHANG:  Good afternoon, Your Honor.  Emily Chang

8    on behalf of the United States.  With me is Rod Hyre, Special

9    Agent with the FBI.

10            THE COURT:  Good afternoon.

11            MR. WAGNER:  Good afternoon, Judge.  Sean Wagner on

12    behalf of Mr. Desphande, who is here with me.

13            THE COURT:  Good afternoon, Mr. Wagner.

14            All right.  What we're going to do first is I'm

15    going to read my order on the motion to withdraw plea.

16            This cause is before the Court on Defendant's Motion

17    to Withdraw Guilty Pleas, "Motion," Document 75, filed on

18    March 7, 2019.  The United States filed a Response in

19    Opposition to Defendant's Motion to Withdraw Guilty Pleas,

20    "Response," Document 77, on March 8, 2019.  Defendant asserts

21    that he did not know or understand the consequences of his

22    plea.  The United States counters by pointing to the

23    transcript, "Transcript," Document 64, of defendant's sworn

24    testimony at his October 29, 2018, change of plea hearing.

25    This Court entered an endorsed order, Document 82, denying the

4

1   motion, and this order sets forth the basis for the denial.

2       On October 29, 2018, defendant entered a plea of

3   guilty as to Counts Two and Three of the Indictment,

4   Document 8.   The United States charged defendant with

5   production of child pornography in violation of 18 U.S. Code

6   Section 2251 as to Count Two and with enticement of a minor to

7   engage in unlawful sexual activity in violation of

8   18 U.S. Code Section 2422 as to Count Three.   Defendant's

9   attorneys, Mark J. O'Brien and Victoria E. Hatfield, were

10  permitted to withdraw by endorsed order, Document 51, on

11  December 13, 2018.   Thereafter, the magistrate judge issued an

12  order, Document 53, appointing Sean M. Wagner as counsel.

13  Defendant filed the motion on March 7, 2019.

14      In support of the motion, the defendant contends the

15  following:  1, he never read the plea agreement;

16  2, Mr. O'Brien directed him to sign the plea agreement without

17  reading it; 3, Mr. O'Brien guaranteed defendant would receive

18  either probation or house arrest in exchange for his

19  cooperation; and, 4, Mr. O'Brien never explained how the

20  sentencing guidelines might apply in his case or the likely

21  sentence he would receive.   The United States opposes the

22  motion, arguing that the transcript from defendant's change of

23  plea hearing directly refutes every claim made in the motion.

24      Federal Rule of Criminal Procedure 11(b)(3) mandates

25  that, quote, "before entering judgment on a guilty plea, the

5

1    Court must determine that there is a factual basis for the

2    plea," closed quote.  Once the Court accepts a defendant's

3    guilty plea but prior to imposing sentence, quote, "a

4    defendant may withdraw his guilty plea if he can show a fair

5    and just reason for requesting withdrawal," closed quote.

6    That's from *United States v. Denseclos*, 604 F. App'x 867 at

7    869, Eleventh Circuit 2015, quoting Federal Rule of Criminal

8    Procedure 11(d)(2)(B).  Quote, "There is no absolute right to

9    withdraw a guilty plea prior to the imposition of sentence,"

10   closed quote.  That's from *United States v. Buckles*,

11   843 F.2d 469 at 471, Eleventh Circuit, 1988.  However, quote,

12   "The decision to allow withdrawal is left to the sound

13   discretion of the trial court," closed quote, id.

14          In determining whether to permit withdrawal under

15   11(d)(2)(B), a district court considers, quote, "a totality of

16   the circumstances surrounding the plea and must weigh the good

17   faith, credibility, and weight of a defendant's assertions,"

18   closed quote.  That's from *United States v. Toussaint*,

19   2015 Westlaw 4978776 at 4, Eleventh Circuit 2015, quoting

20   *Buckles*, 843 F.2d at 471 through 472.  In applying a totality

21   of the circumstances approach, district courts should

22   consider, quote, "1, whether the plea was knowing and

23   voluntary; 2, whether close assistance of counsel was

24   available; 3, whether judicial resources would be conserved;

25   and, 4, whether the Government would be prejudiced," closed

6

1  quote.  That's from *United States v. Bentley*, 571 F. App'x 760

2  at 761, Eleventh Circuit 2014, per curium, quoting *Buckles*,

3  843 F.2d at 471 through 472.

4          Defendant's sworn testimony at his change of plea

5  hearing is a clear indication that he was provided with close

6  assistance of counsel.  Quote:

7          "THE COURT:  Have you had enough time to talk to

8  Mr. O'Brien about your case?

9          "THE DEFENDANT:  Yes, sir.

10          "THE COURT:  Are you satisfied with his

11  representation?

12          "THE DEFENDANT:  Yes, sir."

13          That's from Document 64, 12:13 through 18.

14          Quote, "There is a strong presumption that the

15  statements made during the colloquy are true."  That's from

16  *United States v. Medlock*, 12 F.3d 185 at 187, Eleventh Circuit

17  1994.  In his critique of Mr. O'Brien, defendant makes serious

18  allegations.  Defendant claims he never read the plea

19  agreement and that Mr. O'Brien directed him to sign the plea

20  agreement without reading it.  In rebuttal, the United States

21  correctly points to defendant's sworn testimony at the change

22  of plea hearing.  Quote:

23          "THE COURT:  All right.  You've entered into a

24  32-page plea agreement -- and I don't expect you to scroll

25  down.  I'm confident you've gone over it with him -- but on

7

1   the bottom of each of the 32 pages there are a set of

2   initials.  Are those your initials?

3           "THE DEFENDANT:  Yes, sir.

4           "THE COURT:  Are those initials an indication that

5   you've had the opportunity to read and understand the

6   agreement with the advice of your attorney?

7           "THE DEFENDANT:  Yes.

8           "THE COURT:  Do you need more time to go over that

9   agreement with your attorney?

10          "THE DEFENDANT:  No, sir.

11          "THE COURT:  All right.  On the bottom of page 24

12  there are a set of signatures, one of which is purported to be

13  your signature.  Is that indeed your signature?

14          "THE DEFENDANT:  Yes, sir.

15          "THE COURT:  And is that an indication again that

16  you've had an opportunity to read and understand this

17  agreement with the advice of your attorney?

18          "THE DEFENDANT:  Yes, sir."

19          That's from Document 64 at 5:13 through 6:8.

20          The defendant also contends that Mr. O'Brien assured

21  him that he would receive either probation or house arrest in

22  exchange for his cooperation and that Mr. O'Brien never

23  explained how the sentencing guidelines might apply in his

24  case or the likely sentence he would receive.  Those claims

25  are also inconsistent with defendant's sworn testimony.

1  Quote:

2     "THE COURT:  If you were to be found guilty of this

3  offense, Count Two, the maximum penalty is as follows:  There

4  is a mandatory minimum of 15 years in prison up to a maximum

5  of 30 years in prison, a maximum fine of $250,000, a term of

6  supervised release of five years to life, a $100 special

7  assessment, and restitution, if any."  Id. at 4:10 through 15.

8  Quote:

9     "THE COURT:  The maximum penalties for Count Three

10  are as follows:  A mandatory minimum of ten years to life, a

11  maximum fine of $250,000, a term of supervised release of five

12  years to life, and a $100 special assessment, and restitution,

13  if any.

14     "Sir, did you hear and understand the elements of

15  these offenses and the maximum penalties?

16     "THE DEFENDANT:  Yes, I did."  Id. at 5:6 through

17  12.  Quote:

18     "THE COURT:  Do you understand that the terms of the

19  plea agreement are merely recommendations and that I could

20  reject those recommendations and sentence you up to the

21  maximum penalty without allowing you to withdraw your plea

22  once I accept your plea?

23     "THE DEFENDANT:  Yes, sir.

24     "THE COURT:  Have you discussed the federal advisory

25  sentencing guidelines with Mr. O'Brien?

9

1           "THE DEFENDANT:  Yes, sir.

2           "THE COURT:  Do you understand that they will not be

3      calculated until sentencing and that they're not binding on

4      the Court?

5           "THE DEFENDANT:  Yes, sir."  Id. at 12:19 through

6      13:6.

7           Defendant was placed under oath before the Court and

8      carefully led through a plea dialogue at his change of plea

9      hearing.  The transcript is clear and unambiguous.  The

10     following is another excerpt.  Quote:

11          "THE COURT:  Are you currently under the influence

12     of alcohol, prescribed medication, or any narcotics that may

13     affect your ability to understand these proceedings?

14          "THE DEFENDANT:  No, sir.

15          "THE COURT:  Ever been determined to be incompetent?

16          "THE DEFENDANT:  No, sir.

17          "THE COURT:  Have you been threatened or intimidated

18     into entering this plea?

19          "THE DEFENDANT:  No, sir.

20          "THE COURT:  Other than the plea agreement I've been

21     advised of, have you been made any additional promises to get

22     you to enter into the plea?

23          "THE DEFENDANT:  No, sir.

24          "THE COURT:  Are you entering the plea freely and

25     voluntarily because you believe it is in your best interest?

1     "THE DEFENDANT:  Yes, sir."  That's id. at 12:22

2  through 13:12.

3          The most troubling aspect of the motion is that

4  defendant not only claims to have committed perjury at his

5  change of plea hearing as part of the basis for withdrawing

6  his plea, but he also accuses Mr. O'Brien of suborning

7  perjured testimony.  At a March 11, 2019 status conference,

8  Mr. Wagner informed the Court that the allegations contained

9  in the motion are based exclusively on the uncorroborated

10 claims of the defendant with one exception.  Mr. O'Brien

11 apparently confirmed that the defendant did indeed attempt to

12 cooperate with Special Counsel Robert Mueller's investigation

13 into Russian interference with the 2016 presidential election.

14 AUSA Emily Chang also confirmed that defendant attempted to

15 cooperate and that his attempted cooperation was no secret.

16 It is worth noting that there is a cooperation clause in the

17 plea agreement, Document 38, that the Court summarized for the

18 defendant at the change of plea hearing.  However, the Court

19 was abundantly clear that while the Court would consider

20 recommendations from the litigating parties, the sentence

21 would be left to the sound discretion of the Court.

22          If defendant is granted the relief requested, an

23 otherwise dormant case would then proceed to trial on an

24 abbreviated speedy trial schedule, thereby potentially

25 displacing a number of civil and criminal cases already set

1    for trial, not to mention the resources squandered in

2    preparing Rule 32(e)(2) initial, amended initial, and final

3    presentence investigation reports, Document Numbers 50, 58,

4    and 72.  It is important to note that this analysis is in no

5    way based on an inconvenience standard; rather, the limited

6    finding here is that defendant has fallen short of

7    establishing that withdrawal would result in the conservation

8    of judicial resources.  This element is not at all dispositive

9    of the matter before the Court.

10           On this final prong, the United States points to

11   inconveniencing a minor victim, the need for closure, and the

12   difficulty of preparing this matter for trial after a lengthy

13   delay.  While the Court certainly considered the arguments set

14   forth by the United States on this prong, they do not serve as

15   a primary thrust behind the Court's decision.

16           Defendant's uncorroborated claims are directly

17   refuted by his own sworn statements.  The Court carefully

18   observed defendant's demeanor and listened closely to his

19   answers during the change of plea hearing.  The Court also

20   reviewed the transcript multiple times while deliberating over

21   this matter.  There simply is no doubt that defendant

22   intelligently, freely, and voluntarily waived his rights in

23   entering the plea and that there was a factual basis for the

24   plea.  The Court weighed the good faith, credibility, and

25   weight of defendant's assertions.  Simply put, defendant's

12

1    claims are belied by the transcript.  They are not credible.

2          Done and ordered -- the motion is therefore denied

3    as indicated by the endorsed order.  And this is done and

4    ordered on April 8th, 2019.

5          All right.  So before we move on to the sentencing,

6    is there anything further from the Government?

7          MS. CHANG:  Not on that point, Your Honor.

8          THE COURT:  Anything from the defense?

9          MR. WAGNER:  No.

10          THE COURT:  All right.  If you would be kind

11    enough --

12          MR. WAGNER:  May I have one second?

13          THE COURT:  Sure.

14          MR. WAGNER:  Mr. Desphande is, over counsel's

15    advice, asking to address the Court on this point.  I'll leave

16    it to the Court.  It's not my decision to make.

17          THE COURT:  All right.  Mr. Desphande, against your

18    attorney's recommendation, you wish to address the Court.

19    Feel free to stand at the table.  And if you would like to

20    address the Court, you're certainly welcome to do so.

21          THE DEFENDANT:  Sir, I would like to bring in --

22          THE COURT:  Are you asking to give sworn testimony

23    or unsworn testimony?

24          THE DEFENDANT:  I would like to give some statements

25    regarding the discussions that have been passed through with

13

1    respect to the plea agreement -- withdrawal of the plea.

2            THE COURT:  That's fine.  But I need to know if

3    you're making a sworn or an unsworn statement.  And you should

4    be advised that if you make a sworn statement, I'll have you

5    sworn in.  You'll be seated at that chair.  You can tell me

6    whatever you want, but you will be subject to Ms. Chang's

7    cross-examination.  If you want to make an unsworn statement,

8    I can take it as unsworn.

9            THE DEFENDANT:  Unsworn.

10           THE COURT:  Do you want to talk to your attorney

11   about that before making the decision?

12           THE DEFENDANT:  I'll just go unsworn, sir.

13           THE COURT:  I'm not in a hurry here.  Your attorney

14   says he does not know what you are going to say.

15           THE DEFENDANT:  Basically, sir, we have a

16   disagreement between me and my attorney.

17           THE COURT:  Okay.

18           THE DEFENDANT:  So my attorney doesn't understand

19   what I'm trying to represent, or he probably -- in my opinion,

20   my attorney doesn't even understand my case better.

21           THE COURT:  All right.  So if you want to make your

22   statement, you're welcome to do so.

23           THE DEFENDANT:  Sir, on -- I met my attorney

24   Sean Wagner on December 13th, 2018, in the court down here.

25   And on that day, I told my attorney that I want to withdraw my

14

1   plea.  That was the first day that I met my attorney.  I

2   explained my case to my attorney and I told him that I need to

3   withdraw my plea from the Court.  And from December 13th to

4   almost until January 4th, 2019, I've been asking my attorney

5   through jail classification officers, what is the status

6   regarding withdrawal of the plea?

7           On January 4th, I made a letter -- I sent the first

8   letter to my attorney asking for him on the status of

9   withdrawal of my plea.  No response.

10          On January 23, 2019, I had a second meeting with my

11  attorney in the jail.  I asked for the response on what is the

12  status of my withdrawal of plea.  No response.

13          January 24th, I met my -- met the PSI officers and

14  my attorney in the jail in this federal office and again asked

15  him, what is the status on the plea agreement?  No response.

16          January 25th, I sent a second letter asking for a

17  response on the plea withdrawal.  No response.

18          January 30th, during the day of proffer, I asked my

19  attorney, what is the status of plea withdrawal?  No response.

20          On January 31st, I sent a letter asking for

21  withdrawal -- withdrawal of my plea to my attorney.  Still no

22  response.

23          On February 8th, I sent a letter through

24  classifications from the jail mail asking for response on plea

25  withdrawal.  No response.

15

1          February 11th, I met my attorney asking for a

2     response on plea withdrawal.  Still no response.

3          February 13th, I asked for his response again in the

4     John E. Polk facility.  No response.

5          On February 12th, I wrote a letter to objections on

6     the PSR and also asked for a response on the plea agreement.

7     I still don't have response.

8          March 4th, I asked for an e-mail from the

9     classifications officer.  I was requesting the responses for

10    plea withdrawal.  No response.

11         March 6th, I requested my attorney again asking for

12    what is the status on the plea withdrawal.  No response.  But

13    he said he's going to file it tomorrow.

14         On March 10th, I sent a letter to my attorney

15    saying, I need the plea withdrawal status.  And I still didn't

16    have response.

17         On March 11th, I sent a 14-page letter to honorable

18    judge asking -- requesting for plea withdrawal, and I sent a

19    16-page letter to my attorney asking for plea withdrawal.  No

20    response.

21         On 15th of March, my attorney met me at John E. Polk

22    and gave me the document of plea withdrawal, motion to

23    withdraw the plea.  It was short of multiple factors,

24    Your Honor.  The first one was -- the first one missing in

25    that plea withdrawal was coercion.  My attorney didn't address

16

1   the fact of coercion.

2          The second factor my attorney didn't address was

3   insufficiency of the evidence to which I was forced to plead.

4   If you look at the -- if you look at the case -- sorry --

5   Count Two and Count One, there is absolutely zero evidence

6   with the Government to prove anything of that conduct.  And I

7   still don't have any response from my attorney nor from the

8   Government asking, what are the evidence in the cases in the

9   Counts One and Two, which are violating 2252(a) and 2251(a).

10  So I'm at a loss.

11          And even yesterday, we met, me and my attorney.  We

12  met around noon.  I asked my attorney, did you happen to see

13  the evidence?  I asked my attorney precisely for withdrawal of

14  the plea and I also asked for the count -- case of Count One

15  and Count Two.  I mean, nothing of that sort is in -- is in

16  the motion at all, sir.

17          THE COURT:  So were you lying to me when you were

18  under oath answering my questions?  No, no, no.  That's a very

19  simple question.  When I asked you questions at the change of

20  plea hearing, were you lying to me under oath?

21          THE DEFENDANT:  No, sir.  No, sir.

22          THE COURT:  Well, you told me that you -- and I've

23  read the excerpts from your --

24          THE DEFENDANT:  I did, sir.

25          THE COURT:  So what's the deal?  I mean, you're

17

1  saying you were coerced, but at the change of plea hearing,

2  what you said to me, that you were freely and voluntarily

3  making your plea because you thought it was in your best

4  interest, you were made no promises outside of the plea

5  agreement, and that you were entering the plea because you

6  were, in fact, guilty.  So either that's true or what you're

7  telling me today is true.  Which is it?

8          THE DEFENDANT:  Your Honor, I told whatever I was

9  advised by my attorney back then.  And --

10          THE COURT:  But you just told me a minute ago that

11  you were telling the truth under oath at the change of plea

12  hearing, and your comment just now seems to indicate to me

13  that you deliberately lied to me when you changed your plea

14  because your attorney told you to.  Which is it?

15          THE DEFENDANT:  Your Honor, I responded to that --

16  when I was here in the court, 15 minutes before the court on

17  February -- October 29th, I was coerced by my attorney to say

18  this -- this -- this factors.

19          THE COURT:  So let me ask the question again.  When

20  you gave your statement to the Court at the change of plea

21  hearing under oath, were you lying?

22          THE DEFENDANT:  I wasn't, sir.

23          THE COURT:  You said -- you just told me you were

24  because your attorney told you to lie.  Which is it?

25          THE DEFENDANT:  My attorney -- I told whatever my

18

1    attorney advised me to speak, Your Honor, on that date.

2         THE COURT:  Was what you said true?

3         THE DEFENDANT:  Was what I --

4         THE COURT:  You're telling me you were coerced.

5         THE DEFENDANT:  Right.

6         THE COURT:  You're telling me today that the reason

7    you want to withdraw your plea is there's an insufficiency of

8    evidence.  You stipulated to a factual basis in your plea

9    agreement that described in detail what it was alleged that

10   you did.  You admitted all that as part of your plea agreement

11   and then you told me, when I asked you the question, that you

12   were freely and voluntarily entering your plea.

13        You're here today telling me, A, that there's an

14   insufficiency of evidence, when you swore to the fact that the

15   stuff in the plea agreement happened; and, secondly, you're

16   telling me that you were coerced into entering the plea

17   agreement, when previously you told me you weren't coerced.

18        So were you telling the truth then, or are you

19   telling the truth now?

20        THE DEFENDANT:  Can't somebody understand coercion

21   later, in fact, sir?  It is possible that, you know, a later

22   point in time that you realize, oh, my God, yes, whatever he

23   told -- whatever my attorney told was wrong.

24        THE COURT:  No, no, no.  Either you were telling the

25   truth or not.  This is a binary decision.  It's either yes or

1    no.

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Either you were telling me the truth

4    when you did your change of plea that you were not coerced,

5    that your plea was freely and voluntarily given, or you're

6    telling me the truth now that you were coerced and you were

7    only saying what your attorney told you to say.  And by the

8    way, you're not under oath subject to cross-examination now.

9    I would remind you of that.  You were under oath previously.

10              So which is it?  Were you telling me the truth when

11   you did your change of plea, or are you telling me the truth

12   now?  Because these are irreconcilable.  You couldn't have

13   been telling the truth both times.  Either you were coerced or

14   you were not coerced.  So what is it?

15              THE DEFENDANT:  I didn't understand the meaning of

16   coerced at that time, sir.

17              THE COURT:  So you're telling me that you didn't

18   understand what you -- the plea agreement that you were

19   entering into, correct?

20              THE DEFENDANT:  Yes, sir.  It was no -- it was

21   unknowing for the very fact that my attorney and -- and the

22   facts in the case, the Court -- district court -- I mean, the

23   Court itself was not provided with any evidence of it,

24   Your Honor.  Because for Count Number Two, 2251(a), which is

25   production of child pornography, there is no evidence that

20

1   exists even today that the Government has provided that the

2   allegations are true.

3          THE COURT:  Other than the fact that you agreed to

4   every single thing in your plea agreement and you initialed

5   and signed that plea agreement and you swore to me under oath

6   that everything in that agreement was accurate.  I even had

7   asked you before I accepted your plea whether or not you've

8   had a chance to review the factual basis in your plea and

9   whether or not you had any objections as to the

10  representations made in the plea agreement as to what you

11  actually did, and you said you had no objection.  So that

12  wasn't true either?

13         THE DEFENDANT:  I followed the Supreme Court -- I

14  picked out the Supreme Court piece of advice -- piece

15  of advice that I said.  It is not sufficient that the

16  defendant understand the nature of the charge to which he is

17  pleading; rather, that he must also understand whether his

18  conduct falls within the crimes charged, which I clearly

19  didn't understand, Your Honor.

20         THE COURT:  You clearly did or did not?

21         THE DEFENDANT:  I didn't.  I did not.

22         THE COURT:  So --

23         THE DEFENDANT:  And more with the second factor, the

24  important factor, right, on the 29th of October, my attorney

25  was already in conflict.

21

1          THE COURT:  All right.  So your additional

2     objections that serve as the basis for your attempt to

3     withdraw your plea, notwithstanding the Court's finding -- or

4     additionally, that you were coerced into making the statements

5     you did at the change of plea hearing and that there is an

6     insufficiency of evidence for you to be found guilty of the

7     underlying offenses.  So there's no factual basis for your

8     guilty plea.  Is that it?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Is there anything else?

11          THE DEFENDANT:  And my attorney was in conflict when

12     he took my plea.

13          THE COURT:  All right.  Would the Government like to

14     briefly respond before I make additional findings and we move

15     forward?

16          MS. CHANG:  No, Your Honor.

17          THE COURT:  All right.  As to the assertion that he

18     was coerced, I would note for the record that he has made the

19     decision -- and it's not being held against him certainly --

20     against his attorney's advice to make a statement to the

21     Court.  He chose to make that statement as an unsworn

22     statement and the statement here is in direct conflict with

23     the sworn testimony he gave at his change of plea hearing.

24          The Court hereby finds that the plea that was

25     entered into at the change of plea was intelligently, freely,

22

1   and voluntarily waived, as he indicated under oath, and, as I

2   indicated previously, that there is and there was a clear and

3   unambiguous factual basis for said plea.  That being the case,

4   we're going to continue moving forward.

5            All right.  Mr. Wagner, if you would be kind enough

6   to approach the podium with your client, we'll continue moving

7   forward.

8            All right.  Mr. Desphande, if you would be kind

9   enough to raise your right hand, you're going to be placed

10  under oath.

11           (Deepak Desphande sworn.)

12           THE COURT:  All right.  You can put your hand down.

13           On October 29, 2008, you entered pleas of guilty as

14  to Count Two of the Indictment charging you with production of

15  child pornography in violation of Title 18 U.S. Code

16  Sections 2251(a) and 2251(e) and as to Count Three of the

17  Indictment charging with you enticement of a minor to engage

18  in sexual activity in violation of Title 18 U.S. Code

19  Section 2422.  The Court previously accepted your guilty plea

20  and has adjudicated you guilty of both those offenses.  We've

21  now reached the stage in the proceedings where it is my duty

22  to address several questions to you, your attorney, and

23  counsel for the Government.

24           Mr. Desphande, there was a presentence investigation

25  report prepared in anticipation of today's hearing.  Have you

23

1    had a chance to review it?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Have you had a chance to review it with

4    the advice of Mr. Wagner?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Do you need more time to go over that

7    report?

8          MR. WAGNER:  That's a question to you.

9          THE COURT:  Do you need more time to go over that

10   with Mr. Wagner?

11         THE DEFENDANT:  We didn't have any -- we didn't have

12   any agreements to most of the parts as far as I know.

13         THE COURT:  Yeah.  I'm going to go over the

14   objections with him now.  So feel free to be seated at counsel

15   table.

16         Mr. Wagner, go on ahead and stay up there.  I'm

17   going to go over the numerous objections that we have.

18         MR. WAGNER:  May I grab my laptop, Judge?

19         THE COURT:  Oh, fine.  Whatever you need to do,

20   Mr. Wagner.

21         All right.  The first objection is listed as

22   paragraphs 15, 16, 20 through 30, 30, and 53.  And Probation

23   indicates the defendant disagrees with the facts included in

24   these paragraphs.

25         I will state unequivocally for the record that I'm

24

1   going to be relying primarily and exclusively on the facts

2   agreed to in the plea agreement.  If there's anything

3   additionally that the Government intends on asking the Court

4   to rely on, they're going to have to provide evidence of that

5   today.

6           So is there any additional argument you'd like to

7   make with regard to those objections?

8           MR. WAGNER:  No, sir.

9           THE COURT:  Any from the Government?

10          MS. CHANG:  No, Your Honor.  We will be presenting

11  testimony to cover all of the objections.

12          THE COURT:  All right.  And thank you, Ms. Chang.  I

13  will certainly offer you that opportunity.

14          All right.  So moving on to the second objection,

15  there is an objection as to paragraphs 57 through 60, 70, and

16  78 for obstruction of justice.  Now, I know what the

17  allegations are here.  He didn't agree to any of this in the

18  plea agreement.

19          So, Ms. Chang, I'm sure you're aware of the fact

20  that you're going to have to present evidence to establish

21  that, correct?

22          MS. CHANG:  Yes, Your Honor.

23          THE COURT:  All right.  So at this point, I'm not

24  prepared to rule on the objection, but I'm not going to

25  consider it without evidence to the contrary.

25

1          All right.  Paragraph 66, there's an objection from

2     the defense as to the enhancement for sadistic or masochistic

3     conduct.  And I'm guessing that that has to do with the video

4     evidence that the Government is in possession of; is that

5     correct?

6          MS. CHANG:  We do not have video evidence,

7     Your Honor.  We have evidence from the victim.

8          THE COURT:  All right.  So you're going to have

9     testimonial evidence?

10          MS. CHANG:  Correct.

11          THE COURT:  Okay.  And that is a standing objection;

12     is that correct, Mr. Wagner?

13          MR. WAGNER:  And this might clarify things for you.

14     I only intend to present argument -- specific argument on that

15     objection.

16          THE COURT:  Well, if she doesn't present evidence

17     and relies only on what's in the plea agreement, she opens

18     herself up for problems on appellate review.  So I'll leave it

19     in her capable hands, but thank you for --

20          MR. WAGNER:  Assuming she does that, yes.

21          THE COURT:  All right.  Then we have paragraph 67

22     and 74, use of a computer.  And I think I know what your

23     objection is, but I want to offer you an opportunity to

24     supplement that with additional argument if you would like to

25     do that.

26

1        MR. WAGNER:  Well, the argument is more factual than
2  legal.  It really stems from the fact that Mr. Desphande is
3  denying that he was ever involved in the computer discussions
4  that gave rise to this case.  So I don't have any specific
5  legal argument.  I think the law on the guidelines and the
6  comments are clear.
7        THE COURT:  The Government did present as an
8  attachment to one of their submissions what is purported to be
9  a set of exchanges via either instant messaging or texting or
10  whatever you call it.  And if there are -- if you have
11  concerns in representing your client as to the accuracy or the
12  foundation of that, you know, she can lay the foundation.  And
13  if she can't, it won't be considered.
14        MR. WAGNER:  I understand.
15        THE COURT:  All right.  And then finally -- no, no.
16  We have two more objections.
17        The next objection is paragraph 73, specific offense
18  characteristic.  The problem here as I view it is that was
19  agreed to in the plea agreement in the factual basis.  So is
20  there any -- I'll leave it to the Government if they want to
21  present additional evidence.  They're going to be able to
22  respond to each of those once they present their evidence, but
23  is there any additional argument you would like to make on
24  your objection as to paragraph 73?
25        MR. WAGNER:  No, sir.  And the posture that I'm in

27

1   is, I'm not withdrawing any specific objections, but I'm going

2   to be selective about what I choose to argue.

3           THE COURT:  All right.  Thank you, Mr. Wagner.  I

4   appreciate that.

5           Finally, paragraph 84, and that's an objection as to

6   the enhancement involving -- you're alleging that there's no

7   pattern, and the Government alleges the pattern is the fact

8   that it's agreed upon in the plea agreement that he made five

9   trips to Orlando to engage in the conduct alleged in the

10  Indictment.

11          So would you like to add any additional argument,

12  Mr. Wagner, to that objection?

13          MR. WAGNER:  No.  And I actually will withdraw that,

14  and I'll tell you why.  It's because I -- correct me if I'm

15  wrong, but I don't believe that I raised that specific

16  objection within 14 days.  I think the rules require me to

17  seek leave of Court, and I'm not seeking leave of Court on

18  that particular objection.  It's the five-level increase.

19          THE COURT:  So objection 6 is withdrawn.  And I

20  would invite you to ask for leave of Court if you chose to do

21  so, but I'll leave it in your capable hands.

22          MR. WAGNER:  Sure.

23          THE COURT:  That's a strategic decision on your

24  part.

25          All right.  Is there anything further from the

1    defense before we begin the process of requiring the

2    Government to establish whatever additional variables they

3    want the Court to consider?

4         MR. WAGNER:  Yes, sir.  There's two things.

5         We actually made an objection to Mr. Desphande's

6    ability to pay.  I don't remember where it is offhand.  I have

7    a couple of PDFs going.  Subsequent -- and I did disclose it

8    to the Government.  Subsequent to making that objection, I

9    actually talked to his wife's divorce attorney.  The objection

10   was that what we had represented in the PSR is that he had

11   gotten divorced, the property had been disposed of, and he

12   didn't have title to the property.  I subsequently spoke to

13   his, I guess, current wife's attorney.  The divorce hasn't

14   been finalized yet.  So as far as I know, there's no final

15   disposition of the property.  As an officer of the court, I

16   have to withdraw that objection.  I think the Government

17   probably has taken the time to look into that if it's

18   important to them.

19        The other thing that I would point out, in my

20   sentencing memorandum, I adopted Probation's calculation of

21   what the guidelines would be if we prevailed on all of our

22   objections.  That calculation, as they candidly pointed out,

23   was based on a miscalculation.  Specifically, it didn't

24   include the five-level increase for pattern of conduct, which

25   I've subsequently told you I'm not going to seek an

29

1    enhancement for.  So although I did represent that would be

2    the number in the event that you agreed with us on all of our

3    objections, that's no longer accurate.  I just want to point

4    that out to the Court.

5              THE COURT:  All right.  Thank you, Mr. Wagner.  I

6    appreciate the clarification.

7              So at this time, I cannot make my findings on what

8    the guideline calculations are going to be until I offer the

9    United States an opportunity to prove what it is they're

10   alleging.  So, Mr. Wagner, I would kindly invite you to be

11   seated.

12             At this time, Ms. Chang, I'm going to invite you to

13   begin calling your witnesses.

14             MS. CHANG:  Thank you, Your Honor.

15             The United States calls Special Agent Rod Hyre.

16             THE COURTROOM DEPUTY:  Please come forward and be

17   sworn.

18                      **RODNEY JAMES HYRE**,

19   called by Government, was duly sworn by the courtroom deputy,

20   and in answers to questions propounded, testified as follows:

21             THE COURTROOM DEPUTY:  Have a seat there, please.

22             THE COURT:  All right.  Once seated, please make

23   yourself comfortable with the chair's proximity to the

24   microphone.  Then please state your full name, spelling your

25   last name for the record.

1      THE WITNESS:  Rodney James Hyre, H-y-r-e.

2      THE COURT:  All right, Ms. Chang.  Your witness.

3      MS. CHANG:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5  BY MS. CHANG:

6  Q    Good afternoon, Agent Hyre.

7  A    Good afternoon.

8  Q    Would you please describe for the Court how the FBI first

9  started investigating this case?

10 A    The FBI got an anonymous tip in March of 2018 that a

11 16-year-old girl, identified as a child victim in this case,

12 was being extorted online to produce child pornography videos.

13 Q    And when did the FBI receive that tip?

14 A    We received that in March 2018.

15 Q    At the outset of the investigation, did you -- did there

16 come a time when you actually interviewed the victim?

17 A    Yes.

18 Q    We're going to refer to her as either CV or child victim

19 throughout these proceedings.

20 A    Okay.

21 Q    Did you interview her multiple times?

22 A    Yes, ma'am.

23 Q    Approximately how many times?

24 A    Six times, give or take one or two.

25 Q    Did you determine through your investigation whether

1  there was any truth to the allegations in the FBI tip?

2  A    Yes, ma'am.  They were true.

3  Q    What were the names of the adult males that the child

4  victim produced child pornography for?

5  A    She produced child pornography for Devin, last name

6  unknown, Nick Cuban, and Roger, last name unknown.

7  Q    Did you eventually learn during your investigation who

8  all of those adult males really were?

9  A    Yes.  They all resolved to Deepak Desphande.

10 Q    According to the victim, how did she meet Devin at the

11 very beginning?

12 A    She had posted an ad on an Internet application.  I

13 believe Whisper.  She was looking to be a model.  She wanted

14 to be a model.  And a man portraying himself as a modeling

15 agent named Devin contacted her.

16 Q    And who did Devin say he worked for?

17 A    I believe he said he worked for Britemodels, which is one

18 word.  And like I said, he was a modeling agent.

19 Q    And according to the victim, did she tell the defendant,

20 posing as Devin, how old she was?

21 A    Yes.  She told Devin that she was 16.  And with each of

22 the people, Devin, Nick, and Roger, she was honest about her

23 age, saying that she was 16 at the beginning of each

24 conversation.

25 Q    Did Devin refer the victim to a Britemodels website?

1    A    Yes, ma'am.

2    Q    Have you personally viewed that website before?

3    A    Yes, ma'am.

4    Q    How many times have you done that?

5    A    Several.  I don't know the exact number.

6    Q    When did you last visit the website?

7    A    It was several months ago.  It was back in 2018.

8              MS. CHANG:  Your Honor, I would like to reference

9    Government's Exhibits 1 through 6, which I've provided to the

10   Court and to the defense.  And, Your Honor, I would move to

11   admit Government's Exhibit 5 under seal because it contains

12   very sensitive personal information concerning the victim and

13   her family.

14             THE COURT:  Are there any objections, Mr. Wagner, as

15   to 5 being admitted under seal for those reasons?

16             MR. WAGNER:  No objection.

17             THE COURT:  Without objection, what's been

18   previously marked as Government's 5 for the purposes of

19   sentencing will be admitted and it will be filed under seal.

20   Feel free to proceed.

21      (Government's Exhibit No. 5 (under seal) was admitted

22      into evidence.)

23             MS. CHANG:  Thank you, Your Honor.

24   BY MS. CHANG:

25   Q    Agent Hyre, looking at Government's Exhibits 1 and 2, can

1   you explain to the Court what these are?

2   A    These are what -- we printed these out from what we found

3   when we went on the Britemodels website on our undercover

4   computer.  This is what we printed out.  These are the pages

5   that you would see or the screens that you would see.

6                MS. CHANG:  Your Honor, may I use the ELMO?

7                THE COURT:  You may.  Are you moving the remaining

8   ones in as evidence as well for sentencing?

9                MS. CHANG:  Yes, Your Honor.

10               THE COURT:  All right.  Mr. Wagner, will there be

11  any objections?  The remaining items will not be admitted

12  under seal if they're admitted.

13               MR. WAGNER:  No objection.

14               THE COURT:  All right.  Without objection, the

15  remaining exhibits, 1, 2, 3, 4, and 6, will be admitted

16  without objection.  They will not be under seal.  Feel free to

17  proceed.

18      (Government's Exhibit Nos. 1, 2, 3, 4, and 6 were

19      admitted into evidence.)

20               MS. CHANG:  Thank you, Your Honor.

21  BY MS. CHANG:

22  Q    So I'm showing you Bates 707 of Government's Exhibit 2.

23  What is this?

24  A    This is the -- sorry.  This is the screen page when you

25  would log on to the Britemodels website.

1    Q    Do you see these here, about us and become a model?

2    A    Yes, ma'am.

3    Q    What are those?

4    A    Those were, I believe, two hyperlinks.

5    Q    What does this page purport to be?

6    A    This would be the -- if you want to be a model, you'd

7    fill in these -- you'd fill in the questionnaire here.  I

8    think the red asterisk indicates that these would be mandatory

9    things that you have to fill in to start the process.

10   Q    Turning to page 708 of Government's Exhibit 2, what are

11   the sorts of data points that someone would fill in on this

12   form?

13   A    In this case, height, weight, bust, waist, hips, dress

14   size, shoe size, et cetera.

15   Q    So how would you describe those?  What are those?

16   A    Your personal physical characteristics.

17   Q    Okay.  Under here, portfolio image uploads, what does

18   that invite you to do?

19   A    This is where you could upload pictures of yourself to be

20   judged as a model.

21   Q    Okay.  And turning to page 709, I'm going to make it a

22   little bit bigger here.  It says, "Britemodels is the aspiring

23   leader in talent discovery and model management widely

24   recognized for its diverse client," and it kind of gets cut

25   off on the right.  Was it cut off on the printout that you

1    printed out for us?

2    A     Yes, ma'am.

3    Q     All right.  And then it picks up with, "San Francisco,

4    Paris, London, Milan, and Sidney."

5             Have you ever conducted any research to determine

6    whether this Britemodels agency operated in any of those

7    cities?

8    A     We did.  We did Google searches on Britemodels.  The only

9    evidence of Britemodels written this way as one word is just

10   what you have here in these exhibits.

11   Q     Did you find any reviews for Britemodels online?

12   A     I don't believe so, no, ma'am.

13   Q     Did you do any other research to determine whether

14   Britemodels was an actual operating agency?

15   A     Just Internet checks.  It was my strong suspicion that it

16   was not.

17   Q     And did your checks confirm that suspicion?

18   A     Yes, ma'am.

19   Q     Is the Britemodels website still functioning?

20   A     No, ma'am.  When you try to go there now, it shows that

21   it's no longer on the server.

22   Q     And what have you concluded about whether Britemodels was

23   actually legitimate?

24   A     Britemodels was developed, created by Deepak Desphande.

25   And after his arrest, it also ceased to exist.

1    Q    I'm turning to Government's Exhibit 1.  What is this?

2    A    This is another page from the Britemodels when you would

3    go online.

4    Q    I'm turning to page 712 of Government's Exhibit 1.  What

5    do you see here at the bottom under two responses to Belle?

6    A    This is just two people.  Charlie saying hi and then

7    Charlie saying Devin with a question mark.

8    Q    So these are comments on the page?

9    A    Yes.  And they both came in at the exact same time.

10   Q    In your interviews with the victim, did she ever mention

11   this particular page to you?

12   A    I believe so, yes, ma'am.

13   Q    Why?

14   A    In her mind, it vetted that there was a Devin because the

15   Devin -- because Devin was mentioned here in the website.

16   Q    So when you say in her mind it vetted Devin, at what

17   point in time did the victim see this?  Did she see it before

18   you or after you?

19   A    She saw it before me.

20   Q    Okay.  When did she see this page?

21   A    During the summer of 2018.

22   Q    And did she come across this page after Devin contacted

23   her?

24   A    Yes, ma'am.  This is -- yes, because Devin is the one

25   that told her about Britemodels.

1   Q    Okay.  And then she was directed to this website?

2   A    Yes, ma'am.

3   Q    All right.  Turning to page 714, under safety right here,

4   read what it says next to safety.

5   A    "Model safety is the number one priority of Britemodels.

6   To help protect models, each member is screened for" -- and

7   it's cut -- "offer a way to report scams, abuse, and spam,

8   which is monitored by admins daily.  Last of all, we make it

9   public that criminal activity, despite on our -- "despite our

10  protocols, we strongly urge all models to become experts on

11  model safety and it is unfortunate that it attracts a lot of

12  scummy people.  So always be safe."

13  Q    Do you see this reference to admins --

14  A    Yes, ma'am.

15  Q    -- who apparently monitor the site daily?

16  A    Yes, ma'am.

17  Q    During your investigation, did you determine who the

18  admin was for the Britemodels website?

19  A    Yes, ma'am.  We conducted a -- San Francisco FBI

20  conducted a search warrant at Mr. Desphande's house.  Numerous

21  hard drives were recovered from the house.  The one that was

22  not encrypted, we were able to get into it and look at, and we

23  actually saw communications between Mr. Desphande and -- I

24  forget the company that he set up the Britemodels website with

25  and that he had questions.  He was e-mailing questions about

1   how to act as the admin for the website he had set up.

2   Q    Did you also find a series of e-mails that show that the

3   defendant was actually moderating the website as an admin, for

4   example, moderating comments that were added to the website?

5   A    Yes, ma'am.

6   Q    Did you also find a series of e-mails showing the

7   defendant communicating on behalf of Britemodels with girls

8   who were seeking modeling opportunities?

9   A    That's correct.  There were numerous girls, many of which

10  we were unable to determine their identities, so we couldn't

11  check their ages.

12  Q    And in those e-mails, did the defendant use a number of

13  aliases?

14  A    He did.

15  Q    Let's go back to things that you learned during your

16  interviews with the victim.  What did the victim tell you

17  about her initial interaction with Devin?

18  A    She began speaking with Devin over the Internet.  She

19  also ended up speaking with him directly on the phone.  That

20  Devin started out by asking for face shots, but he -- he

21  progressed that into asking for -- "sexy" was the word she

22  used -- pictures, progressed that to asking for nudes, and

23  eventually asked for pictures of her digitally penetrating

24  herself.

25  Q    What, if anything, did Devin say he was going to use

1   those pictures for?

2   A    He was going to send those to a group connected with his

3   modeling agency that would rate her as a model and that that's

4   how they would come up with her pay scale.  And the pay scale

5   she mentioned was 12 to $15 an hour.

6   Q    Did there come a time when Devin specifically asked for

7   full body nudes?

8   A    Yes, ma'am.

9   Q    And how did the victim send these photographs to the

10  defendant posing as Devin?  Like, what kind of equipment was

11  she using to do that?

12  A    She was using her -- I think at the time it was a

13  Galaxy S4.  And they had set up a -- or at Devin's instruction

14  set up a Megaupload account, a cloud storage basically, and

15  provided Devin the password as well so that she would upload

16  to Mega and he could look at the images and videos.

17  Q    And we'll come back to Mega, but just back to the

18  Galaxy S4, is that a cell phone?

19  A    Yes, ma'am.  A smartphone, yes, ma'am.

20  Q    Can you tell the Court a little bit about Mega cloud

21  storage account -- like what is Mega cloud storage?

22  A    It's just a server storage that you can upload to.  You

23  can either make it private to yourself if you don't give

24  anybody else the username or password, or if you give other

25  people that information, then other people can go see what

1   you're putting in your storage.

2   Q    So it's sort of like a Dropbox?

3   A    Dropbox, yes, ma'am.

4   Q    And multiple users can access a single account, right?

5   A    As long as they have the password.

6   Q    Why did the child victim create a Mega account?

7   A    She was instructed to.

8   Q    By?

9   A    Devin, Deepak.

10  Q    According to the victim, did the defendant instruct her

11  on what type of pictures she should upload?

12  A    He used the word "sexy" and, like I said before,

13  eventually had her producing negative images and videos of

14  herself and -- and where she was also sexually exploiting

15  herself.

16  Q    So she actually -- he instructed her to upload nude

17  photos; is that what you're saying?

18  A    Yes, ma'am.

19  Q    All right.  How frequently did the defendant, posing as

20  Devin, ask the victim to upload nude photos of herself to the

21  Mega account?

22  A    Almost on a daily basis.

23  Q    And all tolled, approximately how many nude photos did

24  the victim upload to Mega at Devin's behest?

25  A    I believe she -- I think she estimated 300 or more.

1    Q     Did the victim state whether the defendant knew the

2    password to her Mega account?

3    A     Yes, ma'am.  He did know.

4    Q     How did he get the password?

5    A     I believe he asked her or had her share it with him.  I'm

6    not sure if he gave her the password to set up.  I don't

7    remember.  But she did say that he had the password to the

8    account.

9    Q     Was there any indication that the defendant actually

10   accessed the account?

11   A     Yes, ma'am.  The CV told us that when she would go in --

12   he would comment on what he had seen, but when she would go

13   in, she could see that he had moved around folders, had

14   changed things inside of the Mega account, which she hadn't

15   done.

16   Q     Did you ever ask the victim what she was hoping to get in

17   return as she was doing all of this?

18   A     She wanted to be a model.

19   Q     And did she actually discuss paying modeling jobs with

20   Devin as she was doing this?

21   A     She did.  They had specifically mentioned a pay rate of

22   12 to $15 an hour.

23   Q     You mentioned that Devin and the -- well, first, did the

24   defendant, as Devin, actually ever get the victim a modeling

25   job?

1    A    No, ma'am.

2    Q    And you said they spoke on the phone.  Approximately how

3    many times had the victim spoken on the phone with Devin?

4    A    I think it's several, but I don't know the exact number.

5    Q    Did there come a time when someone named Nick Cuban came

6    along?

7    A    Yes, ma'am.

8    Q    How did that come about?

9    A    So our CV was frustrated with the fact that her

10   interactions with the modeling agent Devin weren't going

11   anywhere.  So she posted another ad on the same application --

12   I believe it was Whisper -- in which she actually stated, are

13   there any modeling agents which aren't fake?  At that point,

14   Nick Cuban showed up and said that he was a modeling agent and

15   a photographer.

16   Q    So when you say he "showed up," who do you mean, that he

17   showed up in person?

18   A    I'm sorry.  No.  He responded to her Internet ad via the

19   Internet.

20   Q    All right.  And who did Nick Cuban claim to be?

21   A    Both a modeling agent and a photographer.

22   Q    Did Nick Cuban claim to know Devin?

23   A    Yes, ma'am.  He acted surprised when he heard that CV had

24   previously dealt with Devin, actually asked her to prove it, I

25   believe, by sending her a screenshot and then said that -- and

1   then vetted Devin, saying that he did know Devin was a

2   modeling agent.

3   Q    How long did the victim and Nick Cuban chat during their

4   very first Internet chat conversation?

5   A    The very first one evidently went several hours.

6   Q    What did they talk about?

7   A    Modeling.  And that one progressed just in the first

8   interaction to Nick Cuban convincing CV to take naked pictures

9   of herself and make them available to him.

10  Q    And was it just "send me naked photos" at the outset, or

11  was there --

12  A    No.  It was a progression over one conversation, though,

13  that started with face pictures and then progressed.

14  Q    Okay.  And eventually --

15  A    Or more innocent -- more innocent pictures.

16  Q    And what was the most extreme, then, that it got to that

17  he had her send and that she actually sent?

18  A    To her actually physically sexually exploiting herself

19  and taking pictures of it.

20  Q    And did she send those pictures to Nick Cuban?

21  A    Yes, ma'am.

22  Q    During that very first conversation with the defendant

23  posing as Nick Cuban, what happened after the victim sent

24  those first full body nude photos of herself to him?  Did his

25  demeanor change at all?

1   A    Yeah.   I believe he used the word "wow" to describe what

2   he saw, and he was approving of it.

3   Q    Okay.   Did there come a time when he became aggressive or

4   threatening?

5   A    On the first interaction, I don't believe so.   No, ma'am.

6   Q    Did there come a time when the defendant -- did there

7   come a time when the defendant urged the victim to communicate

8   with Devin in a specific way --

9   A    Yes.

10  Q    -- in that first conversation?

11  A    Yes, ma'am.   Basically saying that -- after he got the

12  naked pictures of CV, he then pointed out that she was

13  cheating on Devin, the first modeling agent, and then

14  threatened CV -- so, yeah, she was threatened -- threatened CV

15  to keep producing or he would give those pictures to Devin to

16  show that she was cheating on Devin.

17  Q    Did there come a time when Nick Cuban urged the victim to

18  communicate specific things to Devin?

19  A    Yes.

20  Q    Okay.

21  A    Yeah.

22  Q    And what was the content of that?

23  A    They came up with a story to -- it's confusing.   He

24  wanted the CV to tell Devin that she had made a sex tape with

25  her boyfriend and that this would make -- this could be used

1  to make Devin jealous and could be used to blackmail him

2  because she was his model or he was her agent.  He went on to

3  say that -- once that was established, he went on to say that

4  they should actually make the sex tape so that they would have

5  some legitimacy behind their blackmail threat.

6  Q    So you're saying that Nick told the victim to tell Devin,

7  hey, my boyfriend and I have this sex tape?

8  A    Yes, ma'am.

9  Q    And now Nick and CV need to make it so that it actually

10  exists?

11  A    Yes, tell the boyfriend.  And then the conversation

12  between Nick and CV were, now that you've told him that, we

13  should make a tape so that we can actually back up our

14  blackmail.

15  Q    Okay.  And did the child victim comply with these

16  instructions and convey these messages to Devin?

17  A    Yes.

18  Q    And all of this happened in the first conversation,

19  right?

20  A    Yes, ma'am.

21  Q    Just to be clear, how did this conversation take place,

22  over the phone or otherwise?

23  A    This was over the Internet.

24  Q    All right.  At any time during this conversation, did the

25  victim tell Nick Cuban how old she was?

1    A    Yes.

2    Q    What was his response?

3    A    She told us that his response was that he didn't care.

4    Q    Did the victim tell Nick where she lived?

5    A    I think so, yes.  Orlando, Florida, yeah.

6    Q    And did he --

7    A    Not specifically, but Orlando.

8    Q    In that first conversation, did the defendant actually

9    begin making plans to visit her in Orlando?

10   A    As part of the plan to make the actual sex tape to be

11   used for blackmail, yes, ma'am.

12   Q    At some point after Nick contacted the victim, did she

13   post another ad online seeking a modeling opportunity?

14   A    She did.

15   Q    Did anyone contact her?

16   A    Yes.  This was after Devin and after Nick, she posted

17   another ad.  And a person known as Roger contacted her.

18   Q    And what did Roger do?

19   A    Roger showed up and already had a picture of her and

20   seemed to indicate that he already knew some of her

21   background.  CV told me that Roger was extremely aggressive

22   and insulting right off the bat and was very demanding of

23   additional pictures.  Roger -- like I say, he had indicated

24   that he already had pictures of CV and turned that into

25   threatening to release those pictures in different places,

1  including the dark web, if CV didn't comply with making more

2  pictures and videos for him.

3  Q    So did the victim start making nude photos of herself for

4  Roger as well?

5  A    She did.  And it's important to know that both Roger and

6  Nick were maintaining communication with CV at the same time

7  for the period of time.

8  Q    All right.  Let's go back to Devin for a second.

9  Approximately how long was Devin in contact with the victim?

10  A    Approximately two months.

11  Q    And did there come a time when the defendant stopped

12  pretending to be Devin to her?

13  A    Yeah.  He -- so Nick Cuban told the CV that he had found

14  out that Devin had been arrested in the UK for money

15  laundering and was under house arrest and thereby took him off

16  the table.

17  Q    After being told that Devin was arrested for money

18  laundering in the UK, did the victim do anything with the Mega

19  account that she had made for Devin?

20  A    Yeah.  She shut that -- yeah.  She closed that.  She

21  closed that Mega account down.

22  Q    What happened after she closed out that account?

23  A    She was instructed to -- by Nick to create another Mega

24  account.

25  Q    And did she do so?

1   A    Yes, ma'am.

2   Q    Why did she do that?

3   A    In order -- for the purpose of uploading images and

4   videos.

5   Q    But why did she do that?

6   A    She was told by Nick -- she was told by Nick to do it.

7   What I said earlier -- it's important to remember Nick and

8   Roger were both in communication with CV at the same time in

9   almost a good cop/bad cop thing.  Roger was threatening and

10  demanding.  Nick was there -- Nick and Roger were also talking

11  to each other.  Nick would play as CV's friend and would

12  counsel CV, just do what Roger says and I'll talk to him and

13  I'll keep him from releasing your images and videos on the

14  dark web.  Also, it was threatened that it would be sent to

15  the people in her school.

16  Q    So what did she do with the new Mega account for Nick?

17  A    She opened it up and provided him with the password.

18  Q    Did she upload pornographic images of herself to it?

19  A    Yes.  And she was made to do this, according to CV, on

20  almost a nightly basis.

21  Q    And during the course of your investigation, did you get

22  access to that Mega account?

23  A    Yes, ma'am.

24  Q    And what did you find in it?

25  A    Found hundreds of images of our CV, pornographic images

1    of our CV.

2    Q    Okay.  Did there come a time when the defendant, posing

3    as Nick, when he traveled to Orlando to meet the victim in

4    person?

5    A    Yes, ma'am.  I believe it's in September of 2017 -- I'm

6    sorry -- 2017, yes -- was the first time he traveled to

7    Orlando.

8    Q    Where did he travel from?

9    A    He flew from San Francisco, California.

10   Q    At what time of day did the defendant meet the victim?

11   A    He had instructed her to go to a girlfriend's house.

12   They met at around 2:30 in the morning.  He went to the

13   girlfriend's house and picked her up there.

14   Q    And where did he take her?

15   A    Took her to a Hilton hotel here in Orlando.

16   Q    Did he bring her to the hotel lobby to check in?

17   A    No.  According to the victim, for each of the four to

18   five times that this happens, he had already checked in.  And

19   that way they did not go through the lobby.  They would

20   just -- they would go to the room.

21   Q    So this very first visit in September of 2017, was that

22   the first time that the victim had ever spoken to Nick?

23   A    Yes, ma'am.

24   Q    Did she observe anything about his voice?

25   A    She did.  And she challenged him on the fact that both

1   his voice and Devin's voice sounded similar.  Mr. Desphande

2   played that off as saying, no, no, Devin has a high-pitched

3   voice.  And CV just let it go.

4   Q    At the hotel, did the defendant -- well, actually, let me

5   pause here.

6          Do you remember when the victim was talking about

7   this very first encounter with Nick Cuban and when he pulled

8   up in the car?

9   A    Yes, ma'am.

10  Q    Why did she -- did she tell you why she got into the car?

11  A    Yeah.  She said she was scared.  She realized it had gone

12  too far at that point.  When she got in the car, she looked

13  over at him.  She was extremely unhappy about the fact that

14  she was there in the car with him at 2:30 in the morning, but

15  she said that she felt like she was trapped and that she

16  didn't know what to do.  So she just went forward with the

17  plan, but she -- she said she felt trapped.

18  Q    Why did she feel trapped?  Did she explain that to you?

19  A    She -- by seeing Mr. Desphande and just that this was

20  something she did not want to do anymore and she was scared.

21  But as a 16-year-old, she just felt overwhelmed by the -- in

22  my opinion, she felt overwhelmed by the situation and moved

23  forward.

24  Q    All right.  Let's go back to the hotel now on that first

25  visit.  Did he give her anything to drink?

1    A    He did.  He gave her alcohol in order to make her relax.

2    He also mixed it with -- I believe she said Red Bull.

3    Q    And what did he do after that?

4    A    He instructed her to go take a shower and he would

5    videotape her while she was taking a shower.  He instructed

6    her to act surprised when he walked into the bathroom with the

7    video camera and took the video of her.

8    Q    And how did the victim describe the video camera?

9    A    I believe she said it was a -- I believe she said it was

10   a Nikon.  She also mentioned that he had a tripod -- a tripod

11   that he would put it on and said he also brought a

12   professional-looking camera as well with a telephoto lens.

13   Q    What did the defendant do as she's in the shower as he's

14   videotaping her?

15   A    I just remember that he instructed her to act like she

16   was surprised that he was there and videoing her as she washed

17   herself.

18   Q    And then what did -- what happened after the shower?

19   A    He then took her into the main room of the hotel.  The

20   camera was on.  The lights were on for the purpose of

21   recording, and he recorded himself performing oral sex on the

22   CV and then recorded himself vaginally raping the CV.

23   Q    And did the defendant give the victim any instructions on

24   how she was supposed to respond or appear to be responding as

25   he was doing this?

1    A    Yeah.  He had told her for the purpose of making the

2    video that she was to act like she was enjoying it.

3    Q    And why did the victim believe that he was actually

4    videotaping?

5    A    Because she saw the blinking light on the camera and the

6    camera was set on the tripod on the dresser in the hotel room.

7    Q    Did there come a time when he stopped assaulting the

8    victim?

9    A    Well, there came a time when he stopped filming.  They --

10   after he was finished having sex with her, I remember the

11   victim said the hotel room was cold.  She climbed into the

12   other bed and covered up.  And then some time after that, the

13   lights were now off, and Mr. Desphande climbed into bed with

14   the victim and again assaulted her.

15   Q    So did he film all of the times that he sexually

16   assaulted her?

17   A    No.  Then she made mention of the fact that he was not

18   recording that.

19   Q    Did the victim tell you whether or not the defendant used

20   a condom or any type of contraceptive?

21   A    He did not use a condom.

22   Q    And did he explain why he did not use a condom?

23   A    Yeah.  I think -- something of the fact that he got

24   checked all the time -- I assume for STDs -- and actually they

25   did use a contraceptive.  He would give her the morning after

1   pill when he would leave town.

2   Q    Well, did she tell him that she was worried about

3   contracting a sexually-transmitted disease?

4   A    Yes.

5   Q    And how did he respond then?

6   A    That he got checked.

7   Q    Would using a condom -- did she mention anything about

8   how using a condom might affect the filming?

9   A    I think -- I don't recall.  I don't recall.

10  Q    Okay.  Did the defendant, as Nick and Roger, continue to

11  maintain regular contact with the victim after that visit and

12  between September 2017 and April 2018?

13  A    Yes, ma'am.

14  Q    Describe the victim's interactions with Nick and Roger.

15  A    As I touched on earlier, it was a -- according to the

16  victim, it was almost a constant badgering from Roger,

17  threatening, always pushing her to make more videos.  Roger

18  portrayed that he was a member of a bigger group of other

19  people that were also looking at this, and Roger threatened to

20  put her into porn, I think was what he said.

21         So throughout that time period, like I said, there

22  was a constant push to make more -- more pictures and videos.

23  In fact, the CV told us that as a 16-year-old girl, she would

24  occasionally get in trouble where her mom would take her phone

25  away.  So she was unable to do it on those nights.  And her

1   word was, that would cause them to go on a rampage when she

2   would show back up about why she hadn't been producing for

3   them the night before.  And this was against the backdrop of

4   the threat of these images and videos being released to the

5   public, her school, the dark web and, there again, with Nick

6   playing himself as, just do what he says and I'll take care of

7   it, I'll make sure he doesn't do that, and Roger, the one

8   constantly pushing and Roger being the one that wanted the

9   videotapes.  In fact, Mr. Desphande told the victim that he

10  didn't really want to be having sex with her, but he was only

11  doing this because Roger wanted these tapes.  And so -- I'm

12  sorry.

13  Q    All right.  Did there come a time when the victim's cell

14  phone broke?

15  A    Yes, ma'am.

16  Q    What did Nick do?

17  A    He sent her a new one via FedEx.  And luckily she had

18  kept the FedEx envelope at the time of our interview and she

19  was able to show us the FedEx envelope.

20  Q    When she showed you the FedEx envelope, who was listed as

21  the sender?

22  A    The sender was listed as Nick Cuban, but it resolved to

23  an address in Dublin, California, that resolved to

24  Deepak Desphande.

25  Q    Okay.  And when it say -- do you mean it said N. Cuban?

1   A    I'm sorry.  N. Cuban.

2   Q    What kind of phone did the defendant mail to the victim?

3   Was it a smartphone?

4   A    Yes, ma'am.

5   Q    Did you ever recover that phone from the victim?

6   A    We did.

7   Q    And did you find on that phone confirmation that the

8   victim used various Internet applications to communicate with

9   the defendant?

10  A    Yes, ma'am.

11  Q    What such evidence did you find?

12  A    She had taken screenshots of not all but some of the

13  interactions that she had had with -- excuse me -- Nick and

14  Roger and Devin.  And they were saved.  They were saved as

15  images on her phone, the screenshots were.  And it showed

16  that -- I know off the top of my head Kik was a big user.  I

17  believe they also used Google Hangouts to talk to each other.

18  Q    Did you find on the phone the entire history of chats?

19  A    No, ma'am.  And we asked about that, and then she said

20  she had only taken screenshots of one.

21       It's important to know an application like Kik, once

22  you sign off of it, it's gone.  Everything that you had there

23  is gone.  So if she hadn't taken these screenshots, we

24  wouldn't have had this.

25  Q    Did you ask her why she took these screenshots?

1  A    As evidence.  I think she understood -- at a certain

2  point, she understood what was happening to her.  She just

3  didn't know what to do about it.

4  Q    All right.  I'm turning now to Government's Exhibit 4.

5  What is this?  And it's in front of you, too.

6  A    Yes, ma'am.  That's a conversation between CV and Nick,

7  the person pretending to be Nick Cuban.

8  Q    And Exhibit 4 has, like, 20 pages in it.  Where does that

9  come from?

10  A    This comes from the images that I mentioned before that

11  we recovered from CV's cell phone.

12  Q    Okay.  Has this been redacted in any way?

13  A    Yes, ma'am.  There's child pornography images and I

14  believe also a picture of Mr. Desphande's penis that we

15  redacted.

16  Q    All right.  Have you discussed this particular

17  conversation with the victim?

18  A    Yes, ma'am.

19  Q    What is the date of the conversation?

20  A    It was February 19th.  And that would have been of

21  2017 -- I'm sorry -- 2018.

22  Q    And who is Extra Miles who's referenced at the top of the

23  page?

24  A    I believe that's Nick Cuban.

25  Q    All right.  And whose communications are on the left in

1    white?

2    A    That would be -- that would be Nick Cuban.

3    Q    And whose communications are in the right in green?

4    A    That's CV.

5    Q    All right.  Looking at page 558 of Government's

6    Exhibit 4, what is happening here?

7    A    So they're reliving a sexual encounter that the two of

8    them had and they're talking about it in a positive way.

9    Q    Did you ask the victim what this conversation was about?

10   A    Yes.  This was -- Roger had criticized them -- this was

11   after he had gotten some initial videos of them having sex

12   with each other Mr. Desphande had taken.  So Roger criticized

13   them for not having any chemistry with one another.  So this

14   was Nick's idea to show that they did have chemistry with each

15   other by making up this conversation about what a good sexual

16   encounter they had with one another.

17   Q    Okay.

18   A    And which is completely opposite of -- when I interviewed

19   the CV, she did not enjoy any of the sexual encounters

20   whatsoever.

21   Q    Turning to page 560, who is saying -- I'm pointing at the

22   bottom here.  Who is saying what?

23   A    Okay.  So this would have been Nick.  Do you want me to

24   read it?

25   Q    Yeah.

1    A    "You just have to wiggle your ass and you will find me on

2    your back."

3    Q    Okay.  And moving to the next page, 561, and you see this

4    sort of black rectangle.  What is -- is that a redacted photo?

5    A    Yes, ma'am.

6    Q    Have you seen the original photo?

7    A    Yes, ma'am.

8    Q    What does it depict?

9    A    That the CV's vagina.

10   Q    And how do you know that, that that's what it is?

11   A    Well, we -- when we interviewed CV.

12   Q    All right.  Turning to page 563, who does the CV

13   reference at the bottom of the page?

14   A    Nick -- I'm sorry.  Nick Cuban.

15   Q    And turning to 565 -- well, 564, skimming through, just

16   generally what's happening here?

17   A    Once again, they're talking in a positive fashion about a

18   sexual encounter with one another.

19   Q    And turning to page 565, what is this black rectangle

20   here?  Is that redacted?

21   A    Yes, ma'am.

22   Q    What's the original photo?

23   A    I believe that's the second picture of the CV's vagina.

24   Q    All right.  And turning to page 566, what's this black

25   rectangle on 566?

1   A   The third picture of the CV's vagina.

2   Q   But it's redacted here?

3   A   Yes, ma'am.

4   Q   All right.  And on page 568, does their conversation

5   continue here?

6   A   Yes, ma'am.

7   Q   And on page 569, what's this black rectangle here?

8   A   This is a picture of Mr. Desphande's penis.

9   Q   All right.  What is in the -- well, I'll skip that.

10          Turning now to Government's Exhibit 3, which is a

11   much bigger packet of paper, do you recognize this?

12   A   Yes, ma'am.  These are more of the saved screenshots.

13   Q   Okay.  Whose phone did they come from?

14   A   From the CV's phone.

15   Q   All right.  And who did she tell you she was

16   communicating with in this case?  Note that it says

17   "Nick Cuban" at the top.

18   A   Yes.

19   Q   Who is she talking to here?

20   A   So we had to ask her about this because this was

21   confusing to us.  This is actually -- she's supposedly talking

22   to Roger at this point.  However, Roger was mocking her by

23   using the name Nick Cuban in the header.

24   Q   Why would Roger want to mock her and say, oh, yeah, I'm

25   really Nick Cuban?  What was the logic behind that?

1   A    I think just to show that he understood that -- how do I

2   say it?  It's confusing.  I think to show that he understood

3   that the conversations between -- that there were no private

4   conversations here, that Nick and Roger were both -- both

5   understood what was going on with CV.

6   Q    And whose messages are on the left in white?

7   A    That would be Roger's.

8   Q    And whose texts are on the right in purple?

9   A    That's the CV.

10  Q    What are these black rectangles here?

11  A    That was also part of what he did kind of in a mocking

12  way to -- I'd like to find a better word -- but to needle her.

13  It was actually -- it's a picture of the CV.  It's the CV's

14  picture from one of her social media applications that she

15  used and it's a picture of -- I believe it's of her face.

16  Q    So what's a picture of her face, his -- his profile

17  picture actually a picture of her face?

18  A    Yes.  That's what I was trying to say.

19  Q    Okay.  All right.  Turning -- what's the general nature

20  of these chats just overall?  Because you've read the whole

21  thing before.

22  A    Yeah.  Just extremely demeaning and aggressive, a lot of

23  name-calling from Roger towards the CV, the CV basically

24  trying to explain to Roger that she didn't want to do this

25  anymore and Roger basically continuing to threaten her and

1  call her names and extort her into producing.

2  Q    Start reading here at the top of page 646, starting with

3  the CV's text, and just keep continuing.  I'll stop you on

4  648.

5  A    Okay.  So this is the CV talking.  "If I'd wanted to, I

6  can't drop out, meaning that I am indeed trapped into some

7  dangerous game that I didn't ask for.  Even if I finished it,

8  it isn't done there."

9          Roger says, "You, you, you, you, you."

10          CV:  "I feel like this isn't ever going to end."

11          Roger:  "That's all you got, bitch.  It's only about

12  you."

13          CV:  "That's true.  Myself and Nick's support is all

14  I have."

15          Roger:  "Hello.  Listen to me for a second."

16          CV:  "You only insult people and turn them into

17  something ugly for fun."

18          Roger:  "You as an individual is nothing which

19  people care.  You have zero credibility.  No one likes you."

20          CV:  "Okay."

21          Roger:  "No one in your school even fucking cares

22  about you.  You know why?  Because you have this gut attitude

23  which stinks."

24          CV:  "Oh."

25          Roger:  "What guys have you for, a fuck.  You are a

1    piece of meat that's good to fuck and throw."

2    Q    Okay.  You can stop there.

3    A    Okay.

4    Q    Let's turn to Bates 652.  What's going on here?  Can you

5    just read here?  I'll stop you on the next page.

6    A    Okay.  So starting off with Roger?

7    Q    Yes.

8    A    "Learn how life is.  Go take a moment.  Sit down" --

9    Q    Wait.  Sorry.  Page 652.

10   A    I'm sorry.

11   Q    Right here at the top starting with Roger saying, "Think

12   what you are doing."

13   A    Okay.  "Think what you are doing in your life that makes

14   it big."

15           CV:  "I'm just hurting.  Hurting so bad.  And I'm

16   praying this ends."

17           Roger:  "I am not alone?"

18           CV:  "I hate my life.  I hate what this is."

19           Roger:  "Devin and all the girls you spoke to say

20   the same."

21   Q    What does she say on the next page?  You can read all the

22   way to the bottom of the page and then stop.

23   A    CV:  "I hate it to the point that sometimes the thought

24   of overdosing on anything becomes tempting."

25           Roger:  "This never ends.  This will haunt you

1    throughout your life.  The choices you made will affect

2    throughout."

3            CV:  "I can't do this right now.  I can't believe

4    what you're saying.  I can't.  I've gone beyond what I can

5    handle emotionally.  I need a break.  Then I guess I'll end me

6    by my own hand."

7            Roger:  "No one gets such a damning shot at life at

8    16.  Only a few lucky ones do, but you will be an example of

9    how to ruin it all.  Go end it and die.  Do whatever."

10   Q    Turning to the next page, can you just explain to the

11   Court what's happening here?

12   A    Okay.  This was, again, Roger demonstrating to CV that he

13   had chats between CV and Nick Cuban.

14   Q    And how did that affect the victim; did she tell you

15   that?  Like, what effect -- why did that matter to her?

16   A    I don't recall.

17   Q    Turning to page 657, just reading at the top -- just read

18   this top section.

19   A    Okay.

20   Q    Who is speaking?

21   A    This was from Roger.  "By his and your silence, I am

22   thinking that you are either dead or pretending to be dead.

23   On the other hand, I am sure Nick is erasing all of the

24   content."

25   Q    Let me pause you there.  Did the victim ever pretend to

1    be dead?

2    A    She did.  She told us that for two days, she tried to

3    disappear and make them think that she had killed herself.

4    Q    Okay.  All right.  What else does he say then?

5    A    Okay.  "On the other hand, I'm sure Nick is erasing all

6    the content.  I am left with no other option but to go ahead

7    and dump out the stash."

8    Q    And what's the stash?  What's the stash as the victim

9    understood?

10   A    The stash would be all the videos and images of CV1.

11   Q    Okay.

12   A    "All right, then.  I am dumping it all.  So, bitch, you

13   go and delete me from Snapchat and go silent dead.  Now wait

14   and watch what happens.  I will go and proceed this is -- this

15   in worth."

16   Q    And can you just summarize how the victim responds, how

17   this affects her?

18   A    She just pleads with him.  She seems to be desperate.

19   And she's scared that all of her stuff is going to be on the

20   Internet.

21   Q    And what does she say on page 662, her very last

22   statement right here?

23   A    "You don't like facing this.  Maybe" -- this is the CV

24   talking.  "You don't like facing this.  Maybe because it's

25   true.  But I'm 16, not 20, not 36, not 45, not 50.  Not yet.

1   My actions only correlate to my age."

2   Q    And you've read what happens next.  Did that change the

3   defendant's --

4   A    No.

5   Q    -- actions towards the victim at all?

6   A    No.  It continued.

7   Q    And turning finally to page 664, and this will be the

8   last section you read.  Just read this section starting below

9   my red line --

10  A    Okay.

11  Q    -- on page 664.

12  A    "I have about one" -- this is Roger.  "I have about 1,000

13  requests on Insta waiting to be accepted for one pic I posted.

14  Now wait till I bring more.  Each and every one of your school

15  fellas will be added into my account in a matter of days.

16  Entire" -- and then the redacted is the name of the CV's high

17  school -- "entire blank will come to see you.  Some will hate

18  it, but they will watch your nudes and wait to fuck you when

19  they get a chance.  That's step one."

20  Q    Then keep going.

21  A    Okay.  "Next is I promise your mom will pay for what

22  you've done as well."

23  Q    And does he actually also say that he's going to spread

24  things to her family as well?

25  A    Yeah.  He talks about, I believe, her stepdad and her

1   sister and her brother as well.

2   Q    Okay.  And does he actually name friends of hers on

3   page 666 and we've redacted those out?

4   A    Yes, ma'am.

5   Q    All right.  Did you learn from the victim whether the

6   defendant visited her in Orlando at any other time other than

7   the first time in September 2017?

8   A    Yes, ma'am.  She estimated between four and five times

9   that he would come to Orlando, the last time being over Easter

10  weekend of 2018.  I believe March 29th to April 1st.

11  Q    And did he coordinate those visits through their Internet

12  communications --

13  A    Yes.

14  Q    -- and cell phone?

15  A    Yes.

16  Q    What happened during those visits?

17  A    And this was all part of -- Roger was demanding 24 hours

18  of sex tapes between Nick and CV.  So Mr. Desphande would come

19  to town and basically it was the same -- it was the same MO

20  each time.  He would pick her up away from her parents' house.

21  She would say she was at a girlfriend's house.  They -- he

22  would -- she did remember that they always checked into

23  different hotels, the last one being the Sheraton here in

24  Orlando, that he would meet her, they would take -- they'd go

25  to the room.  He'd have sex with her over the one or two days

1    that he was in town, would videotape it.  In fact, she only

2    remembered one time that they ever left the room and that was

3    to go to a Chic-fil-A.  That was on the last -- on the last

4    visit.  But the rest, it was just in the hotel having sex and

5    the videotaping it.

6    Q    And who was the defendant posing as during those visits,

7    Nick or Roger?

8    A    He was always Nick Cuban.

9    Q    Did the defendant use any particular equipment or props

10   as he recorded himself having sex with the victim?

11   A    Yeah.  From the first, she had told us -- and he brought

12   these each time -- he would bring a blindfold.  He would bring

13   a black phallic device.  He would bring handcuffs and

14   lubricant.  I believe on the last trip, he also brought

15   cannabis drops that she had -- or that he had her put on his

16   tongue -- her tongue in order to relax her.

17   Q    Did the victim indicate what the defendant did with the

18   dildo?

19   A    Yes, that he penetrated her with it and, in fact, tried

20   to penetrate her anus with it.  However, when she told him

21   that it hurt, he stopped.

22   Q    Did the defendant ever give her anything?

23   A    She estimated about $200 in cash and also gave her an

24   American Express -- I think it's called a serve card, which is

25   a card that you can load money onto.  However, that didn't

1   work well because you had to have a name attached to it.  So

2   that's why they decided to go with cash.

3   Q    Did he ever give her little gifts?

4   A    Yes.  I think a pair of earrings, a small pair of

5   earrings.

6   Q    All right.  And did you actually get those during the

7   investigation?

8   A    Yes, ma'am.  She had them and she gave them to us.

9   Q    Did you ever learn why the victim kept going along with

10  making all these videos?

11  A    Yes, ma'am.  She was afraid to stop because she was

12  afraid that, like the threats we just read, that the videos

13  would be released on the dark web and to her friends and to

14  her family.

15  Q    According to the victim, did the defendant ever portray

16  himself as a member of the military?

17  A    He did.  Part of his -- part of Nick Cuban's background

18  was that he was in the United States Marine Corps.

19  Q    Turning to page 670 of Government's Exhibit 3 -- I'll

20  pull it up here.  She says here at the top, "My nose bled this

21  morning when I read your message."

22          That's from the victim.  Are you aware of what the

23  victim was talking about with these nosebleeds?  What's she

24  talking about?

25  A    Yes, ma'am.  Because at the first -- I think the day or

1   the second day after we first made contact with her, we had

2   her interviewed by a child forensic interviewer.  That

3   interview started off -- just as they were sitting down

4   starting to talk, the victim got a -- the child victim got a

5   tremendous nosebleed.  Took about 15 minutes.  She said it was

6   brought on by angst, I guess, nervousness.

7   Q    Did she explain to you during the course of the

8   investigation how the events of these ten months had an effect

9   on her nosebleeds?

10  A    Yeah.  That living under the constant threat of extortion

11  and having to produce these videos and images, that the

12  stress -- that she believed these were stress related.

13  Q    Did the victim ever send the defendant a picture of that

14  nosebleed?

15  A    She did.  As part of a continuing effort to elicit some

16  sympathy so that they would stop demanding -- stop extorting

17  her, she actually sent a picture of her face covered with

18  blood.

19  Q    And did the defendant's conduct stop after that?

20  A    No.  It didn't affect it.

21           MS. CHANG:  I have nothing further, Your Honor.

22           THE COURT:  Mr. Wagner, cross-examination?

23           MR. WAGNER:  May I proceed from my spot here, Judge?

24           THE COURT:  Sure.

25  ////

CROSS-EXAMINATION

BY MR. WAGNER:

1   Q    Good afternoon.  How are you?

2   A    Good afternoon.

3   Q    I just want to clarify a few things --

4   A    Yes, sir.

5   Q    -- about the source of this information.  Some of the

6   information -- just broadly, some of the information you've

7   relayed to the Court here came from interviews with -- I'm

8   going to call her the accusing witness, but we're talking

9   about the person that you're calling CV.

10  A    CV.

11  Q    Okay.  Some of the information you've relayed to the

12  Court here in direct was conveyed to you by CV through

13  interviews, correct?

14  A    Yes, sir.

15  Q    And some of that you were able to -- you were able to

16  look at some screenshots and some information you obtained

17  from the search warrant of Mr. Desphande's home in Dublin,

18  California, correct?

19  A    Some from there, yes, sir.

20  Q    So let's just start one by one.  You said that you

21  recovered a hard drive from Mr. Desphande's home in Dublin,

22  California, that contained evidence that he had been acting as

23  an administrator for the Britemodels website; is that

1   accurate?

2   A    Yes, sir.

3   Q    What you actually recovered, though, was evidence of a

4   Microsoft Outlook inbox -- inbox/outbox, correct?

5   A    Yeah.  It showed who he had been communicating with, yes,

6   sir.

7   Q    It didn't show directly that Mr. Desphande was acting as

8   an administrator for Britemodels.  That's an inference you

9   made, correct?

10  A    Well, yes, sir.  But his name was attached to some of the

11  e-mails.  And also, he used the initials DD as one of his

12  aliases.  But in that -- on that hard drive were e-mails

13  specific to Deepak Desphande.

14  Q    This might sound pedantic, but there isn't any specific

15  direct evidence that shows Mr. Desphande was the one sending

16  or receiving those e-mails just based on the review of the

17  hard drive you seized during the -- you or the agents out in

18  San Francisco seized in the search warrant, correct?

19  A    I wouldn't agree with that.  I mean, there's no e-mail

20  saying Deepak Desphande is sending this e-mail.  But there's

21  e-mails showing that Deepak Desphande was in communications to

22  set up the website.  And there's Deepak Desphande e-mails on

23  the same hard drive.  He had several e-mail accounts on that

24  hard drive as I recall it.  And --

25  Q    What evidence -- I'm sorry to cut you off.

1    A    I'm sorry.

2    Q    That's okay.  What evidence is there that Mr. Desphande

3    actually communicated with anyone to set up the hard drive?

4    Do you have photographs of him or video recordings?

5    A    No.  I don't have a photograph of Mr. Desphande doing it,

6    no, sir.

7    Q    Do you have any eyewitnesses that saw him do that or can

8    attest that he did that?

9    A    No, sir.  He did not want to speak to us.

10   Q    Did you subpoena any documents from the hosting -- the

11   company doing the hosting or any of the third-party activities

12   required to maintain a website to indicate that it was

13   Deepak Desphande and not just someone using an e-mail with DD

14   or Deepak or something like that?

15   A    No, sir.  I was happy with the fact that we found the

16   hard drive in his house.

17   Q    Okay.  So you're inferring all of this was --

18   Mr. Desphande did all of this because you found the hard drive

19   at his house with e-mails either purported -- either with the

20   e-mail address DD or maybe sometimes referencing the name

21   Deepak?

22   A    Yes, sir.

23   Q    Not Deepak Desphande but just Deepak?

24   A    I don't believe --

25   Q    Am I correct?

1    A    -- they ever used those names, no, sir.

2    Q    Deepak Desphande and DD?

3    A    But there were -- but his name was on the hard drive in

4    other accounts.

5    Q    Okay.  Now, with respect to Government's 2, you testified

6    that those were screenshots of a chat that took -- did you say

7    that one was from Kik?  I may --

8    A    No.  Government 2 is the Britemodels website.

9    Q    Directly through the Britemodels website?  Did you

10   attempt to subpoena any -- any of the --

11   A    I don't recall if we did or not, no, sir.

12   Q    Let me finish my question just so the record is clear.

13        Did you attempt to subpoena any records from any of

14   the third-party hosting companies or any companies that had

15   possession of any of this data to confirm that those --

16   independently confirm that those chats took place on the

17   Britemodels website, not just on screenshots from the phone?

18   A    What chats?

19   Q    The chat -- you just said that those chats in

20   Government's 2 came from the Britemodels website.

21   A    It's not a chat.  It's just the Britemodels website.

22   Q    I'm talking about -- maybe I've got my exhibits mixed up

23   here.  I'm talking about -- give me a second.

24        Oh, I'm sorry.  Let's start with 3, Government's 3.

25   A    Yes, sir.

1   Q    Can you tell us what that -- specifically where that's

2   from?

3   A    Yes, sir.  These were recovered from the CV's phone.

4   Q    Okay.  But you didn't independently verify -- did CV tell

5   you what program she was using to have that conversation?

6   A    This is Kik.

7   Q    Okay.  But you didn't subpoena any records from Kik; is

8   that correct?

9   A    I don't believe so, no, sir.

10  Q    So you don't -- you were not -- you or anybody you were

11  working with didn't have any independent verification that

12  that chat actually took place on Kik?

13  A    I'm familiar with Kik.  This is Kik.

14  Q    Same thing with Government's 4.  Where is that from?

15  A    I don't -- I don't recall.  I don't recall.

16  Q    But wherever it came from --

17  A    This was off of her phone.  She mentioned they used

18  WhatsApp, Snap, Wire.  They used numerous ones.  I don't

19  recall which one this is.

20  Q    And I don't think that's the important point I'm trying

21  to make, but the point is, is that whatever third-party

22  software that they were using to communicate, you didn't

23  follow up and subpoena that and get independent, you know,

24  documentation?

25  A    I didn't feel the need to.  Like I said earlier, when Kik

1  is shut down, it's gone.  I know this from doing undercover

2  work.  So to go there and ask them for it, it's not going to

3  be there.  I knew that the only thing that was going to exist

4  was what she -- was what she had on her phone.

5  Q    What about WhatsApp; do you think that was available?

6  A    Off the top of my head, I don't recall.

7  Q    What was the third one you said?

8  A    I believe -- I believe she mentioned using Wire.  She

9  also mentioned using Google Hangouts.  There was several.

10 Instagram, I believe, and maybe Snapchat as well.

11 Q    Did you attempt to subpoena records from any of those

12 companies?

13 A    Didn't feel I needed to, no, sir.

14 Q    Okay.  Now, it's fair to say that you're inferring based

15 on the evidence that you have that it was Mr. Desphande

16 actually typing the words that were, you know, represented in

17 these chats as either being written by Devin, Roger, or

18 Nick Cuban; is that correct?

19 A    Correct.

20 Q    You didn't actually see Mr. Desphande do it?

21 A    No.  But Mr. Desphande showed up at the airport as

22 Nick Cuban.

23 Q    And you didn't actually have an independent eyewitness

24 verify that Mr. Desphande was on the other end of those

25 conversations?

1  A    Like I say, Mr. Desphande showed up at the airport after

2  having that conversation that, hey, I'll show up at the

3  airport.

4  Q    I understand.  But that's an inference you're making

5  based on what you've seen here?

6  A    Yes, sir.

7  Q    So you're not telling the Court there's direct evidence

8  that he was the actual one typing those things?

9  A    I did not stand behind Mr. Desphande and watch him type

10  it, no, sir.

11  Q    And, in fact, CV couldn't tell you that she had personal

12  knowledge of who was actually typing those things, is that

13  correct, in all the times you interviewed her?

14  A    No.  She was completely confused.  She was told it was

15  three different people, although she suspected it was one

16  person towards the end.

17         MR. WAGNER:  All right.  I have nothing further.

18         THE COURT:  Redirect examination?

19                REDIRECT EXAMINATION

20  BY MS. CHANG:

21  Q    Agent Hyre, let's first talk about that hard drive.

22  A    Okay.

23  Q    Isn't it true that there were upwards of ten e-mail

24  accounts on that hard drive?

25  A    Yes, ma'am.

1   Q    And some of them were -- actually had the defendant's,

2   like, tax forms on them naming his name, like an I-9 form?

3   A    Yeah.  I believe -- I hope I said that.  That's what I

4   was trying to say, is that the hard drive had his entire name

5   on it.  He was identified on the hard drive.  The specific

6   ones to the -- for the Britemodels, I don't recall if he had

7   his entire name on it.  I do know -- I do recall DD in there.

8   But it came from the same hard drive that was clearly

9   Mr. Desphande's.

10  Q    Isn't it true that in some of the accounts, he actually

11  calls himself other names like --

12  A    Correct.

13  Q    -- like Dave and Klix?

14  A    Yeah.  It's all the same MO that he used to talk to girls

15  to get them to take naked pictures of themselves in other

16  accounts.  And he used different names in those as well, but I

17  knew it was Deepak Desphande.

18  Q    And there were clearly some forms -- I'm sorry -- some

19  documents tying Illumio, which is where he worked, with his

20  name on that same hard drive in the same area of the e-mail

21  accounts?

22  A    Yes, ma'am.

23  Q    Okay.  Turning to this idea of the inferences, okay.  So

24  you don't have a big brother surveillance video showing

25  24 hours a day, seven days a week, 30 days a month where the

1    defendant was at every moment in time during the offense

2    conduct, right?

3    A    No, ma'am.

4    Q    And you don't have -- the victim doesn't have that

5    either, right?

6    A    No, ma'am.

7    Q    But did the victim confirm to you that all of these chats

8    that she had were with the same person?

9    A    Yes.

10   Q    And then it's through these chats that visits were

11   coordinated for her to meet with someone who would pick her up

12   at her friend's house, right?

13   A    Correct.

14   Q    And who showed up at her friend's house?

15   A    Deepak Desphande.

16   Q    And at the outset of your investigation when you had no

17   idea who this person was, did the victim give you a physical

18   description of what he looked like?

19   A    She gave us a clear physical description, said that --

20   estimated him to be about five-foot-five, mentioned that he

21   had a scar I believe over his right -- right eyebrow, two

22   pierced ears.  She said he was possibly Indian looking, said

23   he had skinny arms and a beer belly.

24   Q    Did she mention a tattoo?

25   A    Yeah.  And most importantly mentioned he had a sleeve

1  tattoo down one of his arms.  And once we got the address from

2  the FedEx envelope, we quickly resolved that it was

3  Mr. Desphande.  This was not a who-done-it for very long.

4  Q    Have you actually seen his sleeve of tattoos?

5  A    I have when we took him to the U.S. Marshals and they

6  took photographs of him.  He has a sleeve tattoo I believe on

7  his left arm.

8  Q    And at the outset of your investigation when you met with

9  the victim, is that the time that she told you about the

10  handcuffs, the dildo, the blindfold?

11  A    And lubricant, yes, ma'am.

12  Q    And lubricant.  And when the defendant a month -- well,

13  it's like two weeks later was arrested in Orlando, what did

14  you find in his luggage?

15  A    We found all of those items, handcuffs, black phallic

16  device, blindfold, lubricant, five smartphones, and the tripod

17  that she had mentioned, the video camera she had mentioned, as

18  well as still cameras.

19  Q    And what's one of the brands of the cameras that she

20  mentioned to you before you even laid eyes on this guy?

21  A    I think it was a Nikon.

22  Q    And did you find a Nikon camera in his luggage?

23  A    Yes, ma'am.

24           MS. CHANG:  I have nothing further, Your Honor.

25           THE COURT:  All right.  Thank you.  Feel free to be

1  seated at counsel table.

2          I would invite the Government to call their next

3  witness.

4          MS. CHANG:  The United States calls Bryce Essary.

5          THE COURTROOM DEPUTY:  Please come forward and be

6  sworn.

7                        **BRYCE ESSARY,**

8  called by Government, was duly sworn by the courtroom deputy,

9  and in answers to questions propounded, testified as follows:

10         THE COURTROOM DEPUTY:  Have a seat there, please.

11         THE COURT:  All right.  Good afternoon.  Once

12  seated, please make yourself comfortable with the chair's

13  proximity to the microphone.  Then please state your full

14  name, spelling your last name.

15         THE WITNESS:  Yes, Your Honor.  Bryce Essary.

16  That's E-s-s-a-r-y.

17         THE COURT:  Ms. Chang, your witness.

18         MS. CHANG:  Thank you, Your Honor.

19                   DIRECT EXAMINATION

20  BY MS. CHANG:

21  Q    Good afternoon, Agent Essary.  Where do you work?

22  A    I'm with the FBI Tampa Division, the Orlando Safe Streets

23  Task Force.

24  Q    How long have you been a special agent for the FBI?

25  A    I came on in October of 2008.

1    Q    What did you do before the FBI?

2    A    I was an active duty United States Marine.

3    Q    Do you recognize the defendant?

4    A    I do.

5    Q    Did there come a time last year when you became involved

6    in an investigation concerning him?

7    A    Yes.

8    Q    And I'll go into detail in a bit.  So just very high

9    level, describe generally what you investigated.

10   A    I received a letter from the U.S. Attorney's Office that

11   was addressed to AUSA Shawn Napier.

12   Q    Go ahead.

13   A    In that letter, it was a -- somebody that was in the jail

14   that was an inmate at the Orange County corrections facility

15   here in Orlando that, in fact, that inmate had knowledge of a

16   potential murder-for plot referencing a victim in an FBI

17   investigation.

18   Q    Okay.  And the person who was allegedly plotting to

19   murder someone, was that the defendant?

20   A    Yes.

21   Q    Did the letter name the defendant specifically?

22   A    I don't remember if the letter specifically named the

23   defendant.

24   Q    Then how did you know it was him?

25   A    Well, we needed to talk to hammer it out, but I do know

1   the letter discussed the actual -- referenced earlier the CV.

2   Q    Okay.  Did the U.S. Attorney's Office receive that letter

3   in about September 18, 2018?

4   A    Approximately, yes.

5   Q    Was the defendant still awaiting trial at that time?

6   A    Yes.

7   Q    Did the letter contain the name and address of the CV?

8   A    Yes.

9   Q    And did you, upon further research, confirm that that's

10  her true name and her true home address?

11  A    I did.

12  Q    And that she was a minor victim in the defendant's

13  pending federal case?

14  A    Yes, ma'am.

15  Q    And did you also consult with agents, such as Agent Hyre,

16  and the agents recognized the name and address?

17  A    I did.

18  Q    And what was done at the outset to protect the victim?

19  A    Well, initially, I'm always a little skeptical with

20  jailhouse -- or any time that you get someone that's going to

21  cooperate from a jail.  So I wanted to verify that before we

22  scare anybody or had cause to -- of concern.  So we ended up

23  going and interviewing the actual CW in the jail facility.

24  Q    The CW is the --

25  A    Yes, ma'am, the cooperating witness.

1  Q     -- the writer of the letter?

2  A     I'm sorry.  The cooperating witness to vet it to see if

3  there were any bona fides or something that we needed to be

4  actually concerned about.  And following that, it became very

5  apparent there was some legitimacy and something to be

6  concerned about based on the fact that the name, address, and

7  other identifying information was provided.

8  Q     And what did you do?  Did you make any contact with the

9  victim at the outset to protect her?

10  A     Yes.

11  Q     What did you do?

12  A     We visited the family, met the family, told them -- we

13  essentially calmed them, let them know this wasn't a concern,

14  but to be vigilant, pay attention to strange vehicles or

15  personnel around based on the information that we obtained

16  from that interview.

17  Q     Okay.  And I know you said that you interviewed the

18  cooperating witness at the outset.  So my next questions are

19  based on this initial set of interviews with him.

20         What had the defendant told this cooperating witness

21  about why the defendant was incarcerated?

22  A     That the defendant told the CW that he was incarcerated

23  for computer hacking.

24  Q     And at some point, did the defendant ask the cooperating

25  witness to assist the defendant with something?  And if so,

1  what did he ask for help with?

2  A    Yes.  So the CW met the defendant the summer of 2018 at

3  the facility, and the defendant -- or the CW explained that

4  initially the defendant told him it was a computer hacking

5  cyber crime and that, in fact, he needed to recover evidence,

6  digital evidence.  And a point on the CW, he had been in the

7  system for a little while, the federal system, and, in fact,

8  was a little leery of this, didn't believe this evidence

9  recovery for the simple fact it's more than one piece of

10 evidence likely and that the Government would already have

11 possession of it.

12 Q    You're saying who is having these doubts?

13 A    The CW believed that the defendant might have been a

14 little naive with the criminal system to believe that the

15 Government would not have that piece of evidence in their

16 possession.

17 Q    Okay.  But what was the defendant asking the witness

18 specifically to do at that time?

19 A    To recover a piece of digital evidence.

20 Q    Okay.  And when the defendant talked about doing that,

21 did there come a time when the witness became suspicious?

22 A    The witness said he was suspicious from the onset and

23 that he had been in the system long enough to know that

24 typically when a federal hold -- in this case, that's what the

25 defendant was, a federal hold awaiting federal trial -- tells

1   you that they're in jail for computer hacking, that it's

2   immediately likely that they are, in fact, potentially child

3   pornography.  He also became very concerned and suspicious

4   when he found out that the individual that was the witness

5   was, in fact, a teenage female.

6   Q    And what exactly did the defendant say that he wanted

7   done concerning the minor female, CV?

8   A    Initially just to make her go away, and then it turned

9   into he needed her killed.

10  Q    Okay.  Did the defendant give the cooperating witness any

11  particular information about the victim?

12  A    He did.

13  Q    Like what?

14  A    Provided a hand-drawn map to the CV's residence with

15  specific directions based on geographical locations here in

16  Orlando, provided the name and biographical data for the CV's

17  mother to include employment, potential locations for where

18  the CV went to high school, where her -- where she would be

19  picked up by a bus, potentially a good time for a school-aged

20  child.

21  Q    Did the defendant also provide the cooperating witness

22  with instructions on how to download a virtual private network

23  or VPN?

24  A    Yes.

25  Q    And why -- what did the defendant say about why he was

1    doing that?

2    A    The defendant was -- let me back up, if you may.  The

3    defendant believed that the CW was due to be released because

4    he had completed state of Florida court proceedings here.  In

5    fact, the CW was not being released.  He was being sent back

6    to the federal facility that he came down here to Orlando

7    from.  So he believes -- the defendant believes that the CW

8    was going to be released.

9              So based upon that, when the CW was released, he

10   would need to contact people on the outside that had contacts

11   with the defendant.  Therefore, he provided the step action

12   download process for the voice over IP, or the VPN network, in

13   order to conceal phone numbers and/or just the contact that he

14   might have with any of the defendant's associates.

15   Q    Okay.  And since we hear a lot of "he's" going on, who

16   exactly provided the --

17   A    I'm sorry.  It is -- it's confusing.

18   Q    Who provided the instructions on the VPN?

19   A    The defendant.

20   Q    Okay.  And who was the confidential witness supposed to

21   contact using the VPN?

22   A    He was supposed to contact the defendant's brother.

23   Q    Okay.  And why -- what's the purpose of having a VPN?

24   Like, why would that benefit anyone?

25   A    To conceal the phone -- a cellular device that you have.

1   If I use a VPN, a voice over IP -- and I'm not a -- I'm not a

2   technical expert, but I do know that then it's not -- it's not

3   your traditional record that leaves a toll record from -- if

4   you and I had called each other on a cell phone, it's going to

5   leave a toll record.  A voice over IP is different.  There's

6   applications that allow you to do that.  There was one

7   specific application that he recommended -- the defendant

8   recommended to the CW.  I believe it is on the actual note.  I

9   don't know the particular app.

10  Q    Okay.  What role was the brother -- what role was the

11  defendant's brother supposed to play in all of this?

12  A    A middleman, but essentially the point of contact, a

13  third party to talk from the outside to the -- to -- Deepak,

14  or the defendant, could call his brother from the jail.  And

15  the brother was essentially -- my belief is unwitting, had no

16  idea what he was really being used for.  But that was the

17  intent, is to have the brother as a third party, because the

18  defendant could not call the CW once the CW was released.

19  Q    And so was this a way for CW essentially to get messages

20  back to the defendant through the brother?

21  A    Correct.

22  Q    Okay.  Did the defendant ever say how much money was

23  available to fund this operation to kill the witness?

24  A    He initially -- the CW provided us -- he was told that

25  the -- that the defendant told the CW approximately

1   1.2 million in bitcoin, which is a digital currency house.

2   But ultimately at the end of the day, he said there was

3   120,000 available for the actual operation, with seven to ten

4   of it dedicated to the actual hitman, or the person that was

5   actually going to execute the operation.

6   Q    So you're saying seven to $10,000 for the hitman?

7   A    Seven to 10,000 for the actual person to conduct the

8   operation.

9   Q    Okay.  Did the defendant discuss with the cooperating

10  witness a ransom demand?

11  A    Yes, he did.

12  Q    Explain.

13  A    I'm going to have a drink of water if you don't mind.

14         The defendant actually -- the -- I'm sorry.  The CW

15  provided information that the defendant told him to demand

16  $500,000 in ransom for the purpose of -- since this was

17  supposed to happen before trial and to remove the child victim

18  from court proceedings, that a ransom would not -- would

19  deceive, if you will.  Why would you demand a ransom for

20  somebody that is paramount to a court proceeding?

21  Q    So did CW understand the ransom to be sort of like a red

22  herring, planting a red herring?

23  A    Yes, ma'am.

24  Q    Okay.  And did the defendant actually explain that red

25  herring to the CW in the way that you just described?

1    A    Yes.

2    Q    Okay.  Did the defendant provide a timeline for getting

3    rid of the victim?

4    A    The defendant needed -- the CW explained to us that the

5    defendant was concerned about the victim.  Initially it was

6    just prior to trial, and then it moved to middle of October, I

7    want to say, of 2018.

8    Q    Did the defendant anticipate that CW would find and kill

9    the victim himself or find someone else to do that?

10   A    No.  The CW believed that the -- or the defendant

11   believed that the CW would be getting a -- would hire a third

12   party or essentially be the organizer of the operation via a

13   third party to actually go dispose of the victim.

14   Q    And what details -- well, you already talked about that.

15        Did the confidential witness have a street name?

16   A    Yes.

17   Q    What was it?

18   A    Music.

19   Q    Did the defendant's plan make any use of that nickname?

20   A    Yes.

21   Q    How?

22   A    The language that was communicated -- again, this is --

23   as the third party, the CW would be released.  The CW would

24   start to put the plan in motion, and then he was directed to

25   contact the brother and relay that the music has started.

1   Q    And so the music had started is supposed to be code for

2   what?

3   A    For the operation has begun, or actually I've -- all of

4   the -- all the ducks are in a row, if you will, to go forward

5   with the plan.

6   Q    And before -- well, as part of this plan, did the

7   defendant actually provide CW with a number of documents?

8   A    He did.

9   Q    And did you get those documents from the CW?

10  A    Yes.

11  Q    All right.  I'm showing you Government's Exhibit 5, which

12  will be filed under seal.  This is the first page of

13  Government's Exhibit 5.  This is something you got from CW,

14  right?

15  A    Yes, ma'am.

16  Q    And where did he get it from?

17  A    He received it from the defendant.

18  Q    All right.  Right here -- I'm not going to read it out

19  loud.  You should not either.  But I'm pointing to something

20  at the top half of the page on the right-hand side.  Is that

21  the victim's actual home address?

22  A    It is.

23  Q    What is referenced below next to "Kik"?  Don't read it

24  out loud, but just explain what this is supposed to be.

25  A    There are two screen names.  Obviously as it was being

1   written down, it says one or the other.  Could not remember

2   whether there was a specific.

3   Q    What is listed below that?  What is referenced two lines

4   below the -- two lines above the bottom?

5   A    The high school.

6   Q    And is that where the victim goes to high school?

7   A    Yes, ma'am.

8   Q    And what is at the very bottom?  What's that supposed to

9   be?

10  A    Another -- another school.

11  Q    And what is the -- well, what appears at the very top of

12  the page?

13  A    The child victim's name, first and last name.

14  Q    What appears below her first and last name?

15  A    It is a map that orients someone viewing the map, if you

16  were traveling on a certain road north-south through Orlando

17  or east-west, a major intersection and then how specifically

18  once you're in the tracked neighborhood to where the

19  residential address is located.

20  Q    Turning to page 2 of Government's Exhibit 5, what is

21  this?

22  A    This is the first, last name of the child victim's

23  mother.

24  Q    Followed by what?

25  A    A social security number that, again, has a possible

1   different two separate ending fours.

2   Q    What appears on the third line?

3   A    A telephone number.

4   Q    For who?

5   A    For the mother.

6   Q    And what appears below that?

7   A    A driver's license number.

8   Q    And what appears at the very bottom?

9   A    A potential place of employment for the mother.

10  Q    Turning to page 3 of Government's Exhibit 5 -- and I know

11  this is really hard to read, but what is this?

12  A    This was the instructions on downloading the VPN

13  network -- or the VPN to a cellular device.

14  Q    Turning to page 4, what's this?

15  A    These are a list of names that the CW provided us that

16  was provided to him via the defendant for people that could

17  potentially help him out on the outside that the defendant had

18  met in jail.

19  Q    When you say "help out," are you saying like --

20  A    Conduct the operation.

21  Q    Okay.  Conduct the operation to kill the victim?

22  A    Yes, ma'am.

23  Q    All right.  And finally, what's on page 5 of Government's

24  Exhibit 5?

25  A    More of the same.  Of note on this one was the --

1    because, again, you go into -- any time you're dealing with

2    somebody that's incarcerated that comes to you for -- with

3    information, something of note on this was, my brother Dilip

4    and the telephone number for Dilip.

5    Q    And Dilip is who?

6    A    The brother of the defendant.

7    Q    Have you spoken with him?

8    A    I have not.

9    Q    But have you corroborated through the family that he does

10   have a brother named Dilip?

11   A    Yes, ma'am.

12   Q    Did you gather all of the documents that we just went

13   through during your meetings with the CW on or before

14   September 27, 2018?

15   A    I gathered the information about the documents, but due

16   to initially he -- the first meeting, he did not have the

17   documents on him.  He told us about the documents and he said

18   that he -- he had no -- he did not know that we were arriving

19   to the jail to speak with him.  So then I advised him that the

20   following day, we were going to arrive and how he could get

21   those documents to me without alerting other prisoners or

22   other detainees that he was bringing those to us.

23   Q    Did you interview the CW again on October 2nd, 2018?

24   A    Yes.

25   Q    Did CW indicate at that time how the defendant was

1   fairing?

2   A    Yes.

3   Q    And what did he -- what did he say?

4   A    He was -- the defendant was much more open, was becoming

5   more desperate with the situation.

6   Q    Why did CW believe that the defendant was becoming more

7   desperate?

8   A    The defendant was concerned that trial was coming up and

9   that the -- paying the CW, issues like that were important,

10  but he was -- he was concerned that this timeline wasn't

11  pushing along.  But I'm not clear on what you're asking why he

12  was getting more desperate.

13  Q    You already kind of hit on it.  That's fine.

14  A    Okay.

15  Q    Around that time, did the defendant give CW anything to

16  pass to the defendant's brother?

17  A    Yes.

18  Q    What was that?

19  A    He provided a letter to the defendant.

20  Q    And I'm showing you Government's Exhibit 6.  Is this the

21  letter?

22  A    Yes, ma'am.

23  Q    What was the confidential source supposed to do with this

24  letter?

25  A    He was supposed to take a photo of the letter and submit

1   it, like, over the cellular device and use the VPN network to

2   submit this letter.

3   Q    Did you get this letter from CW when you went to visit

4   him?

5   A    We actually got this letter on the day that we moved CW

6   from one facility to another.

7   Q    Okay.  What language is this in?

8   A    This is in -- I may not be saying it right -- Kannada,

9   which is a Dravidian language in southwest India.  There's

10  about 46 million people that speak it, but it's pretty rare.

11  Q    And for the record, it's spelled K-a-n-n-a-d-a?

12  A    Yes, ma'am.

13  Q    Did the FBI attempt to learn what this letter says?

14  A    We did.

15  Q    How did you do that?

16  A    There is nobody in the FBI in an official language

17  capacity that speaks that language.  There is one individual

18  that is part of the Los Angeles division that we submitted the

19  letter to that does speak the language and provided us a brief

20  summary.  But overall the letter is, if you'll note -- this is

21  not sealed, correct?

22  Q    It's not.

23  A    Okay.  If you'll note that it is the entire -- the entire

24  letter is written in kind of -- minus the portion that says,

25  "tell your bro that I'm calling to eat lunch at Olive Garden

1  in noon," and then it goes back to Kannada.  The individual

2  that speaks Kannada that read the letter said that it's

3  essentially telling the brother, or Dilip, that somebody is

4  going to call you and this is what they're going to tell you.

5  And then you need to call -- when I talk to you from the jail

6  next time, I need you to tell me that -- in our language that,

7  in fact, you got that call and what was said.

8  Q    Did the defendant give CW any other messages to convey to

9  the defendant's brother as the plot was moving along?

10 A    He said that, as I had mentioned earlier, advising that

11 the music had started.  There was talk about, I just bought

12 the CD that you recommended.  And then when I'm finished

13 listening to the CD, thanks.  That was to indicate that the

14 operation was completed.

15 Q    Did the defendant give CW any specific guidance or

16 instructions about holding or killing the victim?

17 A    The CW explained that the defendant wanted the victim

18 kidnapped, mentioned the ransom again, but the ransom was a

19 distraction, that really he wanted the victim killed and the

20 body dumped somewhere where it would not be found.

21 Q    Did the defendant give CW any instructions as to what he

22 should say when the victim was actually killed?

23 A    Could you ask that again?

24 Q    Did the defendant give CW instructions as to what should

25 be communicated back to him when the victim was actually

1  killed?

2  A    That the music had stopped and/or it was -- I believe it

3  was the music stopped.  But I know that the CW was directed --

4  and, again, the brother was supposed to be the middleman.  And

5  so it was advised, you know, hey, thanks for recommending that

6  CD.  I just finished it.

7  Q    Did the FBI find a way to actually send this letter to

8  the defendant's brother?

9  A    We did.

10  Q    And how did you do that?

11  A    We took a photo of the letter and submitted it to the

12  telephone number that was provided that we verified also

13  through -- through other databases that that was, in fact, the

14  brother, the same number that was provided.

15  Q    And upon learning about the defendant's scheme, did the

16  FBI begin using an undercover in connection with this

17  investigation?

18  A    Yes.

19  Q    What was the purpose of your undercover?

20  A    It was a backstop.  Really at the end of the day for

21  this, we felt like we could control -- one of the first

22  things, again, that I mentioned with the CW is, once I

23  believed -- when I found out about the map, the first -- the

24  information on the child victim, it was to stop the defendant

25  from shopping, if you will, for -- shopping for somebody else.

1   So go ahead, tell that, in fact, you'll work with this.  We

2   wanted to fix it, if you will, meaning isolate it, so we could

3   control it.  Because you get this kind of information in a

4   jail and it goes out all over -- you know, all over the place.

5   I wanted to be able to control it as quickly as possible.

6           So once we removed the CW from the facility, it

7   was -- that's why we wanted the undercover just telephonically

8   as a backstop for if someone made a phone call, in fact, the

9   plan was in motion, anybody involved would believe that that

10  was actually the point of contact.

11  Q   So I just want to -- you've said a lot.  You've covered a

12  lot of ground.  So I just want to make sure we're clear.

13          What was your -- when you say you were trying to

14  stop the defendant from shopping, what was your worst case

15  scenario that you were trying to prevent?

16  A   Yes, ma'am.  The worst case scenario was that this had

17  gotten out to somebody else, that we weren't seeing the money

18  flow or we weren't seeing somebody that was, in fact, already

19  with this plan in motion.  So that, again, went to -- and you

20  asked me earlier about talking with the family and meeting

21  with the child victim.  We also notified the school resource

22  officer, the watch command for Orange County in the area as an

23  immediate threat.  You know, we explained to them if there's a

24  problem at the house or at her bus stop or anything, don't

25  call the FBI, 9-1-1.  That way the watch command for that

1   patrol sector would know they had been advised of this

2   potential threat.

3   Q    And so coming back to your undercover, since you were

4   trying to prevent the defendant from shopping elsewhere, what

5   specifically -- like, what role was the undercover playing?

6   A    Just all the undercover was at the time was a phone

7   number.

8   Q    But what was it supposed to be a phone number leading to?

9   A    So the phone number was provided by the CW if, hey, all

10  else fails, call this number.  This is the guy I'm going to

11  use.

12  Q    To do what?

13  A    For the murder-for-hire plot.

14  Q    Okay.

15  A    This was who was actually going to be the triggerman, if

16  you will, for the operation.

17  Q    And so the FBI communicated the undercover's phone number

18  for this hitman to the defendant through CW?

19  A    Yes, ma'am.

20  Q    And is it the case that through the CW, the defendant was

21  told what the undercover was willing to do?

22  A    Yes.

23  Q    Okay.  Did the undercover receive any phone calls during

24  the course of your operation?

25  A    Yes.

1    Q    And how many calls did he get?

2    A    It was three or four.

3    Q    Who called the undercover?

4    A    Another inmate at the facility by the name of

5    Michael Hunt.

6    Q    And we'll come back to Michael Hunt in a moment, but

7    first explain to the Court what happened in the days

8    immediately preceding that first call to the undercover.  So

9    the FBI sends a letter to the brother and then what happens?

10   What communications occur between the defendant and anyone

11   else?

12   A    So the -- we submitted the letter to the brother.  We did

13   not get a response, which was expected because thus far -- one

14   of the things we had -- when you make calls from the jail,

15   they're told this is subject to recording.  So obviously we

16   were -- we were conscious of his phone -- of the defendant's

17   phone calls to family, to the brother, to the -- there had

18   been no mention -- one of the things I didn't mention about

19   the language, 90 percent of those discussions were, in fact,

20   in Kannada.  So we were having to take cuts of that, send them

21   out to our contact in Los Angeles.  And to that, there had

22   been no specific talk of this op with the family.  So we had a

23   pretty good idea that any family member, for instance, Dilip,

24   was going to be an unwitting participant, would not know what

25   they were relaying back to him just other than he had directed

1   that.

2          So we submitted that letter and then we heard

3   nothing.  But there was a phone conversation -- I don't

4   remember if it was 48 hours to 72 hours -- where the defendant

5   was talking with his family and specifically told, do not give

6   our -- the family, do not give anybody other than your

7   attorney our contact information.

8   Q    And were there any discussions about money at that time

9   as well?

10  A    Yes, but it was -- it was ambiguous.  It wasn't -- it

11  was -- we didn't -- we didn't know if it was about legal fees.

12  There was $10,000 mentioned for that other thing, but for all

13  we knew, it could have been a forensic review.  We didn't

14  know.

15  Q    Okay.  Let's come back to Michael Hunt.  So did the FBI

16  determine whether Michael Hunt was housed in the same pod as

17  the defendant?

18  A    Yes.

19  Q    And did you eventually conclude -- and I'm going to get

20  into more detail, but just high level, did you eventually

21  conclude that Michael Hunt made these calls on behalf of the

22  defendant?

23  A    Yes.

24  Q    Now, why would it make sense for the defendant to use

25  someone else to make his calls?

1  A    At the jail when you make calls, you have a specific

2  inmate number that's tied to your outgoing calls.  So if I get

3  somebody else -- you know, if I'm going to call you, we're

4  going to talk.  If someone -- if I know the Government is

5  potentially listening to those phone calls, I'm going to get

6  somebody else to make that call for me that is none the wiser,

7  meaning I'm not hearing you anymore now.  It's another inmate

8  or somebody else.  I would have to know their inmate number

9  and specifically know to pull that person's records and see

10  who they're talking to.

11  Q    Did you pull Michael Hunt's other calls during this

12  investigation?

13  A    Yes.  Once we identified anyone that had direct -- it

14  wasn't, you know, second, third order of contact.  Once we --

15  we would pull their jail calls and find out who their contacts

16  were.

17  Q    And other than these three calls -- three or four calls

18  to the undercover from Michael Hunt to the undercover, did you

19  find anything else in Hunt's other calls that related to this

20  plot to kill the victim?

21  A    No, ma'am.

22  Q    Did the FBI interview Hunt?

23  A    Yes, we did.

24  Q    When did Hunt first meet the defendant?

25  A    I believe it was May or June of 2018.

1   Q    What was Hunt's relationship with the defendant according

2   to Hunt?

3   A    They were pod mates, which, again, I'm not -- the

4   schematic of it, there's four to eight in a pod, I believe.

5   And then they move around, too.  They don't stay in the same

6   pod.  But Michael Hunt had been in the pod with him for

7   approximately four months.

8   Q    Did Hunt tell the FBI -- did he admit to you that he had

9   made calls on the defendant's behalf?

10  A    He did.

11  Q    Did he tell -- did Hunt tell you who gave him that phone

12  number to make those calls?

13  A    Yes.

14  Q    Who gave him that phone number?

15  A    The phone number was provided to him by the defendant.

16  Q    All right.  And how did Hunt know what to say once he

17  called the undercover line?

18  A    Hunt was provided a yellow piece of notebook paper that

19  said, relay the following:  Has the music started?  Hunt

20  couldn't recall everything that was on the transcript.  It was

21  all the same -- the same coded language.

22  Q    But have you spoken, then, to whoever played the

23  undercover and gotten the substance of their conversations?

24  A    Oh, yes.  Yes.  We listened to them.

25  Q    What was the substance of the conversations?

1   A    It was, has the music started?  I don't have enough

2   money.  You know, I've seen the studio, but I need to -- you

3   know, I need someone to pay for studio time.  And then it was,

4   well, we'll -- let me talk to somebody about getting you paid

5   for studio time.  I'm broad brushing it.

6            But then there's another phone call that referenced,

7   hey, that other plan to get, you know, the money for studio

8   time fell through.  And then they discuss an actual amount,

9   like 7,000, half up front.  So that was what Hunt provided for

10  us, too.

11  Q    How did your investigation end?

12  A    You mean with the -- we continued to make sure

13  throughout, even to this point, that there was no outside

14  contacts with individuals that we didn't know about.  We

15  continue to review jail calls currently just to ensure that

16  there was nothing nefarious still afoot or vindictive.

17           But once we removed the CW and then a month later --

18  three weeks later we get the independent phone calls with the

19  same language, we figured out that it was going to be very

20  difficult -- or it wasn't plausible for the defendant to

21  actually get money to somebody.  That was the biggest problem.

22  And so our investigation ended at that point.  And still,

23  again, we didn't -- the vigilance continued with jail calls

24  and making sure that contacts were out there.

25           But it was a two-way -- we balanced it two ways.  It

1   was a risk assessment.  For instance, the list of names that

2   were provided, it was speculation that any of those people

3   actually knew what was going on, that there could have been

4   some embellishments.  I'm talking about the list of names and

5   phone numbers.  So we weighed it with, we need to fix it,

6   isolate the problem with the CHS or the CW and then the UC and

7   then, at the same time, we don't want to go on knocking on

8   doors and alerting somebody about the defendant and

9   potentially what they've gotten them involved in.

10  Q    Did there come a time when you confronted the defendant

11  about this?

12  A    Yes.

13  Q    Explain to the Court what happened.

14  A    I went to the defendant -- I want to say early November

15  of 2018.  I provided every piece of evidence we had,

16  everything that was right here, the same letters, and

17  explained my biggest concern was if there was something that

18  we didn't know about.  And I just wanted to get out in front

19  of it and stop it.  I Mirandized the defendant and he refused

20  to speak with me.

21          MR. WAGNER:  May I voir dire the witness before I

22  tender an objection, Judge?

23          THE COURT:  And what specifically are you going

24  to --

25          MR. WAGNER:  I just want to know if Mr. Desphande

1    was Mirandized and whether he was -- he was obviously in

2    custody -- before he invoked.

3              THE COURT:  Yes.

4                      <u>VOIR DIRE EXAMINATION</u>

5    <u>BY MR. WAGNER</u>:

6    Q    Was he Mirandized before he invoked?

7    A    Yes.

8              MR. WAGNER:  I would object, comment on silence.

9              THE COURT:  All right.  So would you like to respond

10   to the objection?

11             MS. CHANG:  No, Your Honor.  And I'm actually

12   through.

13             THE COURT:  All right.  Then I won't consider that

14   in any way in determining what the appropriate sentence would

15   be.  The objection is sustained.

16             You said you're ready to rest?

17             MS. CHANG:  Yes, Your Honor.

18             THE COURT:  All right.  Cross-examination?

19             Hold on a second.  My court reporter is asking me

20   for a break.  So I'm going to give her that.  Let's take ten

21   minutes and we'll get started back up.  The Court is going to

22   be in recess for ten minutes.

23        (Recess at 3:10 p.m., until 3:25 p.m.)

24             THE COURT:  Mr. Wagner, are you ready to proceed?

25             MR. WAGNER:  Yes, sir.

1          THE COURT:  All right.  Feel free to conduct your

2     cross-examination.

3          MR. WAGNER:  May I conduct my cross from the table

4     here, Judge?

5          THE COURT:  Sure.

6          MR. WAGNER:  Thank you.

7                    CROSS-EXAMINATION

8     BY MR. WAGNER:

9     Q    Good afternoon, Agent.  How are you?

10    A    Good.

11    Q    You mentioned at the beginning of your testimony on

12    direct that when you initially had contact with the person

13    you're calling the CW in this murder-for-hire investigation

14    that you were skeptical of what CW was telling you.

15         Why were you skeptical of someone who came to you

16    from inside of a jail and offered you information about

17    another inmate?

18    A    I believe I said anytime that I receive tips from a jail,

19    I'm always skeptical.  I wasn't referring specifically to the

20    CW.

21    Q    Why would you be skeptical of tips from a jail?

22    A    Because typically they're quid pro quo.  They want

23    something in return.

24    Q    So are you telling the Court that oftentimes people in

25    the jail will call law enforcement and offer to provide

1  information on other inmates in exchange for -- even if they

2  think it's only -- they think they're going to get something

3  out of it in exchange for some kind of leniency on their own

4  charges?

5  A    Yes.

6  Q    Is that why you're skeptical?

7  A    Historically, yes.

8  Q    All right.  Were you skeptical of CW when he first

9  contacted you?

10 A    No, because he didn't ask for anything.

11 Q    But you still tried to independently corroborate what he

12 was telling you?

13 A    I did.

14 Q    Why would you want to independently corroborate what he

15 was telling you if you at this point believed what he was

16 telling you?

17 A    Because I'm not going to run something as fact until I

18 independently corroborate something.

19 Q    Okay.  You said you had a -- moving on to another

20 subject, you said that you had a special agent in the

21 Los Angeles office who spoke the Kannada language?

22 A    It's not even a special agent.  It's an employee of the

23 FBI.

24 Q    Employee.  Sorry.  And that person was able to informally

25 translate this letter that was admitted, written in the --

1   purportedly written by Mr. Desphande?

2   A    Yes.

3   Q    Did this person produce a written translation?

4   A    No.

5   Q    Any record of the translation?

6   A    Other than phone calls to tell us in general, no.

7   Q    So basically what you got was the gist of the letter --

8   A    Yes.

9   Q    -- from someone else who spoke the language?

10  A    Correct.

11  Q    Did you confirm whether this person had any particular

12  training in translation or interpretation?

13  A    Other than the fact that they're from that portion of

14  India, no.

15  Q    Okay.  And you don't read the language yourself, I

16  assume?

17  A    No, sir.

18            MR. WAGNER:  I have nothing further.

19            THE COURT:  Redirect?

20                     REDIRECT EXAMINATION

21  BY MS. CHANG:

22  Q    Agent Essary, to date, has the confidential witness asked

23  for anything from the Government?

24  A    No, ma'am.

25  Q    Has he gotten anything from the Government?

1   A    No, ma'am.

2   Q    Did you independently corroborate what he told you?

3   A    Yes.

4         MS. CHANG:  Nothing further.

5         THE COURT:  All right.  Ms. Chang, may this witness

6   be excused?

7         MS. CHANG:  Yes, Your Honor.

8         THE COURT:  Will he be subject to recall from the

9   Government?

10         MS. CHANG:  No, Your Honor.

11         THE COURT:  Mr. Wagner, will he be subject to recall

12   from the defense?

13         MR. WAGNER:  No, sir.

14         THE COURT:  All right.  Thank you, sir.  You have a

15   nice day.

16         THE WITNESS:  Thank you, Your Honor.

17         THE COURT:  Please call your next witness.

18         MS. CHANG:  The United States has no other witness

19   apart from the victim, who wishes to make an unsworn statement

20   at the end.

21         THE COURT:  All right.  I appreciate you telling me

22   that.

23         Mr. Wagner, this is the Government's burden, but do

24   you plan on presenting any evidence in rebuttal at this time?

25         MR. WAGNER:  Yes, sir.

1          THE COURT:  All right.

2          MR. WAGNER:  Against my advice, I will call

3    Mr. Desphande.  And may I use the exhibits at the ELMO --

4          THE COURT:  Yes, you may.

5          MR. WAGNER:  -- to examine him, please?

6          THE COURT:  All right.  Mr. Desphande, I want to

7    make sure you understand that your attorney has indicated to

8    the Court that against his advice, you're insisting on

9    testifying under oath.  Do you understand that any statements

10   you make can be used against you here and that you will be

11   subject to cross-examination by Ms. Chang?  Do you understand

12   that?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  All right.  If you would be kind enough

15   to raise your right hand, Ms. Darleen is going to place you

16   under oath.

17                    **DEEPAK DESPHANDE**,

18    called by Defense, was duly sworn by the courtroom deputy,

19   and in answers to questions propounded, testified as follows:

20         THE COURTROOM DEPUTY:  Have a seat there please.

21         THE COURT:  Right here in the witness chair.

22   Mr. Desphande, once seated in the witness chair, please state

23   your full name into the microphone.  You do not have to spell

24   your last name.

25         THE WITNESS:  Deepak Desphande.

1      THE COURT:  All right.  Mr. Wagner, your witness.

2                    DIRECT EXAMINATION

3    BY MR. WAGNER:

4    Q    Good afternoon, Mr. Desphande.  Would you go ahead and

5    look here at what I believe is marked as Government's

6    Exhibit 5.  I think that's why the tab is 5.  I don't have my

7    notes with me.  Can you see this?

8    A    Yes, sir.

9    Q    Did you draw this map?

10   A    Yes, I did.

11   Q    Why did you draw this map?

12   A    This was the information that I drew when I initially met

13   my investigator, Jerry, who was working with my attorney back

14   then, Mr. Mark O'Brien.

15   Q    What was --

16   A    I gave him all the details about -- especially there were

17   two points in here.

18   Q    Well, let me ask you another question before you go off

19   on a narrative.

20            What was the purpose of drawing this map and giving

21   it to your former lawyer's attorney -- I mean, investigator?

22   A    To find detailed information and also some video

23   evidence, if possible.

24   Q    Video.  You said detailed information?

25   A    Video evidence or surveillance footage across CVS and the

1    gas station.

2    Q    Why would you want your investigator to go find

3    surveillance evidence from the CVS across from the gas

4    station, which I think is right here; is that correct?

5    A    Right.

6    Q    Okay.

7    A    Because I wanted my investigator to find out who were the

8    few people that I've met during the days of -- in the -- I

9    think -- I believe March 2018.

10   Q    You just wanted him to go find some random people you met

11   in March of 2018?

12   A    They were important in my case, so I wanted my

13   investigator to find those people.  At least that would prove

14   a certain element into my -- into the case.

15   Q    Why were they important in your case?

16   A    Because according to Government theory, the Government

17   says all the people in the whole course of conversation is me.

18   So I just wanted to give some hints at information regarding

19   who were those people and why were they there, et cetera,

20   et cetera.

21   Q    And you thought that there would be surveillance video of

22   those people?

23   A    I was 100 percent sure in CVS and opposite the gas

24   station there were two surveillance cameras which I saw when I

25   was standing over there.  And I was 100 percent sure that the

1    surveillance footage would have captured those people on that

2    location.

3    Q    Okay.  You want to testify about this particular exhibit?

4    A    Yeah.  It's the same --

5    Q    This is exhibit -- I believe this is -- okay.  This is

6    all Exhibit 5, page 2.

7              THE COURT:  All right.  And that's sealed.  But just

8    so we're clear on the record, it's page 2 of sealed Exhibit

9    No. 5.

10   BY MR. WAGNER:

11   Q    Don't put any information -- don't read any information

12   out loud.  Just tell us, did you write this?

13   A    Yes, I did.

14   Q    And why did you write this?

15   A    Not just this.  There's a larger portion among this.  I

16   mean, this is cut up -- cut up into, like, you know, half a

17   page or something, but there's a larger portion.  I wrote

18   detailed information of all the things that I found in the

19   folders that I received as evidence.  And I gave all this

20   information to my attorney -- sorry -- not to my attorney --

21   to my investigator, Jerry, who was supposed to do all the

22   investigation backgrounds regarding the case.

23   Q    So you're saying that you didn't give this to the person

24   they've been referring to as CW --

25   A    No.

1   Q     -- the FBI and the Government?

2   A     No.

3   Q     You're saying you gave this to your attorney?

4   A     I was supposed to give this to my attorney, but -- I was

5   supposed to give this to Jerry, who is my investigator.  But

6   somehow after the second meeting, which was I think in the

7   month of -- I probably think it's July sometime when my

8   attorney told me that it is not necessary to write down every

9   information from the evidence because Jerry has access to all

10  the information that -- that is already there in the packet.

11  So I just kept it into my folder.

12  Q     So you didn't actually give it to anyone.  You kept in

13  your folder.  Is that your testimony?

14  A     Right.

15  Q     In your property at the jail?

16  A     Right.

17  Q     Your personal effects?  This is page 3 of the same

18  exhibit, the sealed exhibit.

19  A     Right.

20  Q     Once again, don't read anything -- any of this

21  information out loud.  Did you write this?

22  A     Oh, yeah.

23  Q     What was the purpose of writing this?

24  A     I wrote this and about six other pages like this -- I

25  think more than six other -- technical details on how to use

1   telephones, how to use computers, how to secure yourself, how

2   to keep your privacy.  And if you go onto my LinkedIn, you'll

3   have much detailed information regarding this on how to use

4   it.

5   Q    But why did you write all this stuff out?

6   A    Usually in the jail, like, people ask, hey, how do I do

7   this?  How do I do this?  You give them that information and

8   that --

9   Q    Other inmates?

10  A    Pardon?

11  Q    Other inmates asked you for information?

12  A    Yes.

13  Q    Did you give this to anyone?

14  A    Everybody in the jail copy of this, like more than -- I

15  mean, everybody that I met.  There are -- this is not just a

16  single page.  There are about, like, eight to seven pages that

17  I wrote like this on how to secure your Gmail, how to secure

18  your phones, how to secure your e-mails, how to secure --

19  Q    Well, let me clarify my question.  You said you wrote

20  this particular document, right?

21  A    Yes.

22  Q    Did you give the particular document that you wrote to

23  anyone else?

24  A    No.

25  Q    So where did you keep -- where did you have this item

1  until I guess at some point it left your possession?  Where

2  did you have it?

3  A    All these were in my property there in the -- in the book

4  and the -- and the property sheet, something like that, which

5  is there on my desk along with all the evidence which

6  Daryl Ali had it.

7  Q    With respect to the map on the last page and then this --

8  this note page 2, the map page 1, and now this note on page 3,

9  if you left these items in your property, do you have any idea

10  how the FBI might have gotten ahold of them?

11  A    I know it was taken by Daryl Ali, because he was the only

12  person who had access to my documents.

13  Q    Who?

14  A    Daryl Ali.

15  Q    Okay.  So you think someone took them from your personal

16  property and --

17  A    Yes.

18  Q    -- turned them over to the FBI.  Is that what you're

19  saying?

20  A    Yes.

21  Q    All right.  And then the last page -- well,

22  second-to-last page, page 4, did you write this?

23  A    Yes, I did.  I mean, apart from that there are, like,

24  other -- six to seven pages of address.  We don't have address

25  books.  We don't have telephones.  So we just wrote down

1    pieces of address for every person that you meet who is, like,

2    saying, hey, write down my note.  So we just write it down.

3    Q    Did you give this to anyone?

4    A    No.

5    Q    Do you know how it got from your possession to the FBI?

6    A    I'm pretty sure Daryl Ali was the one who picked it up.

7    Q    Last page of this exhibit, page 5, I believe, did you

8    write this?

9    A    Yeah.  It's part of that.

10   Q    Okay.  Did you give this to anyone?

11   A    No.

12   Q    Do you know how it got to the FBI?

13   A    Daryl Ali.

14   Q    So it's your testimony that every document -- you believe

15   that every document in this exhibit was stolen and given to

16   the FBI against your will?

17   A    Including the last letter, which I was supposedly

18   purportedly sent to my brother, so-called.

19   Q    Okay.  Let's talk about that.  This is Government's 6,

20   page 1.  Did you write this letter?

21   A    Yes, I did.

22   Q    What language is it in?

23   A    This is Kannada.

24   Q    Do you want to testify about the contents of it?

25   A    Yeah, sure.

1  Q    I'm asking you a question.  I'm not suggesting you

2  should.  I'm asking if you want to testify about the content.

3  A    I do.

4  Q    You do?

5  A    Yes, I do.

6  Q    What do you want to -- well, do you want to read it in

7  English, or do you want to tell us what it is?  What do you

8  want to say?

9  A    There's a huge history behind this.  If you -- I can go

10 through the entire history.

11 Q    Let's do this.  What does it say?

12 A    This says there's a person called Music and he's going to

13 tell you something important.  Don't speak that in English.

14 Speak that in Kannada to me.  For example, if some -- if he

15 says, tell your brother that I'm eating lunch in Olive Garden

16 at noon, just tell it in -- translate it in the kind of

17 language saying, blah-blah, blah-blah, blah.  And whatever he

18 sends, do not save it.  Delete it immediately.  Don't ask him

19 anything or don't give him anything.

20 Q    Who did you give this letter to, if anyone?

21 A    Well, it was supposed to be given to Raymond F. Brown.

22 Q    Who is Raymond F. Brown?

23 A    Raymond F. Brown is a -- was supposedly the FBI special

24 agent who was supposed to give me information regarding four

25 names that I was looking for and --

1  Q    Why were you looking for the information on these four

2  names?

3  A    These are the four guys who are -- who are linked to my

4  case and I knew them.  And I was supposed to -- I was supposed

5  to testify -- or help the Government in 5K1.  And I thought my

6  idea was, like, since I'm going to help the Government, I'm

7  also going to give them all these four guys' names who are the

8  actual guys behind this so that that way, I'm out of this

9  without any problem.

10  Q    So you're saying that you thought you were

11  communicating with a -- did you know you were communicating

12  with an FBI agent, this person you described as Mr. Brown?

13  A    Mr. Brown was boyfriend of Daryl Ali.  So I was talking

14  through Daryl Ali to Mr. Brown.

15  Q    And the purpose of this conversation was to get the names

16  of witnesses that might help you when you proffer with the

17  Government.  Is that what you're telling the Court?

18  A    These were witnesses and the perpetrators of my case who

19  were, like, involved into my case.  So that's why I wanted to

20  give the Government all these guys' names.

21  Q    Okay.  Is there anything else I haven't asked you about?

22  A    Government claims that I didn't know, I was under the

23  impression -- the whole case says that I was under the

24  impression that Daryl Ali was supposed to go to street, like

25  released back to home, and that's why I was like -- I was like

1   talking to him and to perpetrate murder-for-hire plot.  This

2   is the letter -- this is the address book -- one of the

3   address books which I can show --

4   Q    Are you saying that you have something you want to admit

5   into evidence?

6   A    Yes.

7          MR. WAGNER:  May I approach, Your Honor?

8          THE COURT:  You may.

9          THE WITNESS:  This is the information that Daryl Ali

10  gave me, including his fed number, his -- the way that I am

11  supposed to write and if I'm supposed to write to his mother,

12  the way I'm supposed to write it through this letter.  And

13  this is the guy whom I'm supposed to call up on the phone

14  regarding what happened with the investigation.

15         MR. WAGNER:  Okay.  Let's do this one by one.

16         Your Honor, may I -- I know this is not necessarily

17  protocol.  May I approach and have this marked?

18         THE COURT:  Well, why don't you allow Ms. Chang to

19  take a look at what's on there.

20         We're just going to presume, Ms. Chang, that

21  Mr. Wagner will be moving that as a composite exhibit into

22  evidence.

23         MS. CHANG:  Yes, Your Honor.

24         There's no objection, Your Honor.

25         THE COURT:  All right.  Without objection --

1  Ms. Darleen, is this the first defense exhibit?

2          THE COURTROOM DEPUTY:  Yes, Judge.

3          THE COURT:  All right.  We'll mark it as Defense

4  Composite Exhibit No. 1, which consists of four pages.  It

5  will be marked and admitted in evidence.

6          Do you want to use that during your examination so

7  we can keep it moving?

8          MR. WAGNER:  Yes, Judge.

9          THE COURT:  All right.  We'll just turn it in to

10  Ms. Darleen once you finish.

11          MR. WAGNER:  I'm going to reference it by page and

12  I'll keep them in the same order.

13          THE COURT:  Thank you.  It would help if you would

14  just number each page just manually 1 through 4.

15  BY MR. WAGNER:

16  Q    All right.  Mr. Desphande, let's do this one page at a

17  time.  This is page 1 of what's going to be Composite

18  Exhibit 1 -- Defense Composite Exhibit 1.  Can you tell the

19  Court what this is?

20  A    These are -- on the top is Daryl Ali's federal number

21  wherein I'm supposed to go and write the letter if he --

22  Q    Who is the Daryl Ali?

23  A    He's a defense witness or the person --

24  Q    Is he the person that they've been referring to as CW?

25  A    Right.

1   Q    Okay.  Can you just refer to him as CW for now?

2   A    CW.

3   Q    Thank you.

4   A    And this is the address for CW, the way I'm supposed to

5   write to him.  This is the address of Punta Cana, his native

6   place, wherein I'm supposed to write the letter in case he

7   wants to.  And this is -- the last one is a federal

8   institution address that I'm supposed to write in case if I

9   want to.

10  Q    Okay.  Can you tell us what page 2 is here of this

11  composite exhibit, Defense 1?

12  A    The second one is, again, his address at the Dominican

13  Republic that he wanted me to write to.

14  Q    "He" being CW?

15  A    CW.

16  Q    Okay.

17  A    And Smith, Denise is CW's mother.  The idea behind this

18  was if I were to send message to him, it would not go directly

19  to him.  So the idea was to send the letter to her, and she

20  would read the letter to him when he comes on the phone.

21  Q    Okay.  Let's look at page 3 of Defense Composite

22  Exhibit 1.  Can you tell us what that is?

23  A    This is the phone number that I was supposed to call up.

24  It says Oliver -- oli.g23@yahoo.com.  This would be the e-mail

25  address for the Mega cloud in which he would put on the

1  evidence.  And the password for this e-mail address was --

2  password to Mega cloud was evanna (phonetic spelling).  I was

3  supposed to log in into this, collect the evidence, and send

4  it to my attorney.

5  Q    Okay.  Page 4 of Defense Composite Exhibit 1, can you

6  tell us what that is?

7  A    Initially when I -- when Ali came into -- CW came into

8  jail around -- I think July some time frame.  And when he came

9  over to prison, I didn't want to talk to him because I knew

10  who he was.  I know him from July 2013 because I exposed him

11  long back.  He was -- at that time, he was peddling identity

12  theft.  He was also doing -- forging green cards, immigration

13  papers, visas, DHS documents, DHS database, passports, fake

14  driver's license, printers from black current -- dark

15  currencies.  He was also doing -- he was also working with a

16  multimillion dollar asset management company to which he was

17  peddling identity theft.

18          I was actually searching for OPM hack in 2013,

19  during which I was running the investigation for who was

20  leaking the documents from -- for the top security -- top

21  security clearance people.  These identities were being leaked

22  out on the Internet.

23  Q    Let me ask you this.  What's the purpose -- why did you

24  write all these notes out, save them, and then bring them here

25  to court today to admit them into evidence?

1  A    This was -- all this was supposed to be given to -- was

2  given to prosecution.  Because in the month of August, I told

3  my attorney, Mark O'Brien, that I'm going -- I'm going to

4  support -- or help Government in finding all these doc --

5  finding all these crimes, and Daryl Ali was the guy -- I mean,

6  CW was the guy who was behind this.  There were much other

7  bigger fishes, and I told my attorney that I want to use this

8  as one of my proffer.

9  Q    So are you saying you were interacting with the CW

10 because you were going to try to give him up to the Government

11 in your substantial assistance cooperation?  Is that what

12 you're trying to say?

13 A    He wanted me to --

14 Q    Who is he?

15 A    CW wanted me to help him get lower sentence.  But somehow

16 when I spoke to my attorney, my attorney said prosecution was

17 not interested in the information that I provided.  So they

18 sent it back.  And that's when CW was, like, upset at me that

19 he took -- I mean, I took all his information and I was like

20 doing all that shit -- stuff and hurting him.  And he was

21 upset about it earlier initially, and then -- and he already

22 knew my case.

23 Q    Are you telling the Court that you were interacting with

24 CW not to plan a contract killing, but to get information on

25 him that you could then use in your quest to get a substantial

1  assistance deal from the Government in your own case?

2  A    I was never looking for any murder-for-hire plot or never

3  use him for that.

4  Q    Answer my question.  The question is specific.  Are you

5  saying that you were interacting with the CW not for the

6  purpose of engaging in a murder-for-hire plot, but to get

7  information on the CW that you could then use to your

8  advantage in a substantial assistance agreement with the

9  Government?

10  A    Yes.

11  Q    Okay.  Do you have any other documents that you want to

12  admit into evidence?

13  A    No.

14        MR. WAGNER:  May I approach the clerk, Judge?

15        THE COURT:  You may.

16  BY MR. WAGNER:

17  Q    One more question, Mr. Desphande.  Are those notes that I

18  just gave to the clerk in the same or substantially the same

19  condition when you wrote them?

20  A    I didn't write them.  He wrote them.

21  Q    Oh, he did?

22  A    Yeah.

23  Q    Do you recognize his handwriting?

24  A    It is his handwriting.

25  Q    Okay.  Are they in the same or substantially the same

1   condition as they were when he gave them to you?

2   A    Yes.

3            MR. WAGNER:  I would move them into evidence as

4   Defense 1.

5            THE COURT:  All right.  There is no Government

6   objection.  They are moved into evidence as Defense Composite

7   Exhibit 1, which is comprised of four separate pages.

8            (Defendant's Composite Exhibit No. 1 was admitted

9   into evidence.)

10           THE COURT:  Ms. Chang, would you like to

11  cross-examine the witness?

12           MS. CHANG:  Yes, Your Honor.

13           THE COURT:  All right.  Feel free to proceed.

14                     CROSS-EXAMINATION

15  BY MS. CHANG:

16  Q    You know you're under oath, right?

17  A    Yes, I do.

18  Q    You know it's a crime to lie under oath?

19  A    Mm-hm.

20  Q    Same as at your plea hearing?

21  A    Mm-hm.

22           THE COURT:  If you would be so kind as to answer

23  "yes" or "no," it will assist my court reporter in typing the

24  transcript.

25           THE WITNESS:  Yes.

1    THE COURT:  All right.  Feel free to proceed.

2    BY MS. CHANG:

3    Q    So it's your claim --

4         MS. CHANG:  May I go to the ELMO, Your Honor?

5         THE COURT:  Sure.

6    BY MS. CHANG:

7    Q    I'm showing you the first page of Government's Exhibit 5.

8    You recognize this, right?

9    A    Yes, I do.

10   Q    You drew this, right?

11   A    Yes, I did.

12   Q    You're the one who put your victim's name at the top of

13   the page, right?

14   A    That is right.

15   Q    And you put her address, her home address, right here on

16   the side, right?

17   A    That is correct.

18   Q    And actually, you drew this map from memory, right?

19   A    Map for?

20   Q    You drew this map from memory?

21   A    No.

22   Q    No?  How did you draw this map?

23   A    With help of people.

24   Q    With the help of people?

25   A    Right.

1   Q     Okay.  With the help of which people?

2   A     People in jail.

3   Q     Who have a photographic memory as to maps?

4   A     You understand this is not -- I mean, nobody needs a map,

5   correct?  There is nobody -- in today's generation, nobody

6   needs a map.  This is not a map for address, so-called so and

7   so.  This was -- this was a map drawn to point CVS and gas

8   station and a park along with it.

9   Q     Let me pause you there.  So there's no need to draw a map

10  in this day and age, right?

11  A     Yes.

12  Q     Because you can look everything up on the Internet,

13  right?

14  A     That is correct.

15  Q     You can look up a map on the Internet?

16  A     Mm-hm.

17  Q     You can look up a CVS address on the Internet, too,

18  right?

19  A     That is true.

20  Q     So you're saying that this map you drew because you don't

21  really need a map?  Is that what you're saying?

22  A     I don't need a map for me, myself.  Or I don't have to

23  draw this for anybody except to my investigator.

24  Q     But hold for a second.  You're the one who is in jail,

25  right?

DEEPAK DESPHANDE - Cross-Examination by Ms. Chang          130

1    A     Right.

2    Q     And so in jail, you have limited access to computers,

3    right?

4    A     Mm-hm.

5    Q     You don't always have access to Google Maps when you want

6    to talk about something, right?  And --

7              THE COURT:  If you could answer "yes," so she can

8    type it out.

9              THE WITNESS:  Yes.

10             THE COURT:  All right.  Go on ahead.

11   BY MS. CHANG:

12   Q     So when you're discussing an address, a place, a location

13   in jail with someone like your cellmate, you don't always have

14   ready access to a computer to say, oh, yeah, here's the

15   intersection I'm talking about, right?

16   A     Right.

17   Q     Okay.  Now, your investigator, he was not in jail, right?

18   A     That is right.

19   Q     His name is Jerry what?  Rivera?

20   A     I don't know the last name.

21   Q     So your investigator.  That investigator was hired

22   through your attorney, Mark O'Brien; isn't that right?

23   A     Mm-hm.

24             THE COURT:  Is that a "yes"?

25             THE WITNESS:  Right.  Yes.

1        THE COURT:  Okay.  Go on ahead.

2        MS. CHANG:  I apologize, Your Honor.  I'll try to

3   wait for him to say yes.

4   BY MS. CHANG:

5   Q    You only knew your investigator through your attorney,

6   correct?

7   A    That is correct.

8   Q    Now, your investigator -- pardon me if I asked you this

9   already -- he's not in jail, right?

10  A    That is right.

11  Q    He has access to the Internet pretty much whenever he

12  wants, right?

13  A    That is correct.

14  Q    So why draw him a map?

15  A    Okay.  So when I started looking at my evidence, I wanted

16  to give out specific places, place A, which is CVS, and

17  place B, a gas station, and along with that, all the

18  information that I know about the accuser and all the details

19  that I know about my case to my investigator so that he can

20  investigate every aspect of the case.  Along with that, I

21  wrote, hey, you need to go here, which is -- if I go from

22  here, from Semoran Drive -- I drew the map saying if I -- I

23  drew this map for my friends saying, if I go from here, what

24  is the first right?  Okay.  That is correct.  This is the

25  address which comes for here as Semoran Drive.  And then

1   there's an intersection.  What is this?  I drew this map

2   talking to the friends or people in the jail not to illustrate

3   or go to this directional address.

4          Eventually I came over here and gave all the

5   directions, whatever I had, to my -- to my investigator,

6   Jerry, thinking that he would not have access to the so-called

7   evidence.  I didn't think he --

8   Q    You thought a map would help him with access to evidence;

9   is that what I'm hearing?

10  A    Right.

11  Q    I'm also hearing you drew the map?

12  A    Yes.

13  Q    All right.  And your investigator worked for your

14  attorney.  And this information -- you know, you're claiming

15  all this information came from -- came from discovery; is that

16  right?  You were giving your investigator information from

17  discovery, right?

18  A    Most of it from the discovery, rest of it from my memory.

19  Q    So how does that make any sense?  Your investigator works

20  for the attorney, the attorney -- the very same attorney who

21  gave you discovery.  How does that make any sense?

22  A    Initially when my attorney spoke about investigator, I

23  was under the assumption that I will be hiring the

24  investigator who is going to assist me and I was supposed to

25  pay him some money.  And I thought, okay, whatever the

1    information that I'm supposed to give, I'll give it in writing

2    in every aspect of it.  This is not just the portion that you

3    are seeing.  There's a larger portion of information that I

4    drew and wrote for my investigator.  What you have is just a

5    small piece of that.

6    Q    Let's turn to page 5 of Government's Exhibit 5.  You said

7    you have this phone book because -- I guess because, again,

8    you're incarcerated, you don't have, like, your iPhone where

9    you can save all your contacts, right?

10   A    Correct.

11   Q    So you kind of go old school and you write it down

12   yourself.  So it's your claim that this is actually your own

13   personal phone book for yourself so that you can, you know,

14   have the names and phone numbers and contact information of

15   people that you need to contact, right?

16   A    These are all people in jail.

17   Q    They're all people in jail.  But you wrote this for your

18   own purposes, right?

19   A    Yes.

20   Q    This is for Deepak Desphande's own personal records,

21   right?

22   A    That is right.

23   Q    Okay.  And the same goes for page -- goodness -- 5, the

24   very last page of Government's Exhibit 5, right?

25   A    Yes.

1  Q    This is also Deepak Desphande's own personal old-school

2  phone directory?

3  A    Yes.

4  Q    Okay.  Read where I'm pointing at here four lines from

5  the bottom.  Just read that out loud.

6        THE COURT:  Wait a minute.  Is that the sealed

7  document?

8        MS. CHANG:  I apologize, Your Honor.

9  BY MS. CHANG:

10  Q    Let me reference four lines from the top, Mr. Desphande.

11  A    That is my brother's.

12  Q    And does it say the word "my brother" in parentheses?

13  A    That is correct.

14  Q    Did you have to remind yourself that that's your brother?

15  A    Yes.

16  Q    Why?

17  A    If you make call from a different phone number -- if you

18  make call from, let's say, a local number, you get charged

19  different number -- a different amount.  If you call from long

20  distance, you get charged differently.  That's why my brother

21  had two numbers.  One -- my brother and my wife had two

22  numbers.  One was local, which is -- which you get charged,

23  like, $2 or something, and the other one is your actual

24  number, which is -- which you get charged extra for long

25  distance.

1  Q    I don't think you understand my question.  You have a

2  name four lines from the top -- four lines from the bottom,

3  correct?  There is a name?

4  A    Right.

5  Q    And then it says "my brother," correct --

6  A    Mm-hm.

7  Q    -- in parentheses?

8  A    Mm-hm.

9  Q    Like, that guy is my brother.  If this is

10 Deepak Desphande's personal phone book, why are you reminding

11 yourself that that's your brother?  Don't you know who your

12 brother is?

13 A    I know.  Is it a crime to write that?

14 Q    It just doesn't make sense.  But if you're telling me

15 that's -- this is your personal address book -- that's your

16 testimony, right?

17 A    That's part of the address book.  There's --

18 Q    All right.

19 A    There's a bigger sheet of address book about six to ten

20 pages long.

21 Q    Couple last questions for you.  You said on direct that

22 there's this person called Music, right?

23 A    Mm-hm.

24       THE COURT:  That's a "yes," please, you said?

25       THE WITNESS:  Yes.  Sorry.

1      THE COURT:  Okay.  Go on ahead.

2    BY MS. CHANG:

3    Q    So your letter was written to your brother, correct?

4    That's Government's Exhibit 6.  I can show you that one.  This

5    is Government's Exhibit 6.  This is a letter you claim went to

6    your brother, correct?

7    A    Yes.

8    Q    It's meant for your brother.  And you're telling him in

9    this letter someone is called Music, right?

10   A    Yeah.

11   Q    And you say Music is going to tell you something in

12   English, right?

13   A    Yes.

14   Q    And when you get that message in English, translate it

15   into Kannada, right?

16   A    Yes.

17   Q    Don't save it?

18   A    Yes.

19   Q    You told him, don't save it, delete it, right?

20   A    Yes.

21   Q    Delete it immediately, right?

22   A    Yes.

23   Q    Because this is some message that's supposed to go to

24   some FBI agent named Raymond F. Brown?

25   A    No.  This is the message that is supposed to come from

1    Mr. Raymond F. Brown.

2    Q    And that's an agent who you were working with already?

3    A    This was the boyfriend of CW, who was helping me with

4    information about four people that I request of him of.

5    Q    Uh-huh.

6    A    And he was supposed to provide names, the addresses,

7    their locations, their FBI positions, where they are located,

8    which branch, et cetera, et cetera, and put their information

9    in Mega cloud, for which the user name was oli.23@yahoo.com or

10   something.  And there was a password, evanna, for that.  So as

11   soon as this gets to my brother, the message was -- as soon as

12   he starts the investigation, the message was, has -- I'm

13   supposed to ask him the question, has the Music started?  Once

14   I ask this question, he's going to say if the -- if the search

15   for the information that he's looking for he's already found

16   or he's in the process of finding, he's going to say yes.

17   Once he finds it, he's going to -- he's going to send me a

18   message which says, I finished -- I finished listening to the

19   tracks that you have provided.  Thank you.  Once this message

20   comes over to me, I was supposed to ask my brother to log into

21   Mega cloud, in which the account was oli.23@yahoo.com.

22   Q    Let me pause you right here.  So this person called Music

23   and all your coded words about Music, that was all really to

24   get information to help your case, right?

25   A    Yes.

1    Q    That was all supposed to be so that you could get

2    information on these other co-conspirators who helped you do

3    what you did to the victim, right?

4    A    Mm-hm, yes.

5    Q    These were four other people who you worked with and you

6    coordinated with when you came to Orlando and assaulted the

7    victim on five different occasions, right?

8    A    No.

9    Q    Those are four other people?

10   A    No.

11   Q    No?

12   A    These are four co-conspirators that you can call, but I'm

13   not going to say assaulted, no.  I'm not going to accept that.

14   Q    All right.  So either way, though, this Music's job is to

15   help you get evidence.  It's nothing to do with the

16   murder-to-hire the victim -- a plot to hire [sic] the victim,

17   right?

18   A    That is correct.

19   Q    You absolutely disavow any involvement with trying to

20   kill the victim, correct?

21   A    Yes.

22   Q    And you know you're under oath, right?

23   A    Yes.

24   Q    Same oath that you were under when you pled guilty?

25   A    Yes.

1  Q     The same oath that you were under when you stated under

2  oath that you agreed to the factual basis in the plea

3  agreement, correct?

4  A     I just agreed to a factual basis.  Doesn't mean I agreed

5  to the elements of the crime, did I?  I didn't say I agree to

6  the elements or my conduct fall into the elements of --

7  elements of the crime.

8            THE COURT:  I'll take judicial notice of the fact

9  that I went over the elements with him, as I read in my order.

10 He did agree to the elements.

11           MS. CHANG:  Thank you, Your Honor.

12 BY MS. CHANG:

13 Q     Mr. Desphande, there came a time when you were given a

14 phone number from Daryl Ali, isn't that right?  There came a

15 time when CW gave you a phone number; isn't that right?

16 A     Yes.

17 Q     And that phone number was a phone number that you gave to

18 Michael Hunt, right?

19 A     Yes.

20 Q     And you had Michael Hunt speak in the same coded language

21 about Music, right?

22 A     Yes.

23 Q     And you coordinated through Michael Hunt to carry out

24 what you wanted done, right?

25 A     It was CW's plan to talk -- or to use Michael Hunt

1   because --

2   Q    I'm not asking that.  I'm asking, was it at your

3   direction that Michael Hunt called that phone number?

4   A    Yes.

5   Q    And you were told that the person at the other end of

6   that line was going to be someone who could help you do what

7   you were trying to do through Music, right?

8   A    He was going to provide me with the information of four

9   people which he's going to put that onto the Mega cloud.

10             MS. CHANG:  I have nothing further, Your Honor.

11             THE COURT:  Redirect examination?

12             MR. WAGNER:  I just have one question that's outside

13   the scope, but it's --

14             THE COURT:  I'll give you some leeway.  Go on ahead.

15                     REDIRECT EXAMINATION

16   BY MR. WAGNER:

17   Q    Mr. Desphande, there was some talk when we first started

18   about whether or not you retain any property interest in the

19   marital home that you shared with your wife in Dublin,

20   California; do you recall that?

21   A    Yes.

22   Q    Is it your testimony today that you do not currently have

23   a property interest in that home?

24   A    No, I do not.

25             MR. WAGNER:  Okay.  I have nothing further.

141

1          THE COURT:  All right.  Thank you, sir.  Feel free

2     to be seated at counsel table.

3          All right.  I'm prepared to make my findings and

4     I'll go over each of the objections one at a time and then

5     we'll continue to move forward.

6          All right.  As to the objections in objection No. 1,

7     covering paragraphs 15, 16, 20 through 30, 33, and 53, I will

8     rely on the evidence presented from the witnesses today.

9     Also, I will consider the facts agreed to in the factual

10    summary in the plea agreement.  That's going to be only what I

11    rely on.

12         Paragraphs 57 through 60, 70 and 78, the Government

13    has presented evidence, although albeit in the form of hearsay

14    statements that were corroborated by what's been admitted as

15    Government's Exhibit 5 and 6.  Therefore, the Government has

16    met their burden, and I will overrule the objection as to

17    paragraphs 57 through 60, 70, and 78.  I will consider

18    primarily the testimony given here at this evidentiary hearing

19    that there was an obstruction of justice, and that is the

20    basis for the additional points on the guideline calculation.

21         I'm going to skip 3 and go to 4.

22         On No. 4, paragraphs 67 and 74, use of a computer,

23    this is often objected to by the defense because in every

24    single case, the only way that I've seen anecdotally that this

25    type of evidence -- or type of contraband is viewed, stored,

1    or otherwise sent, is by an electronic medium.  There are no

2    VHS tapes or anything else.  This is almost always exclusively

3    by this.  But based on the particular circumstances in this

4    case where, as the evidence has revealed thus far, the

5    defendant used these mediums to threaten the minor into the

6    conduct she engaged in I think is more than just a slight

7    passing use of the computer, as is argued against in the other

8    cases.  I think it was a significant component of this.  And

9    for that reason, I'm going to overrule the objections and I

10   will allow the points to remain for the use of the computer.

11             The specific offense characteristic, the

12   misrepresentation, I would indicate as to paragraph 73, that's

13   included in the factual basis submitted in the plea agreement

14   where it is stated unequivocally that he pretended to be the

15   three people in question and that while pretending to be those

16   three people, he communicated -- and the three people we're

17   talking about are Nick, Devin, and Roger.  And on page 30 of

18   Document 38, the third paragraph, it even states, "Desphande,

19   posing as Nick and Roger, maintained regular contact with CV

20   between September 2017 and April 2018 and consistently

21   persuaded him or her to produce and transmit via the Internet

22   pornographic images of CV.  In addition, when CV's cellular

23   phone broke, Desphande, posing as Nick, mailed CV an Android

24   Nexus 6P cellular phone so that they could stay in contact."

25   So he's admitted to this.  And for that reason, the objection

1    as to paragraph 73 is overruled.

2         The defense withdrew the objection as to

3    paragraph 84.

4         So let's talk about paragraph 66, the masochistic

5    conduct.  I'm going to give the Government a brief opportunity

6    to address this issue via argument.

7         MS. CHANG:  Your Honor, Agent Hyre testified that

8    the defendant used the phallic device, the dildo, to penetrate

9    the victim anally as well as vaginally, and also that he used

10   handcuffs, a blindfold on the victim.  All of these qualify as

11   sadistic or masochistic conduct.  In *United States v. Caro*,

12   C-a-r-o, 309 F.3d 1348 at 1352, Eleventh Circuit 2002, the

13   Eleventh Circuit held that pictures of minors in bondage are

14   sufficient to warrant the sadistic conduct enhancement, citing

15   *United States v. Tucker,* at 136 F.3d 763 at 764, Eleventh

16   Circuit 1998.

17        In addition, I know it's persuasive authority, not

18   binding, but in the Eighth Circuit in *United States v. Starr*,

19   533 F.3d 985, 1001 to 1002, out of the Eighth Circuit in 2008,

20   the Eighth Circuit affirmed application of this enhancement

21   where a 17-year-old self-penetrated with a foreign object,

22   reasoning that given the plain meaning of violence, it is

23   difficult to imagine that sexual penetration with a foreign

24   object of a minor female would not qualify as violence even if

25   self-inflicted.

144

1          THE COURT:  All right.  Thank you, Ms. Chang.

2          Would the defense -- Mr. Wagner, would you like to

3    have an opportunity to address this issue briefly before the

4    Court makes its final set of findings on the objections?

5          MR. WAGNER:  Yes, sir.

6          With respect to *U.S. v. Caro*, which is also a case

7    that I researched and brought with me here, I disagree with

8    the Government's argument.  *Caro* cites an older case,

9    *U.S. v. Garrett*, 190 F.3d 1220, and clarifies *Garrett* because

10   *Garrett* talked about whether there was a need to have a

11   medical expert prove up particular injuries.  But one thing --

12   and *Caro* said that wasn't the case.

13         But one thing that *Caro* was clear about -- and the

14   best case to tease this out is *U.S. v. Rothenberg*,

15   610 F.3d 621, Eleventh Circuit 2010 -- is that the

16   sadistic/masochistic offense conduct involves an element of

17   injury.  And I don't believe that the Government has proven up

18   injury in this particular case.  And I'm trying to find the

19   specific language here.  But at any rate, it specifically

20   references injury and the entire discussion is about whether

21   injury is proven.

22         I don't believe sexual penetration without some

23   showing of physical injury beyond the mere penetration -- I

24   don't believe the case law supports the argument that -- at

25   least in the Eleventh Circuit -- that sexual penetration in

145

1    and of itself constitutes sadistic or masochistic conduct for

2    purposes of this enhancement.

3         I would submit, too, that the Government didn't give

4    you any images.  There isn't really any solid evidence that

5    there were any images created.  I know there was some

6    testimony that there was a red light on the camera, but that's

7    not the same as proof that there were photographs or videos

8    taken.  So the image itself has to be sadistic or masochistic.

9    We don't have the images, number one.

10        Number two, I don't believe the Government has met

11   its burden of showing any particular injury beyond just the

12   penetration here.  And for that reason, I would persist in

13   that objection.

14        THE COURT:  Well, I'll take that issue up.  So I do

15   recall the testimony of the special agent with regard to the

16   sexual device that was used, and the testimony was abundantly

17   clear that it wasn't just a matter of sexually penetrating the

18   victim vaginally, but that he attempted to do so anally and

19   that that caused so much pain that the victim -- he couldn't

20   go through with it because of the victim's pain and then he

21   stopped because of the victim's pain and the request by the

22   victim that he stop.  So that's primarily what I'm relying on.

23   But there doesn't seem to be a dispute factually as to what

24   was testified to.  You're having a legal dispute as to what

25   the Court's interpretation of the case law provided should be.

1         In light of that, I'm sufficiently satisfied that

2    the conduct described by Agent Hyre, and specifically what I

3    just referenced a moment ago, are enough to convince this

4    Court that the conduct described factually by sworn testimony

5    here today satisfies U.S. Sentencing Guideline

6    Section 2G2.1(b)(4), and that objection will also be

7    overruled.

8         So in light of the Court's findings, the objections

9    are noted and preserved for the record.  The Court adopts the

10   undisputed factual statements and guideline applications

11   contained in the report.  As to the controverted factual

12   statements, as the Court indicated previously, I'm going to

13   rely primarily on the sworn testimony provided to the Court

14   here today and the factual determination or the findings of

15   fact at the end of the plea agreement that was sworn to by the

16   defendant.  So the Court is going to adopt those as the facts

17   in this case along with the uncontroverted facts and therefore

18   determines that the advisory guidelines are as follows:

19        Total Offense Level 43, Criminal History Category I.

20   The range of imprisonment is a term of natural life.  The

21   supervised release is five years to life.  The restitution in

22   this case -- is there any pending request for restitution at

23   this time?

24             MS. CHANG:  No, Your Honor.

25             THE COURT:  All right.  Are you going to be asking

1   for any restitution?

2          MS. CHANG:  No, Your Honor.

3          THE COURT:  All right.  So there is no restitution.

4   It's not applicable.

5          The fine range is 50,000 to $500,000, a $200 special

6   assessment, $100 per count.

7          So there has been matters filed before the Court

8   that I've had a chance -- and I appreciate the fact that they

9   were timely filed.  I've had a chance to review all the

10  matters that have been filed before the Court prior to today's

11  hearing.

12         So, Mr. Wagner, from your perspective, is there any

13  additional matters in mitigation you would like to present at

14  this time before I hear sentencing argument?

15         MR. WAGNER:  No, sir.

16         THE COURT:  All right.  Mr. Desphande, if you would

17  be kind enough to stand at counsel table, I do need to go over

18  this with you individually.  There's a very important decision

19  you need to make at this time.  That's whether or not you're

20  going to choose to make a statement to the Court prior to

21  sentencing.  The decision is yours and yours alone, but I need

22  to make sure that whatever decision you make, that decision is

23  knowing, voluntary, and intelligent with the advice of

24  counsel.

25         Have you had an opportunity to talk to Mr. Wagner

1    about whether or not you're going to be making a statement to

2    the Court prior to sentencing?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Are you going to be making a statement?

5              THE DEFENDANT:  No, sir.

6              THE COURT:  Are you sure that you don't want to make

7    a statement?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  All right.  Thank you, sir.  Feel free

10   to be seated.

11             Ms. Chang, will you be presenting any evidence in

12   aggravation, or would the victim like to be heard at this

13   time?

14             MS. CHANG:  The victim would like to be heard.

15             THE COURT:  And will the victim be providing the

16   Court with a sworn or an unsworn statement?

17             MS. CHANG:  An unsworn statement.

18             THE COURT:  All right.  So she will not be subject

19   to cross-examination.  If you'd like to call her, you're more

20   than welcome to do so.

21             MS. CHANG:  The United States calls the child

22   victim, whose name I would like to keep off the record.

23             THE COURT:  All right.  This is an unsworn

24   statement.  The child victim is permitted to stand at the

25   podium while giving the Court a statement.  And I need to make

149

1  sure that we're clear on the record.  The Government is

2  asserting that this is the person alleged as the child victim

3  in the Indictment.  We're not stating her name for the record.

4  So I want to make sure we're clear.

5          Does the defense have any objection to the

6  representation by the United States that this is, in fact, the

7  child victim as alleged in the Indictment?

8          MR. WAGNER:  No, sir.

9          THE COURT:  All right.  Yes, ma'am.  Feel free to

10  make your statement.

11         THE WITNESS:  Dear Honorable Judge Carlos Mendoza,

12  thank you for the opportunity to speak here today.  I am here

13  today to speak out against Deepak Desphande and shed light on

14  the emotional and sexual abuse that struck me not so long ago.

15         When I was younger and a little more naive, I fell

16  for lies that were told to me by a person I didn't know

17  online, lies that led me to be extremely dependent and

18  vulnerable to someone else's feelings, thoughts, and actions.

19         We already established that he had me believe that

20  he was a modeling agent and then he was a different modeling

21  agent and then he was this blackmailer.  And they were all

22  three played by one man.

23         These characters interacted with me for ten months

24  and often at the same time.  I cried nearly every single night

25  and constantly suffered bad nosebleeds as a result of constant

1    anxiety and stress.

2          When you have multiple people harassing you and

3    pressuring you from every angle, you lose strength.  When you

4    have one manipulative being who knows exactly what they're

5    doing to you, what they're trying to accomplish, you lose

6    control.  He was a relentless blackmailer.  Even when I came

7    to suspect the truth, he denied it all.  I was called crazy

8    and a psychopath for my suspicions.

9          Some of things I was threatened with by mainly Roger

10   included contacting my family and telling them what I had been

11   doing, putting my private pictures on posters all over my

12   school and sending them to all my friends, because he knew my

13   Instagram as well as other information.  He also threatened me

14   with posting those photos online and kidnapping me.

15         Logically speaking, some of the threats -- most of

16   the threats weren't very plausible.  But at the same time, I

17   was afraid of what could happen.  If I didn't want to do

18   something, he would say I had to face consequences.  He made

19   me feel like I had to do what he wanted all the time.

20         He had me stage sexual acts and when I didn't do it

21   right or the angle was off, he would make me do it over and

22   over again.  He had these requirements where he wanted Nick to

23   get, quote/unquote, all three holes.  And I just didn't want

24   to be part of that.

25         He wanted 24 hours of footage between Nick and I,

1  which is physically impossible.  And it had to be done in one

2  weekend.  I was always tired.  I drank his alcohol to deal

3  with it because I felt disgusted by what I had to do.

4      I could go into so much detail about what occurred

5  with him.  Unfortunately, it's far too much to condense into a

6  statement.  But I do want to call out some of the lies.

7      It is not an exaggeration to say that he lied about

8  most of the things he said, even small ridiculous things like

9  his height, his ethnicity, and military history.  He claimed

10  to be in the Marine Corps when he was, in fact, not.

11      During the last time I saw him, my friend, who knew

12  a little about the situation, tried to convince me to not meet

13  up with him.  But I went anyways because I felt that I had to.

14  And I understood that any time I didn't do something, there

15  was a major consequence following that.

16      And when we arrived at the hotel -- and this was the

17  last time I saw him, I believe, at the Sheraton -- I was

18  crying as he berated me because I didn't have a plan set for

19  that night.  Instead of making me feel better, he tried to

20  have sex with me mid me crying.  He didn't care about anything

21  but his pleasure.  He took advantage of me.

22      And as for the bigger things that he lied about,

23  like his wife, his two young kids, it's disgusting.  I was

24  shocked when I found out.  I cried a bit.  I don't know how

25  someone could put their family to the side like that and do

152

1    what they do over and over again, but I did know that these

2    kids of his are going to grow up without a father, most

3    likely.  And as someone who grew up without a father, I could

4    tell you it's very hard.

5            But the reason why they will grow up without a

6    father is even more devastating.  And unfortunately, it will

7    be his wife who has to explain that Deepak decided to travel

8    across the country to take advantage of a clueless teenage

9    girl.  And no one else will be at fault but him.

10           Despite that they will be left without a father, I

11   think it's important to remember that by putting him away, his

12   family will be protected from him.  He's a monster that can

13   only cause them more harm.  If someone is capable of

14   pretending to be three different individuals in order to both

15   play the role as the abuser and play the role of the hero,

16   they are devoid of a conscience or being capable of making

17   true human connections to others.

18           All he cared about was his own gratification.  His

19   ongoing threats led me to believe he does not feel an ounce of

20   remorse for his actions, nor do I believe he is capable of

21   feeling guilt.  He shows true sociopathic tendencies and if

22   that's the case, then no amount of rehabilitation will make

23   him less of a danger to society.

24           I am learning new strengths and regaining my

25   confidence, and I am lucky and grateful for having a support

153

1   system that is helping me get through this rough time in my

2   life.  My heart goes out to all the women who have been harmed

3   by him in the past and those who may be still quietly

4   struggling with trauma caused by his actions.

5          I ask that you please ensure that he doesn't just

6   get to walk away free any time soon, because he doesn't

7   deserve it.  And I don't want anyone else to go through what I

8   did.  I want to live my life in peace knowing my family and I

9   are safe and I won't get any threats from prison in the

10  future.

11         Thank you.

12         THE COURT:  Thank you.  Feel free to be seated in

13  the courtroom.

14         And at this time, Mr. Wagner, would you like to make

15  a sentencing argument?

16         MR. WAGNER:  Yes, sir.  I don't think there's been

17  any evidence -- and I say this as an advocate, not to

18  denigrate anyone here -- but I don't think there's any

19  evidence that Mr. Desphande has sociopathic tendencies, and I

20  don't think there's any evidence that he has harmed anybody --

21  any other women.

22         The sentencing request from the accusing witness was

23  that you make sure that Mr. Desphande doesn't walk away from

24  prison any time soon.  And I don't think there's any question

25  that your sentence is going to reflect that wish.  I think the

1   million dollar question here is whether you're going to give

2   him a guideline sentence or you're going to vary.  You know,

3   there's arguments for variances and then there's arguments for

4   variances.  And this is not necessarily the cakewalk argument.

5           So I'm confronted with the problem as what to argue

6   in a situation like this based on the entire procedural

7   background of this case.  And I can't say that he's taken

8   responsibility.  I can't say that he's shown any remorse.

9   And, you know, that's his right not to do that.  But that

10  doesn't really fit in very well with these sentencing factors.

11          But what I do see here is that one of the factors

12  the Court needs to consider is the nature and circumstances of

13  the offense and the history and characteristics of the

14  defendant.  And the overall sentence in this case should be

15  sufficient but not greater than necessary to comply with all

16  of the purposes of sentencing set forth in subsection (2) of

17  Section 3553(e), 18 U.S.C. 3553(e).

18          So I think the nature and -- I think the history and

19  characteristics of Mr. Desphande militate against a life

20  sentence.  He's got no criminal history.  He's 40 -- early

21  40s, 41 years old, I believe.  He's got two children.  There's

22  another side of Mr. Desphande, despite what we've heard here,

23  and that side is not all bad.  You know, I mean, I've been

24  doing this for a long time and the people I usually represent,

25  whether it's in the state or the federal system, are -- you

1    know, they have long criminal histories.  They've got all of

2    this baggage.  He has none of that baggage.

3          He's also overcome quite a bit of adversity in his

4    own life.  He was born in India.  He moved here.  That's not

5    easy.  It's not easy to immigrate to any country.  He got an

6    education.  He got a well-paying job.  I mean, in many ways,

7    he was living the American dream.  That doesn't just happen.

8    That doesn't just happen with a recidivist degenerate

9    criminal.  That happens with somebody who is self-disciplined,

10   who is smart, who's ambitious, who's willing to do the things

11   that he needs to do and take responsibility for the things he

12   needs to take responsibility for.  So I think that militates

13   against giving him a life sentence.

14         The need for the sentence imposed is to reflect the

15   seriousness of the offense.  I don't think you need to impose

16   a life sentence to reflect the seriousness of this offense.

17   To promote respect for the law, I don't think you need to

18   impose a life sentence to do that and to provide just

19   punishment.  I don't think you need to give him a life

20   sentence to do any of those things.  To afford adequate

21   deterrence to criminal conduct, I don't think a life sentence

22   is necessary to do that.  To protect the public from further

23   crimes of the defendant, I don't think a life sentence is

24   necessary to do that.  To provide the defendant with needed

25   educational and vocational training, medical care, and other

1   correctional treatment in the most effective manner, I don't

2   think a life sentence is necessary for that.

3         A life sentence in my view is -- is just barely less

4   severe than a death sentence.  The reason is, is because it's

5   a final sentence.  You know, the way someone is released from

6   prison after receiving a life sentence is -- statistically,

7   it's not even worth talking about.  No future president of the

8   United States is ever going to pardon him or commute his

9   sentence.  That would be a political farce.  Maybe he'll get

10  released on compassionate release when he's very elderly.

11  Other than that, I don't know of any other way he could be

12  released from prison if you sentence him to life.

13        I don't that know a man in his early 40s who spends

14  25, 30, 40 years in prison is going to be the same person or

15  going to pose the same threat to society that he does now that

16  the Court may deem.  I just see life as too final for this

17  case, and I think the Court can achieve the goals of

18  sentencing without giving him a life sentence.

19        I think the Court can sentence him to a long period

20  of time, and I hope that if he gets a life sentence or if he

21  gets a long sentence that he can move past this and somehow he

22  can figure out whatever is going on in his head and grow and

23  improve from where he is now.  I think that's possible.  I

24  think every human being has the ability to do that.  And I

25  think life sentences preclude a human being from doing that

1  and preclude a human being from improving and changing in any

2  meaningful way.

3        And that's really the only argument that I have for

4  you is, mercy plays a role in sentencing, so does the concern

5  about imposing a sentence that's greater than necessary.  I

6  hope that you consider that in light of the inflammatory

7  evidence that we've heard here.  And I'm not suggesting that

8  that's anybody's doing.  It's just the evidence is what it is.

9  But I hope that doesn't blind the Court to the larger picture.

10 The larger picture is if he lives 30, 40 more years, there's

11 no way that he is going to be the same person then that he is

12 now.  I would like his sentence to reflect his human capacity,

13 the capacity we all have to change and to improve and become

14 better people, and I just don't think he can do that if you

15 give him a life sentence.  And I hope he does.

16        THE COURT:  Thank you, Mr. Wagner.

17        Argument from the Government?

18        MS. CHANG:  Your Honor, at the outset, I want to

19 address the defendant's cooperation, since the plea agreement

20 terms obligate the United States to inform the Court as to the

21 nature and extent of the defendant's cooperation.

22        The defendant did meet with the United States

23 several months ago for a proffer.  At the very -- the very

24 first question from the agents was, please unlock this entire

25 array of devices that we recovered from you.  That was in an

1    effort to identify any further victims.  The proffer did not

2    proceed from there.

3          As for the nature and circumstances of the offense,

4    the Court has reviewed the sentencing memorandum, the plea

5    agreement, the PSR.  We've talked about all this at length.

6    We've heard so much testimony.  And the evidence on the record

7    makes it plain that the nature and circumstances of this

8    offense -- of the defendant's offenses, they're egregious.

9          The defendant posed not as one, not as two, but

10   three different people to lure a teenager, a high school

11   junior, into creating a steady stream of child pornography for

12   him over the course of nearly a year.  He started by posing as

13   a modeling agent and tricking the victim into sending child

14   pornography.  Oh, send pictures of your face.  Oh, now with

15   your shirt off so I can get a better sense of you.  Okay.  Now

16   a full-on nude photo.  And once he got her on the hook, he

17   just extorted her for more, more, and more.  Then he

18   interjected new characters into his scheme, Nick Cuban and

19   then a Roger to increase his leverage over the victim.

20         The victim told the defendant, as Devin, Nick, and

21   Roger, all three of them, that she was 16 years old.  But he

22   did not care.  In fact, it was all the better, it seemed, to

23   prey on her insecurities, to prey on her underdeveloped

24   judgment and her manipulability to get what he wanted.  And

25   the evidence has shown clearly the defendant wanted and got a

1   whole lot.

2          He wanted naked pictures of her on a nearly daily

3   basis.  And he made sure he got them.  He essentially wanted

4   an on-demand sex slave across the country, and he got that,

5   too.  He would swoop in from California, sexually abuse her

6   all weekend long, and then swoop home to return to his wife

7   and his two little kids.  He did this four or five times, the

8   swooping in and out of Orlando for the purpose of filming his

9   own sexual assaults of the victim.

10         When I say sex slave, I really do mean that the

11  defendant did whatever he wanted with her.  He used the sex

12  toys on her.  He handcuffed and blindfolded her, gave her

13  alcohol and cannabis drops to make her relax.  And the

14  defendant in the meantime, when he wasn't in here in person,

15  kept her under his control with his multiple personas, Nick

16  and Roger by the end.  He put her in the middle of good

17  cop/bad cop, as you heard from Agent Hyre.

18         He was like a puppeteer, and he kept the victim

19  under his control by berating her and bullying her, degrading

20  her emotionally.  And she was getting these massive nosebleeds

21  over this.  And what was his response?  We showed you this in

22  one of the exhibits.  He says, "This ends never.  No one gets

23  such a damning shot at life at 16.  Only a few lucky ones do.

24  But you -- you will be an example of how to ruin it all.  Go

25  end it and die.  Do whatever."

1        And he also controlled her with his constant threats

2   to ruin her life by releasing her nude photographs to her high

3   school, her family, and the world.  He said she would -- and

4   I'm quoting here -- "watch the whole life break down on you

5   right in front of your eyes for what you have done to me.  You

6   are the reason for all of this.  You, you, you, you are to be

7   blamed."

8        His manipulation continued in full force when the

9   FBI got involved in the investigation and posed as the victim,

10   taking over her social media accounts.  At that time, the

11   defendant, as Nick Cuban, reached out to the undercover and

12   said he was coming to Orlando to see her because Roger was

13   extorting him.  He told her that he was coming to do pictures

14   and videos just like all the other times.  But for the

15   intervention of the incredible team of FBI agents that handled

16   this case, the defendant's dogged pursuit of unrelenting abuse

17   of the victim would have continued for who knows how long,

18   because to the defendant, the victim was not a 16-year-old

19   high school junior with talents, dreams, and a future.  To him

20   -- and, again, his words, not mine -- "what guys have you for

21   is a f-u-c-k.  You are a piece of meat that is good to f-u-c-k

22   and throw."  Those are his words.  And that phrase pretty much

23   sums up what his offense conduct comes down to.

24        As for the history and characteristics of this

25   defendant, there are people in the world who are born and

1    abandoned.  They are given zero direction from their parents.

2    They do not get an education.  They do not get a job.  And not

3    because they're not smart, but because they never got a

4    chance.  This is not that defendant.  He is the opposite of

5    those people.  As his own counsel stated, he was born in

6    India.  And now at the time of his offense, he was living the

7    American dream.  And he did that, by the defense's estimation,

8    because of his hard work and his discipline and everything

9    good that he did.

10         Well, his mother made tremendous sacrifices and

11   worked odd jobs under the radar to avoid social and religious

12   scrutiny in order to pay for his education.  He got to come to

13   the United States -- that's from the PSR, Your Honor.  And

14   then he got a master's degree from Northwestern University.

15   Then he gets this lucrative job as a security architect, lives

16   in a million-dollar home, is married and has two kids.  He had

17   it really, really good.  But he was smart.  This is the

18   defense -- the defense's words -- smart, ambitious, and

19   willing to do the things he needed to do.  Indeed, willing to

20   do the things he needed to do.  This conduct, going to such

21   tremendous lengths to extort and sexually abuse a minor,

22   that's what he decided he needed to do.

23         This defendant is skilled in computers and

24   electronics, but what did he do with that?  You know, he has

25   all these skills to offer to the world.  Well, what did he do

1   with that?  He fashioned this elaborate Britemodels website

2   will fillable forms for models, puts it up as if there's

3   actual models who are working for him.  And he does that to

4   lure people in.

5          He has all this money from his job, and what did he

6   do with that?  He bought plane tickets to Florida to sexually

7   abuse his victim.  He bought expensive camera equipment so he

8   could film himself sexually abusing this victim.  He bought

9   five iPhones.  Why?  So he could pose as multiple different

10  people on his different phones.  And then he bought her a

11  phone when she didn't have a phone.  That's what he did with

12  his money.

13         All of that tells you who this defendant is as a

14  person.  And also telling is his utter lack of responsibility

15  in this case.  He has contested portions of the PSR that set

16  forth facts that he agreed to in the factual basis of the plea

17  agreement.

18         But perhaps -- perhaps the greatest window into the

19  defendant's soul is his conduct between his arrest and his

20  scheduled trial.  He knew through his attorney that the

21  United States was unable to access almost every single digital

22  device that we've recovered from him, again, because he's so

23  smart with computers.  He knew that the biggest source of

24  evidence in this case -- it's not that didn't have evidence.

25  Our evidence came in the form of a person, the person that you

1   met a few minutes ago.  What did the defendant do?  He plotted

2   to kidnap and kill her.  And of course he couldn't do that

3   himself from jail.  So he recruited other people to help him.

4        His plan had many parts, as you heard.  He had this

5   whole code about the music starting, paying for studio time,

6   let's play the CDs, and of course his goal of finishing the

7   track.  He wrote letters to his brother and spoke to his

8   brother in Kannada to obfuscate his nefarious plans.  And he

9   passed messages through his confidential witness to his

10  brother and tried to set up the system where messages would

11  get back to him so that he could avoid direct contact with his

12  hitman.  And he tried to scrounge up money and he claimed to

13  have $120,000 available for his operation, including a rather

14  meager seven to $10,000 share for the hitman.  He disseminated

15  the victim's full name, address, her schedule, her school, and

16  a map to her home, and he put her in very real danger by doing

17  so.

18        His attorney just said that life is too final,

19  Your Honor.  This defendant had no trouble with ordering the

20  death of his victim.  Death is too final, not life is too

21  final.  Death is too final.  But this defendant had no

22  compunctions about arranging for the death of his victim.  And

23  as horrific as this conduct is, it's easier to discuss today

24  because, by grace and luck and the fact that the confidential

25  witness was unwilling to endanger the victim, that this victim

1   is alive and well here today and able to speak to you herself.

2          But what all of this shows about the defendant, what

3   the window into his soul shows is that he only cares about

4   himself at the expense and exclusion of all others, no matter

5   the cost.  And that proves just how dangerous he is and what

6   an ongoing threat he poses to the community.

7          At every turn, the defendant has lied, cheated, and

8   lied again.  You heard it numerous times today in this very

9   hearing.  The defendant's sentencing memorandum was critical

10  of the Government's submission and argued that there are

11  really only three questions that the Court must answer.  Now,

12  setting aside whether that's true or not, in closing, I just

13  want to address those three simple questions that the

14  defendant posed.

15         Question one, what happened?  Well, you've heard at

16  length what happened.  And by any measure, the defendant's

17  conduct and victimization of the minor was egregious.  His

18  post-arrest conduct further underscores the depth of his

19  depravity and his belief that his interests trump everything

20  else, even if it means kidnapping and killing his victim.

21         Question two, what is the defendant's total offense

22  level and criminal history category?  It's 43, but really it's

23  48.  And his guidelines range is life.

24         Question three, what sentence will be sufficient but

25  not greater than necessary to comply with the purposes of

1   federal sentencing?  And what is sufficient in this case?

2   Certainly the sentence has to reflect the seriousness of the

3   defendant's offenses and it has to promote respect for the law

4   and provide just punishment.  This defendant must be punished

5   for his conduct on a scale that is commensurate with his

6   conduct and protect the public from further crimes of the

7   defendant.

8           I submit that nothing less than a life sentence --

9   anything less than a life sentence would not be sufficient in

10  this case.  There are no grounds for a variance, no grounds

11  for lenience.  There is only aggravation upon aggravation.

12  And for these reasons, the United States seeks life in this

13  case.  We also request that the Court impose the no-contact

14  order using the text set forth on page 13 of the sentencing

15  memorandum at Document 69 to further protect the victim from

16  the defendant, who has demonstrated both ability and

17  willingness to endanger her even while detained.

18          Thank you.

19          THE COURT:  The Court has asked the defendant why

20  judgment should not now be pronounced and after hearing the

21  defendant's response, the Court has found no cause to the

22  contrary.  The parties have made statements on their behalf or

23  have waived the opportunity to do so, and the Court has

24  reviewed the presentence report.

25          First of all, this is a very difficult case, and I

1    want to commend the attorneys in this case for their high

2    level of professionalism.  These are difficult issues made

3    even more difficult when attorneys act in a less than

4    professional manner, and that certainly was not the case.  So

5    I do appreciate your professionalism.

6            The statutory maximum is a ceiling placed

7    statutorily on any defined offense, which is something I

8    interpret to mean the worst and most severe circumstance

9    involved in the underlying conduct, so the worst that someone

10   could do in terms of committing the offense.  And there's a

11   lot of relevant conduct that the Court does consider in making

12   a determination where exactly on that spectrum this particular

13   conduct falls.

14           I have to admit that I've been thinking about this

15   case for a long time, pretty much since the plea was entered

16   and since the documents started coming in, so I could begin

17   determining what the battle lines were going to be at

18   sentencing.  There's a part of me that wished, quite frankly,

19   that some of the things alleged by the Government in terms of

20   relevant conduct were not going to be the case.  There's a

21   part of me that wished that he wasn't so callous that he was

22   actually going to try to hire someone to murder the victim,

23   who he had already victimized repeatedly.  There's a part of

24   me that wished a lot of the disputes that were going on here

25   in terms of the sadomasochism, the threats, everything,

1   there's a part of me that certainly wished that wasn't the

2   case.  But unfortunately, you have to take reality on

3   reality's terms.

4        So the way I analyze these things are -- and I've

5   said it before.  There was an English Franciscan friar that

6   came up with a theory of problem solving called Occam's razor

7   that sort of says that the simplest solution is often the most

8   accurate solution, rather than the complex ones.  There's a

9   lot of behavior that I tend to try to observe during these

10  hearings.

11        Before I get to that, I would like to say to the

12  victim in this case that this was not your fault.  Don't let

13  him win by blaming yourself.  You're brave beyond your years

14  to come in here and face him, because I don't blame a victim

15  if they decide that they don't want to come in here.  But it's

16  a very difficult thing to come in here and face the person who

17  did this to you, and you should be commended for your bravery.

18  The strongest statement you could make after today is to live

19  a successful, accomplished, and law-abiding life.  That will

20  make a bigger statement than anything else that's happened

21  here today.  So I wish you well moving forward and I hope you

22  really consider that this is absolutely not your fault.

23  You're a 16-year-old person who was absolutely taken advantage

24  of and you bear no responsibility over what happened.

25        I guess what I'm struck with in terms of

1   Mr. Desphande is just how absolutely mean and nasty you are.

2   The cruelty you displayed is something that I didn't expect.

3   I read through all those text messages before we came in here

4   today, and I had a chance to think about what was going on.

5   You admitted that that was you pretending to be three

6   different people and communicating with the victim.  And there

7   are certain things I look -- and Ms. Chang used the term

8   "window into your soul."  And that's sort of how I analyze

9   these things.  You engaged in unprotected sex while sexual

10   assaulting her and then forced her to take a morning after

11   pill.  That's the testimony before the Court.  Despicable.

12       When she was becoming frustrated over the text

13   messages and made comments indicating that she was preparing

14   to take her own life, your callous indifferent response to

15   that -- in fact, you were encouraging her to do it -- was

16   troubling to say the least.  And the constant threats of

17   exposing her to her schoolmates, her family, it's beyond

18   offensive.

19       I think you're a dangerous and manipulative little

20   man.  I think you're a mean little man.  And I think most

21   troubling for the Court is that I don't think you were

22   truthful at sentencing.  I tell you, I look for those signs.

23   And this is a very important thing that happened during your

24   testimony that you insisted on giving over your attorney's

25   advice.

169

1          "QUESTION:  Like, that guy is my brother.  If this
2     is Deepak Desphande's personal phone book, why are you
3     reminding yourself that that's your brother?  Don't you know
4     who your brother is?"

5          Your response:  "I know.  Is it a crime to write
6     that?"

7          It might not be a crime to write that, but it might
8     be a crime to come in here and lie under oath.  There's no
9     rational explanation for why if you're putting your brother's
10    actual name on that document while in parentheses next to it
11    you would write "brother" if it was only for your use.  The
12    most reasonable explanation, using the theory of Occam's
13    razor, is that you were providing that paperwork for someone
14    else.

15         So we're already in dangerous territory in terms of
16    your behavior.  You're mean and you're nasty.  You're
17    indifferent as to her plight.  You treated her worse than a
18    human being.  Human beings shouldn't treat each other this
19    way.  But on top of that, when things weren't going your way,
20    you made a decision, a conscious decision, to begin this chain
21    of events where you were going to try to find someone to kill
22    her.

23         So you sexually assaulted her at least five times.
24    From the testimony today, we know that one time when you came
25    to Florida, you sexually assaulted her more than once and you

170

1    didn't film the second time.  You manipulated her in a way

2    that makes me -- I mean, this is so premeditated and planned.

3    You're so good at this that I'm concerned of how dangerous you

4    are.

5            And I understand what your attorney's concerns are

6    about a life sentence.  I don't think anyone should ever want

7    to impose a life sentence.  It's a very heavy responsibility,

8    and I do anything I can to avoid doing it.  Anything I can

9    consider, any mitigation, anything good about you that I can

10   find that would justify not imposing a life sentence, I look

11   desperately for it in every case, because I don't ever want to

12   have to do that.  It's a horrible thing to have to do, but

13   it's a responsibility that lands on my shoulders at times and

14   at times, it has to happen.

15           So let me put it to you this way.  There's already

16   someone in this courtroom who I hope will recover, but has

17   already been imposed -- had a life sentence imposed upon her.

18   That's the victim.  She's got a lot of good people around her,

19   I'm sure.  And she's going to be able to handle this.  And I

20   hope and pray that she will be a better person because of this

21   and she will go on to do great things.  But she will have to

22   live with this the rest of her life.  Anyone she meets, anyone

23   she gets to know, if she chooses to marry someone and have

24   kids, it's going to be a part of her life that she's going to

25   have to weigh and consider carefully about telling other

1    people.  So she's got a life sentence, and all she did was

2    trust somebody and behave like a 16-year-old.

3           So I understand you don't have to accept

4    responsibility for anything.  You don't have to make a

5    statement to the Court.  I'm not going to hold that against

6    you.  But what I'm going to do is focus on the evidence before

7    the Court.  And I can't stress enough how mean and nasty a

8    person you are.  I've seen people that have murdered people.

9    I was a state court judge and those are some of the toughest

10   cases to preside over.  I've seen people that have killed

11   people that aren't as mean and nasty as you are.  I've not

12   seen that that often as manipulative as you are.

13          You come in here and you think you're going to

14   outsmart the Court and prosecutor in this case and just make

15   up a story whole cloth about what happened.  Nothing you said

16   made any sense.  You were just telling us whatever you thought

17   you had to tell me to limit your exposure.  But there's one

18   difference between what you did in this case and what you

19   tried to do in this courtroom.  I'm not 16 years old.

20          So at this time, if the defendant and counsel would

21   please stand, we'll move on to the sentencing.

22          MR. WAGNER:  Would you like us to come to the podium

23   or stand?

24          THE COURT:  He can stand there.

25          Pursuant to Title 18, U.S. Code, Sections 3551 and

172

1  3553, it is the judgment of the Court the defendant is hereby

2  committed to the custody of the Bureau of Prisons to be

3  imprisoned for a term of natural life.  This term consists of

4  360 months as to Count Two and a term of life as to

5  Count Three to run concurrently.

6          Upon release from imprisonment, you shall serve a

7  ten-year term of supervised release.  This term consists of

8  ten years as to Count Two -- I'm going to make it five -- five

9  as to Count Two and five as to Count Three.  They'll run

10 concurrently.

11         While on supervised release, you shall comply with

12 the mandatory and standard conditions adopted by the Court in

13 the Middle District of Florida.  In addition, you shall comply

14 with the following special conditions:

15         You shall participate in a mental health treatment

16 program specializing in sexual offender treatment and submit

17 to polygraph testing for treatment and monitoring purposes.

18 You shall follow the Probation officer's instructions

19 regarding the implementation of this court directive.

20 Further, you shall contribute to the costs of such treatment

21 and/or polygraphs, not to exceed an amount determined

22 reasonable by the Probation officer based on your ability to

23 pay or the availability of third-party payment in conformance

24 with the Probation office's sliding scale for treatment

25 services.

1          You shall register with the state sexual offender

2     registration agency in any state where you reside, visit, are

3     employed, carry a vocation, or are a student as directed by

4     Probation.  The Probation officer shall provide state

5     officials with all information required under Florida sexual

6     predator and sexual offender notification and registration

7     statutes and/or the Sex Offender Registration and Notification

8     Act (Title I of the Adam Walsh Child Protection and Safety Act

9     of 2006).  And your Probation officer may further direct you

10    to report to these agencies personally for any required

11    additional processing, such as photographing, fingerprinting,

12    and DNA collection.

13         You shall have no direct contact with minors -- a

14    minor is defined as a person under the age of 18 -- without

15    the written approval of the Probation officer.  And you shall

16    refrain from entering into any area where children frequently

17    congregate, including schools, daycare centers, theme parks,

18    playgrounds, et cetera.

19         You are prohibited from possessing, subscribing to,

20    or viewing any images, videos, magazines, literature, or any

21    other materials depicting children in the nude and/or in

22    sexually explicit positions.

23         Without prior written approval of your Probation

24    officer, you are prohibited from either possessing or using a

25    computer.  That includes a smartphone, a hand-held computer

174

device, a gaming console, or an electronic device capable of

connecting to an online service or an Internet service

provider.  This prohibition includes a computer at a public

library, an Internet cafe, your place of employment, or an

educational facility.

You are also prohibited from possessing an

electronic data storage medium.  That includes a flash drive,

a compact disk, or a floppy disk, or using any data encryption

technique or program.  If approved to possess or use any such

device, you must permit routine inspection of the device,

including the hard drive and any other electronic data storage

medium to confirm adherence of this condition.  The United

States Probation Officer must conduct the inspection in a

manner no more intrusive than necessary to ensure compliance

with this condition.  If this condition might affect a third

party, including your employer, you must inform the third

party of this restriction, including the computer inspection

provision.

You shall submit to a search of your person,

residence, place of business, any storage units under your

control, computer, or vehicle, conducted by the United States

Probation Officer, at a reasonable time and in a reasonable

manner based upon reasonable suspicion of contraband or

evidence of a violation of a condition of release.  You shall

inform any other residents that the premises may be subject to

175

search pursuant to this condition.  Failure to submit to a search may be grounds for revocation.

You shall be prohibited from incurring any new credit charges, opening additional lines of credit, or obligating yourself for any major purchases without the prior written approval -- or prior approval of your Probation officer.  Doesn't have to be written.  You shall provide the Probation officer access to any requested financial information.

If you are deported, you shall not re-enter the United States without the express permission of the appropriate governmental authority.

Having been convicted of a qualifying felony, you must cooperate in the collection of DNA as directed by probation.

The mandatory drug testing requirements of the Violent Crime Control Act are suspended.  However, you must submit to random drug testing not to exceed 104 tests per year.

Based on the financial status of the defendant, the Court will waive the imposition of a fine.

Are there any forfeiture matters pending?

MS. CHANG:  Yes, Your Honor.

THE COURT:  All right.  They will be part of the final judgment and sentence.

1          It is ordered the defendant shall pay a $200 special

2   assessment, $100 per count, which shall be due immediately.

3          After considering the advisory sentencing guidelines

4   and all the factors identified in Title 18 U.S. Code

5   Sections 3553(a)(1) through (7), the Court finds that the

6   sentence imposed is sufficient but not greater than necessary

7   to comply with the statutory purposes of sentencing.

8          The Court will not be ordering a fine pursuant to

9   18 United States Code Section 3014.

10          The Court has accepted the plea agreement because it

11   is satisfied that the agreement adequately reflects the

12   seriousness of the actual offense behavior and that accepting

13   the plea agreement will not undermine the statutory purposes

14   of sentencing.  Under the plea agreement, the defendant

15   entered pleas of guilty as to Counts Two and Three and

16   dismissal for Counts One and Four.  In accordance with the

17   plea agreement, Counts One and Four are dismissed.

18          The Court having pronounced sentence, Mr. Wagner, do

19   you have any objection to the sentence imposed or the manner

20   in which the Court imposed sentence other than those

21   previously stated for the record?

22          MR. WAGNER:  Yes, sir.  The objection would be the

23   sentence is substantively unreasonable.

24          THE COURT:  All right.  Thank you, Mr. Wagner.  That

25   is preserved for appeal.

1          Are there any objections from the United States?

2          MS. CHANG:  No, Your Honor.  I would ask that the

3    no-contact order be included in the judgment.

4          THE COURT:  Would the defense like to be heard on

5    this request?

6          MR. WAGNER:  No, sir.  We don't object.

7          THE COURT:  All right.  As another condition,

8    neither the defendant nor anyone acting in concert with or at

9    the behest of the defendant shall have contact with the victim

10   or her family, friends, or employers, past, present, or

11   prospective, by any means, including but not limited to

12   verbal, telephonic, or electronic means.  It will be the

13   defendant's duty and the duty of anyone acting on his behest

14   and in concert with him to affirmatively absent himself from

15   her presence and from contact with her, her family, friends,

16   or employers, past, present, or prospective.

17         The defendant is hereby remanded to the custody of

18   the U.S. Marshal to await designation by the Bureau of

19   Prisons.

20         To the extent permitted by your plea agreement, you

21   do have the right to appeal from the judgement and sentence

22   within 14 days from the entry of this judgement.  Failure to

23   appeal within that 14-day period shall constitute a waiver of

24   your right to appeal.  The Government may also file an appeal

25   from this sentence as well.

1        You are also advised that you are entitled to the

2   assistance of counsel in taking an appeal and that if you

3   cannot afford a lawyer, one will be provided for you.  If you

4   are unable to afford the filing fee, the Clerk will be

5   directed to accept notice of appeal without such fee.

6        Is there anything further from the Government?

7        MS. CHANG:  No, Your Honor.

8        THE COURT:  Mr. Wagner, anything further from the

9   defense?

10       MR. WAGNER:  Request a recommendation that

11  Mr. Desphande be sent to a facility in or as close to the

12  State of California as possible.  That's where his children

13  are.  And I believe he's got a brother in Oregon.  That's his

14  only family other than his soon to be ex-wife that I know of

15  who live in the United States.

16       THE COURT:  Would the Government like to be heard on

17  that request?

18       MS. CHANG:  No, Your Honor.

19       THE COURT:  All right.  For familial proximity, the

20  recommendation of the Court is that he will be placed in a

21  Bureau of Prisons facility as close to the west coast,

22  specifically California, as possible.

23       Anything else, Mr. Wagner?

24       MR. WAGNER:  No, Your Honor.

25       THE COURT:  All right.  Thank you both.  Court's in

179

1    recess.

2         (WHEREUPON, this matter was concluded at 4:55 p.m.)

3                            *   *   *

4              <u>CERTIFICATE OF REPORTER</u>

5
    I certify that the foregoing is a correct transcript of the
6    record of proceedings in the above-entitled matter.

7
     _/s/ Suzanne L. Trimble_____          _6/10/19_
8    Suzanne L. Trimble, CCR, CRR, RPR            Date
    Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25